1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  ELIZABETH SALVESON, State Bar #83788
   Chief Labor Team
3  MARGARET W. BAUMGARTNER, State Bar #151762
   ADELMISE WARNER, State Bar #215385
4  Deputy City Attorneys
   Fox Plaza
5  1390 Market Street, Floor No. 5
   San Francisco, California 94102-5408
6  Telephone:    (415) 554-3930
   Facsimile:    (415) 554-4248
7
   Attorneys For Defendants
8  CITY AND COUNTY OF SAN FRANCISCO ET AL.

9            UNITED STATES DISTRICT COURT

10          NORTHERN DISTRICT OF CALIFORNIA

11  CLIFFORD COOK,                        Case No. C 07 2569 CRB

12              Plaintiff,                **DECLARATION OF MARGARET W.**
                                          **BAUMGARTNER IN SUPPORT OF**
13      vs.                               **DEFENDANTS' MOTION FOR**
                                          **PARTIAL SUMMARY JUDGMENT**
14  CITY AND COUNTY OF SAN
    FRANCISCO, ANTONIO FLORES,
15  DON SLOAN, MARSHA ASHE, and           Date:  Feb. 22, 2008
    DOES 1-50, inclusive,                 Time:  10:00 a.m.
16                                        Place: Ctrm. 8, 19th Fl.
                Defendants.
17                                        Date action filed:
                                          Trial date:  None set
18

19

20

21

22

23

24

25

26

27

28

---

**Baumgartner Dec. / MSJ CASE NO. C 07 2569 CRB**                    n:\labor\li2007\080165\00461300.doc

1      I, Margaret W. Baumgartner, declare:

2   1.  I am a Deputy City Attorney with the San Francisco City Attorney's Office.  I am the attorney

3       assigned to this matter.  I have personal knowledge of the facts contained herein, except for

4       those facts stated on information and belief, and as to those facts I believe them to be true.  If

5       called upon to testify, I could and would testify competently hereto.

6   2.  Attached hereto as Exhibit 1 are pertinent pages from the deposition of plaintiff Clifford Cook.

7   3.  Attached here as Exhibit 2 is a print out of the minute order reflecting the Court's ruling granting

8       the City's motion to dismiss plaintiff's due process claim without leave to amend.

9       I declare under the penalty of perjury under the laws of the State of California that the

10  foregoing is true and correct.

11      Dated:  January 18, 2008

12

13

14                                      Margaret W. Baumgartner
                                        Deputy City Attorney
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**NOTICE/ MSJ CASE NO. C 07 2569 CRB**                    n:\labor\li2007\080165\00461300.doc

# EXHIBIT "1"

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CLIFFORD COOK,                                    CERTIFIED COPY

        Plaintiff,

vs.                              CASE NO. C07 2569

CITY AND COUNTY OF SAN
FRANCISCO, ANTONIO FLORES,
DON SLOAN, MARSHA ASHE, and
DOES 1 - 50, inclusive,
        Defendants.
_____/

DEPOSITION OF
CLIFFORD COOK
December 4, 2007

Reported by:          HANNAH KAUFMAN & ASSOCIATES, INC.
SUSAN IMPERIAL          Certified Shorthand Reporters
CSR #11219            472 Pacheco Street
                      San Francisco, CA 94116
                      (415) 664-4269

HANNAH KAUFMAN & ASSOCIATES, INC.

1     Q.  How long have you been in the Operation Center?

2     A.  Since August.  Someplace around the 14th, I

3   think.  14th or 15th of August.

4     Q.  Of this year?

5     A.  Of this year.

6     Q.  Where were you before the Operation Center?

7     A.  Robbery detail.

8     Q.  When did you start working for the robbery

9   detail?

10     A.  I think in May of -- I guess May of 2002.

11     Q.  When did you join the department?

12     A.  When did I --

13     Q.  When did you become a police officer?  When did

14   you join the department?

15     A.  In June of '91.

16     Q.  And you've been working for the S.F.P.D. ever

17   since that time?

18     A.  Yes.

19     Q.  Do you currently have any other jobs?

20     A.  No.

21     Q.  Have you ever worked in the domestic violence

22   unit?

23     A.  No.

24     Q.  What are your current -- what are your current

25   tasks at the Operation Center?  What does somebody who

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1   works in the Operation Center do?

2       A.  You field phone calls from patrol and, if

3   necessary, you contact the different inspectors that the

4   crime may relate to.

5       Q.  So that's an internal -- it's what I think is

6   colloquially referred to as a desk job?

7       A.  It's a non-public-contact job.

8       Q.  And you're currently disarmed.  Is that correct?

9       A.  Yes.

10      Q.  Have you made a request to the Weapons Review

11  Panel to be re-armed?

12      A.  No.

13      Q.  Where do you currently reside?

14      A.  San Francisco.

15      MR. SCOTT:  You know the law better than I do on

16  this one.

17      MS. BAUMGARTNER:  I was just going to ask.

18  That's why I was pausing.  I was figuring out how to ask

19  this question.

20      Q.  Does the department have your current address?

21      A.  Yes.

22      Q.  All right.  Does anyone reside with you at your

23  current address?

24      A.  No.

25      Q.  How long have you lived where you currently live?

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1       A.  I had no idea because they didn't explain it to

2   me.  Don Sloan downstairs, he didn't say what they wanted

3   to talk about.  He just said, "We need to talk to you up

4   in 400."

5       Q.  Was Lieutenant Sloan assigned to DV at that time?

6       A.  Yes.

7       Q.  And you were aware of that?

8       A.  Yes.

9       Q.  So you went to robbery, and then you walked over

10  with Lieutenant Loftus.

11          And was Mike Lewis still with you?

12      A.  Mike Lewis had left and -- Mike Lewis left.  He

13  had to go up to his office, and he came back downstairs.

14      Q.  So when you were walking between robbery and Room

15  400, you were with John Loftus?

16      A.  Correct.

17      Q.  And no one else?

18      A.  No one else.

19      Q.  And so what happened when you showed up in Room

20  400?

21      A.  Walked into 400, Captain Cashman was there.  Then

22  Mike -- so we waited for Mike to show up before we go into

23  the room.

24      Q.  How did it come about that you waited for Mike?

25      A.  Because we were in the lobby.  Because I wanted

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1  Mike to be in the room with us when we were going to have

2  our discussion.

3      Q.  So you asked Captain Cashman to wait for Mike?

4      A.  Yeah.  I said we were waiting for Mike.

5      Q.  How long did you have to wait for Mike?

6      A.  I don't know.  Less than five minutes.

7      Q.  Did Captain Cashman have a conversation with you

8  while you were waiting?

9      A.  I don't recall.

10     Q.  What was your understanding of why Captain

11  Cashman was there?

12     A.  That's his office.  He works at 400.

13     Q.  He was in your chain of command, correct?

14     A.  Yes.  He's above John Loftus.

15     Q.  So he's John Loftus's boss?

16     A.  Correct.

17     Q.  Okay.  And what happened after -- is it Inspector

18  Lewis?

19     A.  No.  Officer.

20     Q.  Officer Lewis.  What happened after Officer Lewis

21  showed up?

22     A.  We all went into the room.

23     Q.  That's the conference room right there to the

24  left in Room 400?

25     A.  No.  We actually weren't in the conference room.

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1   We were in the other captain's office.  So that was the

2   office of -- John Hennessey's office.

3       Q.  So you went into John Hennessey's office?

4       A.  Right.

5       Q.  Was John Hennessey there?

6       A.  No.

7       Q.  So it was you, Captain Cashman, John Loftus, Mike

8   Lewis.  Was anybody else present?

9       A.  Yeah.

10      Q.  Who else?

11      A.  Lieutenant Don Sloan and Captain Marsha Ashe.

12      Q.  Was Deputy Chief Tabak there?

13      A.  No.

14      Q.  So what happened when you were all in the room?

15      A.  They had a tape going on the table, and they

16  informed me that I was going to be arrested on an

17  allegation of domestic violence.  After they informed me

18  of the arrest, they informed me that there was a tape

19  going.

20      Q.  Okay.  And what happened after they said you

21  would be arrested?

22      A.  I told them, "On an allegation?"

23          And they said, "Yes."

24          And Sloan made the comment that, "We were

25  investigating this thing up to 11:00 o'clock last night."

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1    And then I said, "No one has heard my side of the

2   story."

3    Q.  And what happened after that?

4    A.  I told them they hadn't heard my side of the

5   story.  Don Sloan did inform me that Lisa had injuries; a

6   possible broken finger and bruises.  And I can't -- and

7   then they basically left out of the room.

8    Q.  Besides you saying they hadn't heard your side of

9   the story, did you say anything else?

10    A.  Yeah.  I said she was drunk, and I can't recall

11   what else I said.

12    Q.  Did they read you Miranda rights?

13    A.  No.

14    Q.  And then what happened?

15    A.  We sat down, Captain Cashman left the room.  And

16   I presume he called Steve Johnson, the POA rep, because

17   moments later, he came up to Room 400.

18    Q.  Had you previously called a union rep?

19    A.  No.

20    Q.  So even though you had been disarmed the day

21   before, a couple of days before, you never called a union

22   rep?

23    A.  No.

24    Q.  So Captain Cashman returned to the room with

25   Steve Johnson?

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.  He returned to the room, Steve Johnson returned

2  moments later.

3    Q.  And then what happened?

4    A.  We were then discussing the whole situation; the

5  arrest, the allegations.  Steve Johnson advocated for

6  Captain Cashman to go out and ask Lieutenant Sloan and

7  Captain Ashe for me to give a statement on what happened.

8  Captain Cashman left the room, went out, and spoke to

9  Lieutenant Ashe --

10    Q.  I'm sorry, I missed something here.  When you say

11  Captain Cashman left the room and you believe he called

12  Steve Johnson, were Lieutenant Sloan and Captain Ashe

13  still in the room?

14    A.  No.

15    Q.  When did they leave?

16    A.  They left momentarily after they told me that I

17  was being arrested on an allegation, the injury.  I made

18  the statement about her being drunk, no one heard my side

19  of the story.  They then left the room.

20    Q.  How long were you in that room when Don Sloan and

21  Captain Ashe were also present?

22    A.  Maybe five minutes.

23    Q.  And then when Captain Cashman left, Mike Lewis

24  and John Loftus were still in the room?

25    A.  Yes.

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.  And then Cashman and Johnson showed up.  So

2 again, there were five of you in the room?

3    A.  Well, Cashman called Johnson, I presume.  And

4 Cashman came back into the room, and then Steve Johnson

5 showed up.

6    Q.  Okay.  Then you had a conversation, and Steve

7 Johnson encouraged Captain Cashman to go talk to Don Sloan

8 and Marsha Ashe?

9    A.  Well, Steve Johnson, the PR rep, stated that we

10 can have an attorney up here in a matter of minutes, let

11 him give a statement on what happened; his side of the

12 story.

13    And Captain Cashman went outside the room and

14 spoke, I presume, to Ashe and Sloan.  And he came back in

15 and said, no, they won't do it.

16    Q.  Won't do what?

17    A.  Won't let me give a statement.  Statement or

18 interview.

19    Q.  So who actually put you under arrest?

20    A.  Well, Captain Ashe and Lieutenant Sloan.  Their

21 name was on the arrest cards.  On the booking cards.  And

22 they were the only two officers in the room opposite the

23 people that I brought in.

24    Q.  And so when Captain Cashman left the room to

25 presumably go call Steve Johnson, at that point you were

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1    under arrest, correct?

2        A.  Yeah.  I was under arrest.  The moment they told

3    me I was being arrested on an allegation, I was under

4    arrest.

5        Q.  And who actually did that?  Was it Lieutenant

6    Sloan or Captain Ashe?

7        A.  Well, Captain Ashe I believe said, "You're under

8    arrest."  Well, Captain Ashe said that, "We're arresting

9    you on an allegation."  She said, "You're going to be

10   placed under arrest for DV."

11            And I said, "You're arresting me on an

12   allegation?"

13       Q.  Did Deputy Chief Tabak ever come in?

14       A.  Never.

15       Q.  And so after Cashman came back in and said that

16   they wouldn't let you give a statement, what happened?

17       A.  We were arranging to make bail.  Mike Lewis -- we

18   started inquiring what bail would be -- the cost of bail.

19       Q.  And inquiring of whom?

20       A.  Inquiring -- well, from Ashe and Sloan.  Because

21   they were the arresting officers.

22            And they had Inspector Flores, who was the lead

23   investigator on the case.  And usually a bail schedule is

24   set for such incidents pertaining towards each charge.

25   And it was easy enough to know what the Ciardellages were,

DEPOSITION OF CLIFFORD COOK

1   so the bail schedule would have been very easy to find

2   out.  Because the DV inspectors -- the charges never

3   change practically in DV.  So the bail schedule we believe

4   was $50,000.

5       Q.  So you were discussing bail while you were still

6   in Captain Hennessey's office?

7       A.  Yes.  Because I was under arrest.

8       Q.  And who -- was everybody discussing the amount of

9   possible bail?

10      A.  Everyone who was in the room, yes.

11      Q.  And at this point --

12      A.  Everyone may not have joined in the conversation,

13  but we were discussing the bail amount.  And John Loftus

14  was in between finding out what the bail was going to be.

15      Q.  I see.  So at some point, Lieutenant Loftus left

16  the room?

17      A.  Yes.  Went outside.

18      Q.  And who do you believe he went and spoke to?

19      A.  Ashe and Sloan.

20      Q.  And what did he inform you that Ashe and Sloan

21  had said?

22      A.  Then he came back in the room, and we were

23  informed that there had been a bail enhancement of

24  $50,000.

25      Q.  So who informed you of that?

1      MS. BAUMGARTNER:  Did he know it then.

2      WITNESS:  They were asking for a bail

3  enhancement, and they hadn't -- while we were in the room,

4  Loftus informed us that they were asking for a bail

5  enhancement.  We didn't know what the amount was going to

6  be until -- Inspector Flores was at the judge -- I believe

7  at the time, in front of the judge requesting the bail

8  enhancement.

9      MS. BAUMGARTNER:  Q.  So you knew while you were

10  still in --

11      A.  They were asking for a bail enhancement.

12      Q.  Let me finish the question.

13      You knew while you were still in Captain

14  Hennessey's office that Inspector Flores would be asking

15  for a bail enhancement, but you didn't know at that time

16  that one had been ordered?

17      A.  I knew at the time that he was at the judge

18  asking for a bail enhancement.

19      Q.  Oh, I see.  That's done outside your presence?

20      A.  Yes.  It has to go through a Superior Court judge

21  with an affidavit and the reasons why they're requesting

22  bail enhancement for approval.

23      Q.  I see.  So you knew he was asking for bail

24  enhancement?

25      A.  Yes.  That's what I was informed.  That they were

1  asking for a bail enhancement.

2  Q.  And did anybody inform you at the time the basis

3  for asking for the bail enhancement?

4  A.  No.

5  Q.  And then what happened after that discussion

6  about bail?

7  A.  Mike Lewis left the room, he went across the

8  street and arranged bail.

9  Q.  With a bail bonds person?

10  A.  Yes.

11  Q.  So he left the room, then what happened?

12  A.  We were all in the room together, and I just, you

13  know, couldn't believe what was happening.

14  Q.  Did you ever go down to whatever room it is where

15  you get fingerprinted?  375 or something like that?  The

16  ID --

17  A.  Why would I go there?

18  Q.  I don't know.  I'm just asking.

19  A.  No.

20  Q.  Okay.  How long were you in Captain Hennessey's

21  office total?

22  A.  I don't know.  Until everything was concluded

23  with the bail.

24  Q.  Do you have an estimate as to how long that took?

25  A.  45 minutes to an hour maybe.

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.  During this entire time, you were waiting in

2  Captain Hennessey's office?

3    A.  Correct.

4    Q.  Where did you go after Captain Hennessey's

5  office?

6    A.  While in Captain Hennessey's office, they took my

7  property from me -- my watch, my rings, all my stuff they

8  needed to book in -- and then they took me to CJ9 where

9  they had broadcasted over citywide band that the jail was

10  being closed because they were booking a police officer.

11    Q.  So what kind of property did they take?

12    A.  My cufflinks, my watch, my ring, my belt, my

13  money, my tie, all my stuff that you're not allowed to

14  have in jail.

15    Q.  And who took that?

16    A.  Lieutenant Loftus and Captain Cashman inside of

17  Captain Hennessey's office.

18    Q.  And then, I'm sorry, then they took you to CJ9?

19    A.  Oh.  Prior to that, though, the key factor is

20  that when Lieutenant -- Captain Ashe -- I mean, Captain

21  Cashman came back in and told me I wouldn't be able to

22  give a statement, Lieutenant Sloan came back into the room

23  and made a statement in front of us that no matter what I

24  said, it wasn't going to change anything.

25    Q.  Okay.  So Lieutenant Sloan at some point returned

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.  Yeah.

2    Q.  Someone's been arrested.

3    A.  Right.

4    Q.  The DA's Office can then rebook, which means that

5  they actually charge someone with a crime at that

6  particular time?

7    A.  Right.

8    Q.  File what's considered a criminal complaint, I

9  suppose?

10    A.  Right.

11    Q.  Then you said that they can be kicked and

12  released?

13    A.  Well, if someone has been arrested and the DA

14  doesn't charge that case -- when someone is arrested,

15  they're in the jail.  The case goes to whatever bureau it

16  happens; DV, burglary, or whatever.  Whatever that person

17  has been arrested for.  It's a rebooking.  That inspector

18  gets that case, does the whole work-up on it, types

19  everything up, goes and interviews the suspect, talks to

20  the victim again, and takes that whole case down to the

21  DA.

22        At the time, the DA looks at the case, reviews it

23  and decides whether to kick it -- which means it's gone

24  bye-bye -- the suspect in custody is released, or the DA

25  recharges a case, or the DA can also 27 a case -- which

HANNAH KAUFMAN & ASSOCIATES, INC.

1  means further investigation -- and the suspect would be

2  released.  And that inspector would have to do more and

3  more work, then they would have to get a warrant for that

4  guy and bring him into custody.

5      MR. SCOTT:  But that's not what happened in this

6  case.

7      MS. BAUMGARTNER:  Well, first of all, I object to

8  you testifying.

9      Second of all, I'm trying to figure out what did

10  happen in this case.

11      MR. SCOTT:  I'm not testifying.  I'm just making

12  a point that your question is really irrelevant because

13  it's not what happened in this case.

14      MS. BAUMGARTNER:  Well, that's what we're trying

15  to determine, isn't it.

16      MR. SCOTT:  We already know what happened.  It's

17  in the chron.  It's documented.

18      MS. BAUMGARTNER:  Q.  So in this particular case,

19  you were arrested, correct?

20      A.  After the case had been presented to the DA.

21      Q.  Okay.

22      A.  And the DA refused to file it.

23      Q.  What is your understanding of what happened after

24  you were arrested with respect to the inspector's

25  communications with the DA?

HANNAH KAUFMAN & ASSOCIATES, INC.

1      Q. -- when you were informed that you were being

2  disarmed?

3      A. No.

4      Q. So you didn't call the union?

5      A. No.

6      Q. Is there a reason why not?

7      A. Is there a reason I should?

8      Q. Most people do upon getting disarmed.

9      A. Well, I mean, it's a Chief's Order. The way

10  things work in the police department, as you well know, it

11  takes forever and a day to get anything resolved. Just

12  calling the union would just be calling them, and that

13  would have been about it. It wasn't going to get anything

14  resolved for the next nine or ten, you know.

15     Q. Okay. So after you received this Chief's Order,

16  you were given an opportunity for a hearing, correct?

17     A. Correct.

18     MS. BAUMGARTNER: This will be Defendant's

19  Exhibit 9.

20                    (Whereupon, Defendant's

21                    Exhibit 9 was marked for

22                    identification.)

23     MS. BAUMGARTNER: Q. What is this document?

24     A. Well, it's a decision from the Chief stating that

25  I remain suspended pending a Police Commission hearing.

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1    Q.  So this indicates you had a hearing on

2  August 3rd, 2005, correct?

3    A.  I had a back-to-work hearing.  Yes.

4    Q.  And were you represented at that hearing?

5    A.  Yes.

6    Q.  By whom?

7    A.  James Collins.

8    Q.  And did you make a statement at the hearing?

9    A.  No.  It was a taped hearing.  And if I recall, I

10  didn't make any statements.  I mean, Mr. Collins did most

11  of the talking.

12    MR. SCOTT:  Just answer the question.

13    MS. BAUMGARTNER:  Q.  So as far as you know, you

14  didn't make a statement at the hearing?

15    A.  No.

16    Q.  Did you present anything about your side of the

17  story on the domestic violence allegations?

18    A.  Mr. Collins did all the talking.  He made

19  statements about that.

20    MS. BAUMGARTNER:  Let me mark this as Defendant's

21  Exhibit 10.

22                    (Whereupon, Defendant's

23                    Exhibit 10 was marked for

24                    identification.)

25    MS. BAUMGARTNER:  Q.  Have you seen this document

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1    A.  About six months ago, eight months ago.

2    Q.  Do you know if he was interviewed before he was

3    arrested?

4    A.  No.  I don't know.

5    Q.  What is his race?

6    A.  He's black.

7    Q.  Anybody else you can think of?

8    A.  His wife is white, too.  But that doesn't make a

9    difference, I guess.

10       No.  No one else.

11   Q.  Do you have any idea what percentage of the San

12   Francisco Police Department is African American?

13   A.  No.  Maybe 10, 11 percent.  Less than that, I

14   think.

15   Q.  Do you know what percent of those African

16   American officers are married to white spouses or spouses

17   of a different race?

18   A.  No, I don't.

19   Q.  Do you know how many interracial marriages there

20   are throughout the department?

21   A.  No, I don't.

22   Q.  So misconduct charges were eventually brought

23   against you, the case was filed with the Commission,

24   correct?

25   A.  Yeah.  About the 20th something of December of

DEPOSITION OF CLIFFORD COOK

1  last year.

2      Q.  Those charges are still pending?

3      A.  Yes.

4      Q.  And those charges included both the domestic

5  violence charges and the computer-related charges?

6      A.  Yeah.  And two more.

7      Q.  Two more what?

8      A.  Charges.  There's more charges.

9      Q.  What were the other charges?

10     A.  I think one was evading -- impeding an

11 investigation.

12     Q.  Oh, that was -- okay.  That was based on the gag

13 order in your --

14     A.  The court order.

15     Q.  Yeah.  Are there any dates scheduled in that

16 case?

17     A.  No.

18     Q.  To your knowledge, is there any law that actually

19 requires the police department to obtain some type of

20 commitment from the District Attorney's Office to

21 prosecute before the police department arrests somebody?

22     A.  One more time, please?

23     Q.  Is there any law, to your knowledge, that

24 requires the police department to obtain a commitment from

25 the District Attorney's Office to prosecute a matter

DEPOSITION OF CLIFFORD COOK

POLICE DEPARTMENT
## CITY AND COUNTY OF SAN FRANCISCO
THOMAS J. CAHILL HALL OF JUSTICE
850 BRYANT STREET
SAN FRANCISCO, CALIFORNIA  94103-4603

**HEATHER J. FONG**
CHIEF OF POLICE

**COPY** 

September 26, 2005

Inspector Clifford L. Cook
Star Number 881
Robbery Unit
850 Bryant Street
San Francisco, CA  94103

| | RECEIVED |
|---|---|
| Date: | 9/27/05 |
| Name: | |

Re:    JCT C05-094
       Return to Restricted Duty

Dear Inspector Cook:

On July 27, 2005, you were suspended from your duties and disarmed pending resolution of charges to be filed with the Police Commission. In the interim, the District Attorney's Office has declined to criminally prosecute you for charges related to the incident for which you were suspended.

Therefore, based on my understanding of this matter, I hereby order that you return to duty in the Robbery Detail, effective September 27, 2005. Your Star will be returned to you; however, you will remain unarmed, with the Identification Card you currently possess that does not allow for the possession of concealable firearms.  The July 27th order that you not carry a concealable firearm on or off duty remains in effect.

Report to the Commanding Officer of the Personal Crimes Division, Captain Kevin Cashman, at 0900 hours on September 27, 2005.

Sincerely,

HEATHER J. FONG
Chief of Police

cc:    Police Commission
       Human Resources
       Office of the Chief
       Deputy Chief Morris Tabak
       Captain Kevin Cashman
       Mr. James Collins, Esquire
       Mr. Steve Johnson, SFPOA
       Controller
       Personnel Division
       Payroll Section
       Management Control Division

C. Cook 12-4-07
**DEPOSITION
EXHIBIT
13**

# Memorandum

**San Francisco Police Department**

**To:**   Inspector Dan Gardner
Acting O.I.C./ Robbery Detail

ANTONIO T. PARRA #1021
Deputy Chief, Administration
*recvd. 9/29/05*

**From:**   Inspector Clifford Cook
Robbery Detail

Kevin Cashman
Captain #036

Deputy Chief Morris Tabak
Investigations Bureau

|  | YES | NO |
|---|---|---|
|  | ☑ | ☐ |
|  | ☑ | ☐ |
|  | ☐ | ☐ |

**Date:**   Tuesday, September 20, 2005

**Subject:**   Request to return to work

Sir:  On Monday, September 19, 2005, I was notified by you that the District Attorney's Office declined to file formal charges against me in the matter for which I am currently suspended.

I am requesting that I be allowed to return to work  immediately at my current assignment at the Robbery Detail.



C. Cook 12-4-07
DEPOSITION
EXHIBIT
14

Respectfully submitted,

# EXHIBIT "2"

## CIVIL MINUTES

**Judge CHARLES R. BREYER**

Date: **October 26, 2007**

**C-07-02569 CRB**

### CLIFFORD COOK  v.  CITY AND COUNTY OF SAN FRANCISCO

Attorneys:    Lizabeth N. De Vries _____        Margaret Baumgartner _____

_____        _____

Deputy Clerk: **BARBARA ESPINOZA** _____        Reporter:  **Sahar McVickar** __

**PROCEEDINGS:**                                                                          **RULING:**

1.  D's Motion to Dismiss _____        Granted in part/
                                                                                                        Denied in part

2. _____        _____

3. _____        _____

## ORDERED AFTER HEARING:

 The 1983 claim granted in part/denied in part, equal protection claims are denied, due process granted

without leave to amend , Monell claim is granted with leave to amend and the FEA claim is denied pending

resolution of the Title VII claim.  The defendant to take plaintiff's deposition not to exceed 4 hours with the

right to further deposition if the matter goes forward, plaintiff's discovery is limited to the 56f motion.

(  ) ORDER TO BE PREPARED BY:    Plntf _____  Deft _____  Court _____

(X) Motion for Summary Judgment filed on or before:   January 18, 2008 _____

(X) CASE CONTINUED TO February 22, 2008 @ 10:00 a.m. for  Motion _____

Discovery Cut-Off _____        Expert Discovery **Cut**-Off _____
Plntf to Name Experts by _____        Deft to Name Experts by _____
P/T Conference Date _____ Trial Date _____ Set for _____ days
                                      Type of Trial:  (  )Jury    (  )Court

Notes: _____

_____