John Houston Scott, SBN 72578
Lizabeth N. de Vries, SBN 227215
**SCOTT LAW FIRM**
1375 Sutter Street, Suite 222
San Francisco, CA 94109
Tel: (415) 561-9600
Fax: (415) 561-9609
john@scottlawfirm.net
liza@scottlawfirm.net

Attorneys for Plaintiff,
CLIFFORD COOK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD COOK,<br><br>        Plaintiff,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, ANTONIO FLORES, DON SLOAN, MARSHA ASHE, and DOES 1-50, inclusive<br><br>        Defendants. | Case No.: C 07-02569 CRB<br><br>**DECLARATION OF JOHN HOUSTON SCOTT IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Date**: February 22, 2008<br>**Time**: 10:00a.m.<br>**Place**: Courtroom 8, 19th Fl. |

I, John Houston Scott, declare as follows:

    1.    I am the attorney for the Plaintiff, Clifford Cook, and I make this Declaration in support of Plaintiff's Opposition to Defendants' Motion for Partial Summary Judgment.

    2.    Attached hereto is a true and correct copy of excerpts (40:13 - 42:1; 55:5 - 56:5; 56:6 - 12; 56:18; 63:1 - 66:6; 68:4 - 69:13; 69:14 - 20; 74:4 - 24; 99:21 - 104:6; 116:9 - 17; 109:1-110:4; 126:7 - 24; 126:23 - 24; 131:25 - 132:16; 132:17 -133:6; 140:4 - 10; 153:1 - 154:11; 166:9 - 17; 170:22 - 171:8; 171:24 - 172:13; 174:19 - 25; 177 -179; 187:3 - 10; 189:7 – 18) of the deposition transcript of Captain Marsha Ashe taken on January 16, 2008.

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct and that this declaration was executed this 1st day of February, 2008,

3    at San Francisco, California.

4

5

6    _____
     John Houston Scott

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JHS IN SUPPORT OF OPPOSITION TO DEFS MOTION FOR PARTIAL S.J.

SCOTT LAW FIRM
1375 SUTTER STREET, SUITE 222
SAN FRANCISCO, CA 94109

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CLIFFORD COOK,                    )
                                  )
              Plaintiff,          )
                                  )
      vs.                         )
                                  )   No. C 07-02569 CRB
                                  )
CITY AND COUNTY OF SAN            )
FRANCISCO, ANTONIO FLORES, DON    )
SLOAN, MARSHA ASHE, and DOES      )
1-50, inclusive,                  )
                                  )
              Defendants.         )
                                  )
_____    )


DEPOSITION OF CAPTAIN MARSHA ASHE

January 16, 2008


REPORTED BY:  A. MAGGI SAUNDERS,

          C.S.R. No. 2755

1          A.    It could be.

2          Q.    Okay.  And when you say "could be," what

3    do you mean?

4          A.    Well, there is a variety of things that

5    could happen that would make it a misdemeanor,

6    depending how they were scratched.

7                There is -- Oftentimes, if there is mutual

8    combat, we try to determine who the primary aggressor

9    is.  Many of those decisions are made at the Patrol

10   level.

11               There is a totality of circumstances that

12   are looked at in a Domestic Violence case.

13         Q.    Now, you used the term "mutual combat".

14   What does that mean?

15         A.    Well, that's -- We've spent a lot of time

16   talking about mutual combat in the Domestic Violence

17   community.

18               There are cases in which both participants

19   are equally engaged in a physical altercation, but we

20   still try to determine a primary aggressor in those

21   situations.

22         Q.    When you used the term "primary

23   aggressor," what does that mean?

24         A.    The person who is most at fault, or most

25   responsible for starting it.

                                                      40

1            If there was a situation that involved
2     self-defense, for example, that a primary aggressor
3     would be the one who initiated the physical
4     altercation, as opposed to the one who attempted to
5     defend themselves.
6            Q.    Okay.  Could someone be a primary
7     aggressor based only on words, as opposed to action?
8     In other words, taunting somebody:  Can you be a
9     primary aggressor by taunting somebody, or calling
10    somebody names?
11           A.    No.
12           Q.    Why not?
13           A.    Because you didn't physically begin an
14    altercation.
15           Q.    Okay.  So the primary aggressor would be
16    the first person to take it from being verbal, to
17    become physical.
18           A.    Generally.
19           Q.    Okay.  And could "physical" include, say,
20    throwing something at someone?
21           A.    Yes.
22           Q.    And I take it, some of the cases that you
23    are involved in, the Domestic Violence incidents that
24    might be characterized as "mutual combat," they start
25    with somebody throwing something at someone?

                                                      41

```
 1          A.      They could.
 2          Q.      Okay.  And if -- In mutual combat,
 3   situations, how do you try to find out who the primary
 4   aggressor is?
 5          A.      Based on injury and statements and
 6   physical evidence.
 7          Q.      Okay.  So, what if someone is the primary
 8   aggressor, threw the first punch or the kick or, you
 9   know, was the initial aggressor, physical aggressor,
10   but then got injured:  What do you do in those cases?
11                  MS. BAUMGARTNER:  Objection.  Incomplete
12   hypothetical; but to the extent you can answer, you can
13   answer.
14                  THE WITNESS:  Well, I'm not sure I
15   understand your question.
16                  MR. SCOTT:  Q.  Okay.  Let's say a woman,
17   you know, kicks her husband, okay, and bites him, okay,
18   kicks and bites him, okay, first.  She's the initial
19   aggressor.
20                  And then, the husband, during this
21   struggle, hits her back, throws her, and she gets an
22   injury.  Is that -- Has the husband committed felony?
23                  MS. BAUMGARTNER:  Objection.  Incomplete
24   hypothetical, and calls for a legal conclusion.
25                  MR. SCOTT:  Q.  No, just under those --

                                                       42
```

1    infinite number of situations, and we could be here for

2    years discussing all the possible variables, and we --

3    I don't have time for that.

4         Q.    I just gave you one simple hypothetical.

5              So, the officers don't have discretion, if

6    a spouse says, "My spouse hit me, and it hurts":

7              That's an automatic felony arrest; is

8    that right?

9              MS. BAUMGARTNER:   Objection:   Incomplete

10   hypothetical; vague.

11             MR. SCOTT:   Q.   Is that correct?

12        A.    Technically, officers have almost no

13   discretion at the scene of a domestic violence, when

14   there has been injury --

15        Q.    Okay.

16        A.    -- unless there is compelling evidence to

17   the contrary --

18        Q.    Okay.

19        A.    -- and it has to be overwhelmingly --

20        Q.    Okay.   Now, you said "at the scene".   What

21   does that mean, "at the scene"?

22        A.    Most arrests in domestic violence occur at

23   the time, or very close to the time of the incident.

24        Q.    Why is that?

25        A.    Because of the mandated arrest policy.

55

1          Officers are called to the scene of a

2     domestic violence; there is evidence that supports the

3     victim's statement when the arrest is made.

4          That is the majority of cases that we

5     handle.

6          Q.    What if a spouse waits a week to complain,

7     is it still mandated?

8          A.    It becomes more difficult to have the

9     supporting evidence for the arrest; but the arrest

10    itself is not mandated:  You have an opportunity to

11    review a case in a way that is different from being

12    there at the scene.

13         Q.    How is it different?

14         A.    Well, for one thing, there has been a

15    week's lag time.  There is not the ongoing situation.

16    It's calmed down.  You may have lost evidence; you may

17    have developed more evidence.

18         There is -- It's a more complex situation.

19         Q.    A person could claim an injury that

20    occurred two or three days after the so-called assault,

21    right?

22         A.    Absolutely.

23         Q.    And a person may have -- things may have

24    happened in a week that would give a person a motive to

25    make a false allegation.

56

1      Q.      How long have you known him?

2      A.      I've known Clifford, to nod "hello" to,

3  for five years.

4      Q.      And how did you first meet him?

5      A.      I first met him the afternoon that he was

6  arrested.  I don't remember meeting him before that, or

7  knowing his name, or who he was exactly, prior to this

8  case.

9      Q.      And when did you have him arrested?

10     A.      I think it was on the 28th, 27th, 28th of

11 July of 2005.

12     Q.      Who was the Arresting Officer?

13     A.      I suppose, technically, I was.

14     Q.      Well, were you the only Arresting Officer?

15             MS. BAUMGARTNER:  Objection.  Vague.

16             MR. SCOTT:  Q.  Do you understand the

17 question?

18     A.      Not really.  I don't know whose name went

19 on the Booking Card as "Arresting Officer".

20     Q.      Should it have been your name?

21     A.      Not necessarily.  There were other

22 officers in the room.

23     Q.      Did someone else assist you in making that

24 arrest?

25     A.      There were other people in the room, yes.

63

1    Q.    No, I didn't ask who was in the room.

2          I asked, did someone else assist you in

3    making the arrest.

4          MS. BAUMGARTNER:  Objection.  Vague.

5          THE WITNESS:  There wasn't any assistance

6    that was needed.

7          MR. SCOTT:  Q.  Okay.  Was Lieutenant

8    Sloan also an Arresting Officer?

9          MS. BAUMGARTNER:  Objection.  Vague.

10         THE WITNESS:  I don't know who went on the

11   Booking Card as "Arresting Officer".

12         Lieutenant Sloan was in the room.

13         MR. SCOTT:  Q.  If Lieutenant Sloan's name

14   was on the Booking Card, would that make him an

15   Arresting Officer?

16    A.    Well, what makes an Arresting Officer is

17   not necessarily what goes on the Booking Card.

18         An Arresting Officer, in this setting, is

19   not as clear as in a field setting.

20         I informed, as I recall, Inspector Cook

21   that he was under arrest and, in that sense, I suppose

22   that makes me the Arresting Officer.

23    Q.    Was Lieutenant Sloan present at the time?

24    A.    Yes.

25    Q.    Do you know who took my client into

                                                      64

1  custody?

2              MS. BAUMGARTNER:  Objection.  Vague.

3              MR. SCOTT:  Q.  Go ahead.

4        A.    No, not in the sense of --

5              You know, again, an Arresting Officer

6  takes somebody into custody, and I suppose that that

7  would be me, in the sense that I did tell Inspector

8  Cook he was under arrest.

9        Q.    Okay.  This afternoon in July, when you

10 told him he was under arrest, this would be July 2005,

11 or. . .

12       A.    2005.

13       Q.    2005.

14             Had you had any contact with Mr. Cook

15 prior to that time?

16       A.    No.

17       Q.    Did -- Had you ever seen him prior to that

18 time?

19       A.    Yes.

20       Q.    And where had you seen him?

21       A.    He worked in the Robbery Detail, which is

22 Room 400.  I worked in Room 400.  We would nod to each

23 other in the hallway.

24       Q.    Did you know him by reputation prior to

25 July 2005?

65

```
 1          A.     No.  Well, I take that back:
 2                 I knew -- I never put a face with the
 3     name, but I did hear Clifford Cook talked about in
 4     the Robbery Detail with affection.  So, I knew that
 5     he was well-liked.  That was the reputation that I
 6     had about him.
 7          Q.     Can you give me an example of things that
 8     you heard said that led you to believe he was
 9     "well-liked"?
10          A.     I don't remember anything specifically.
11          Q.     So, based on what you had heard from other
12     officers, he had a good reputation?
13          A.     He was well-liked.
14          Q.     Okay.  Did you -- But, by reputation, had
15     you heard anything negative about him?
16          A.     No.
17          Q.     Did you know anything about his work
18     history?
19          A.     No.
20          Q.     Did you have access to his personnel file?
21          A.     No.
22          Q.     Why not?
23          A.     We don't have access to personnel files.
24     There has to be a reason to access a personnel file.  I
25     certainly never had one.
```

1        Q.    Okay.

2        A.    -- if it related to domestic violence,

3   yes, that would have been relevant.

4        Q.    Okay.  And did you attempt to determine,

5   as part of your investigation before you arrested him,

6   whether he had a history of domestic violence?

7        A.    Yes.

8        Q.    And what did you find out?

9        A.    There were four prior allegations in

10  outside jurisdictions, three or four.  The number, I

11  don't recall specifically.

12       Q.    And was that something you had specific

13  information about?

14       A.    That was information provided by the

15  victim and corroborated by calls for police services in

16  other jurisdictions.

17       Q.    Okay.  And what did you get to corroborate

18  the allegations?

19       A.    There were CAD, or whatever the -- there

20  were histories that documented those calls for

21  services.

22       Q.    Okay.  And you said three or four?

23       A.    Three or four.

24       Q.    And what do you know about those three or

25  four?

68

```
 1              A.     Just that there were three or four

 2     allegations:  One of which involved an incident of

 3     drinking; one of following, or -- up in Napa.

 4                     You know, the particulars, if I knew, I

 5     have certainly forgotten.

 6              Q.     Did any of them involve violence or

 7     injuries?

 8              A.     I don't believe there were any allegations

 9     of injury.

10              Q.     Oh.  So, there was a history of some, I

11     guess, reports to police, but no prior history of

12     injuries or violence, correct?

13              A.     As I recall.

14              Q.     All right.  And the victim, what was her

15     name?

16              A.     Lisa.

17              Q.     And when did you first meet her?

18              A.     I never met her.

19              Q.     Did you ever talk to her?

20              A.     No.

21              Q.     And the information you had about her

22     allegations, from whom did you obtain that information?

23              A.     We got that information from Lieutenant

24     Sloan.

25              Q.     And when did you get --
```

```
 1          Q.    When did you see a picture of her?

 2          A.    When I reviewed the file; I think that was

 3   in August.

 4          Q.    Okay.  When did you first discover that

 5   she was Caucasian?

 6          A.    I don't remember.  It didn't -- It didn't

 7   matter.  Probably in reviewing the pictures or -- it --

 8   My sense -- Well, that's not correct.

 9                My sense was that she was Caucasian,

10   because of talking about bruising.

11          Q.    Okay.  So --

12          A.    And that was early on; and pictures that

13   she had taken, or had had taken of bruises.

14          Q.    And those were part of the file before the

15   arrest?

16          A.    I don't know where those were before the

17   arrest.  I reviewed the file in August, and saw those

18   pictures.

19          Q.    Did you see the pictures before you made

20   the arrest?

21          A.    No.

22          Q.    Were you aware of alleged bruises before

23   you made the arrest?

24          A.    Yes.

25          Q.    And who told you about the bruises?
```

                                                          74

1    know -- I don't believe that's the phrase she used, so

2    I believe that's a vague question.

3              MR. SCOTT:  Can you read back about two

4    questions and answers ago?  Was there an answer where

5    the witness used the term "decline to prosecute".

6              (The record was read by

7              the Reporter as requested.)

8              MS. BAUMGARTNER:  I apologize.  I did not

9    hear the word "decline".

10             MR. SCOTT:  Fair enough.  It happens to me

11   all the time.

12        Q.   When you used the term, "decline to

13   prosecute," what did you mean by that?

14        A.   I meant the same thing I meant with

15   "discharging a case".  The standard for an arrest is

16   different, and certainly much lower, than the standard

17   of proof in a criminal court case.

18             And it's the District Attorney's Office,

19   after the arrest is made, who has the responsibility

20   to review cases for the likelihood of a conviction.

21        Q.   Are you aware of any cases where a

22   District Attorney reviewed a case before an arrest was

23   made?

24        A.   In an arrest warrant case, that obviously

25   happens.  That information is presented to the District

99

DEPOSITION OF CAPTAIN MARSHA ASHE

1  Attorney.

2          We oftentimes review cases with the

3  District Attorney before an arrest is made, for a

4  variety of reasons:  Not for approval, but just to

5  see what additional charges may exist; what we may be

6  missing; and if we have an opportunity prior to an

7  arrest for investigative steps, we bring the District

8  Attorney in, as a matter of course, on many, many

9  cases.

10          Q.    So it's not unusual to have the District

11  Attorney's Office review a Domestic Violence case

12  before an arrest is made.

13          A.    Actually, it is unusual.

14          Q.    Okay.

15          A.    It's not unusual to discuss a case with

16  the District Attorney before the arrest, but most of

17  our cases come to us already with an arrest made.

18          Q.    Okay.  But in the cases where an arrest

19  hasn't been made, is it unusual to discuss the case

20  with the District Attorney before an arrest is made?

21          A.    No.

22          Q.    All right.

23          A.    Once the case is being investigated.

24          Q.    And would it be unusual to arrest someone

25  after the District Attorney has told you that she is

                                                    100

1    not going to prosecute the case?

2         A.    It would be unusual, yes.

3         Q.    How many times has that occurred since

4    you've been assigned to the Domestic Violence Unit?

5         A.    I have never been told by a District

6    Attorney that they weren't going to prosecute a case

7    prior to an arrest.

8         Q.    Okay.  You mean, directly.

9         A.    Or indirectly.

10        Q.    Oh.  And if you were aware of that, would

11   you make an arrest?

12        A.    Possibly --

13              MS. BAUMGARTNER:  Objection.  Calls for

14   speculation.

15              MR. SCOTT:  Q.  Go ahead.

16        A.    Possibly.

17        Q.    Why?

18        A.    The District Attorney doesn't approve our

19   arrests.  The level of --

20              The requirement to make an arrest is .

21   very different from the requirements necessary to

22   proceed with a criminal case.

23              And based on the totality of circumstances

24   in a case, it would be unusual, and it would -- it

25   would absolutely be unusual.

                                                    101

1            I would want to know what the District

2    Attorney's concerns were, and if we could address

3    those prior to making an arrest.

4        Q.    But would it be a futile gesture, if the

5    DA had told you she wasn't going to prosecute, and then

6    you went and arrested anyway?

7            MS. BAUMGARTNER:  Objection.  Calls for

8    speculation.  Incomplete hypothetical.

9            MR. SCOTT:  Q.  Go ahead.

10       A.    No, I don't think it would be a futile

11   gesture to make the arrest.  We have a legal

12   responsibility to arrest on Probable Cause.

13       Q.    Even -- But you've never done it, as far

14   as you know.

15       A.    Arrested on Probable --

16           MS. BAUMGARTNER:  Objection.  Vague.

17           MR. SCOTT:  Q.  Arrest someone, after the

18   DA told you she wasn't going to prosecute.

19       A.    I've never been told by the District

20   Attorney that they were not going to prosecute a case,

21   and then made an arrest on it; but I've never had a

22   discussion personally with the District Attorney about

23   an arrest prior to making an arrest.

24       Q.    Okay.  Have you ever been informed through

25   your staff that the District Attorney was not going to

                                                    102

1    prosecute, and then approved an arrest?

2         A.    No, I have not.

3         Q.    Why not?

4              MS. BAUMGARTNER:  Objection.  [Inaudible]

5              MR. SCOTT:  Let me ask it another way.

6         Q.    Is that because the facts were never

7    egregious enough?

8              MS. BAUMGARTNER:  I think this lacks

9    foundation.  Objection:  Lacks foundation.

10             MR. SCOTT:  Q.  Fair enough.  Go ahead.

11        A.    I don't understand your question.

12        Q.    Well, you have testified that you have

13   never had someone arrested, after you learned that the

14   District Attorney did not want to prosecute the case,

15   correct?

16        A.    That is correct.

17        Q.    And my question is, although you can

18   hypothetically conceive of a situation where you might

19   do that, correct?

20        A.    Yes.

21        Q.    Okay.

22             So my question is, you have never come

23   across the situation that you thought was so

24   egregious, where you felt compelled to arrest, after

25   you learned the District Attorney was not going to

                                                       103

1   prosecute.

2             MS. BAUMGARTNER:  Objection.  Lacks

3   foundation.

4             THE WITNESS:  No, I've never been told

5   that a District Attorney would not prosecute a case

6   prior to making an arrest.

7             MR. SCOTT:  Q.  Okay.  So, is it your

8   testimony that every case that your unit has submitted

9   to the District Attorney's Office has resulted in the

10  decision to prosecute?

11            MS. BAUMGARTNER:  Objection.  Vague, and

12  lacks foundation.

13            MR. SCOTT:  Q.  Go ahead.

14       A.   No.  Most cases we present to the District

15  Attorney are not prosecuted.

16       Q.   All right.  When you say "most," what

17  percent?

18       A.   I have the numbers we track; that's one of

19  the things we track.

20            I would say at least 50 percent of cases

21  we present are not prosecuted.

22       Q.   And are these monthly reports?

23       A.   Yes.

24       Q.   And what are these reports called?

25       A.   Statistics.

                                                    104

1          Q.    Okay.  And as a supervisor, do you on

2    occasion rely on these Chronologicals?

3          A.    I do a -- I'm not sure what you mean by

4    "rely on".

5          Q.    Any decisions you make as a supervisor, do

6    you rely on these?

7          A.    I, as a matter of course, review cases

8    after they are closed.

9                The Lieutenant reviews active and ongoing

10   cases.  I look at them for the quality of

11   investigation, to get a sense of the type of

12   investigations the officers are doing.

13               Generally, in a case like Inspector

14   Cook's, I don't know when this Chronological record was

15   started.

16               When, you know, the Inspectors keep

17   notes and record notes; and then, when they go to

18   transcribe it onto a written document, I'm not sure

19   when this was -- I know that the notes started on the

20   26th, but I don't know when Inspector Flores started

21   keeping this record.

22               I reviewed this particular record, I

23   believe, in August.

24         Q.    Okay.  But you don't know if --

25         A.    So, I didn't base decisions for Inspector

                                                          109

DEPOSITION OF CAPTAIN MARSHA ASHE

1  Cook's arrest on this document.

2          Q.    But you don't know if it existed then or

3  not at the time of his arrest?

4          A.    I -- I don't -- I never asked about this.

5          Q.    Okay.

6          A.    I don't know if it did or didn't.

7          Q.    Now, before you talked about high-profile

8  cases, and you talked about the Fire Chief.  Was

9  Mr. Cook's case considered a high-profile case?

10         A.    Yes.

11         Q.    Why?

12         A.    Because of the allegation of Domestic --

13  any -- Well, the allegation of any crime against a

14  Police Officer rises to a higher level of

15  investigation.

16              A Domestic Violence allegation against a

17  Police Officer triggers all sorts of things

18  Departmentally for that officer, whether or not the

19  allegations are true.

20              There has been a great deal of public

21  focus on officer-involved domestic violence cases

22  nationally and locally.

23              A Police Officer, unlike a truck driver,

24  can lose his or her job based on a Domestic Violence

25  allegation.  So, there is a lot more personal and

                                                    110

1          MS. BAUMGARTNER:  Wait.  I'm going to

2    object.

3          THE WITNESS:  Okay.

4          MS. BAUMGARTNER:  Inspector Cook is in the

5    room.  I am presuming that he's waiving any rights to

6    confidentiality in his Peace Officer personnel record,

7    with respect to private Administrative matters?

8          MR. SCOTT:  I don't know.  Can we talk

9    about it?

10          MR. COOK:  Yes.

11          MR. SCOTT:  Okay, we'll take a break.

12    Let's take a short break.  I'll talk to my client about

13    it.

14          (Brief recess taken.)

15          MR. SCOTT:  Okay, back on the record.

16      Q.    Let me reask the question:

17          As far as prior Administrative matters are

18    concerned, was any prior discipline brought to your

19    attention?

20          MS. BAUMGARTNER:  Objection.  Vague.

21          THE WITNESS:  I don't remember a specific

22    discipline discussed.  I remember allegations of

23    misconduct --

24          MR. SCOTT:  Q.  Okay.

25      A.    -- against the Inspector involving --

                                                    116

1          A.    Because that's something worth knowing.

2          Q.    Why?

3          A.    Because I would want to ask her, "Why:

4    What problems do you see with this case?  And what, if

5    any of those concerns, can we address before we make

6    the arrest?"

7          Q.    Okay.  And if you had been told on the

8    morning of July 27th, 2005, that the District

9    Attorney's Office was not going to prosecute, would you

10   have gone ahead with the arrest anyway in the

11   afternoon?

12             MS. BAUMGARTNER:  Objection.  Incomplete

13   hypothetical.  Calls for speculation.

14             MR. SCOTT:  Q.  Go ahead.

15         A.    Yes, I would have.

16         Q.    Why?

17         A.    Because this case was predicated on

18   physical evidence, escalating violence, as reported by

19   the victim, and lethality factors, that suggested this

20   could easily be a domestic violence homicide.

21             And I felt that we had a legal and ethical

22   responsibility to make an arrest in this case.

23         Q.    And is that why you wanted enhanced bail?

24         A.    Yes.

25         Q.    Did you think enhancing the bail from

                                                      126

1    Flores?

2                    MS. BAUMGARTNER:  Objection.  It's been

3    asked and answered.

4                    THE WITNESS:  I don't have any

5    recollection of who I discussed it with, or when.

6                    MR. SCOTT:  Q.  Okay.  I thought you

7    testified a little while ago you discussed it with

8    Inspector Flores and Lieutenant Sloan?

9         A.    Well, it was discussed with them.  I don't

10   have specific recollection of discussing that with

11   them.

12        Q.    Okay.  You believe it was discussed with

13   them, but you do not recall those discussions?

14        A.    It had to have been discussed with

15   Inspector Flores, as he was attempting to get the

16   enhancement.  I don't recall discussing that with him.

17        Q.    All right.  So, if I understand your

18   testimony, you believe you must have discussed it with

19   him, you just do not have a recollection of the

20   discussion.

21        A.    That's correct.

22        Q.    And you don't recall if that discussion

23   took place before or after the arrest.

24        A.    No, I don't.

25        Q.    Okay.  Do you recall having any

                                                      131

1    conversations with Inspector Flores after the

2    9:30 meeting and before the arrest?

3         A.    No.

4         Q.    Is it your testimony that you did not?

5         A.    I don't remember if I did or I didn't.

6         Q.    Did you have any conversations regarding

7    this case with Lieutenant Sloan after the 9:30 meeting

8    and before the arrest?

9         A.    Yes.

10        Q.    Okay.  And how many?

11        A.    I don't remember.  We spoke on the phone,

12   I think, several times.

13        Q.    Did he tell you he had talked to Miss

14   Aguilar-Tarchi?

15        A.    I don't remember a discussion with him

16   about that.

17        Q.    If he had talked to her, is that something

18   that he should have reported to you in the normal

19   course of business?

20             MS. BAUMGARTNER:  Objection.  Calls for

21   speculation.  I think it's been asked and answered.

22             MR. SCOTT:  Q.  Go ahead.

23        A.    That he talks to her would not be

24   something he would have told me; nor would I have

25   expected him to tell me, in the normal course of

                                              132

1    events.

2          Q.    Okay.  And if Miss Aguilar-Tarchi told him

3    she was not going to go for a warrant or prosecute the

4    case, is that something you would expect him to tell

5    you?

6          A.    Yes.

7                MS. BAUMGARTNER:  Objection.

8                MR. SCOTT:  Q.  Thank you.

9                MS. BAUMGARTNER:  Asked and answered.

10               And if I could finish my objection,

11   please:  It's been asked and answered, and calls for

12   speculation.

13               MR. SCOTT:  Q.  Is it your testimony that

14   Lieutenant Sloan did not tell you that he was informed

15   of that Ms. Aguilar-Tarchi was not going to seek a

16   warrant or prosecute the case before my client was

17   arrested?

18               MS. BAUMGARTNER:  Objection.  Compound.

19               MR. SCOTT:  Q.  I'll break it up.

20               Is it your testimony that Lieutenant Sloan

21   did not tell you that he learned that Miss

22   Aguilar-Tarchi was not going to prosecute this case

23   before you arrested my client?

24         A.    I'm still confused about exactly what you

25   are asking.

                                                    133

1  did the issue come up of whether Officer Cook would be

2  interviewed?

3          A.     No.

4          Q.     Would it -- If -- Did it matter to you

5  whether he was interviewed before he was arrested?

6          A.     No.  Not at that time.

7          Q.     Oh.  And were you -- Did you intend to

8  have him arrested, regardless of what he would have

9  said at an interview?

10         A.     Yes.

11         Q.     All right.  And if he could have proven to

12 you that at the time of the alleged assault he wasn't

13 even in the state, you would have arrested him anyway.

14             MS. BAUMGARTNER:  Objection.  Calls for

15 speculation and lacks foundation.

16             MR. SCOTT:  Q.  Go ahead.

17         A.     Based on the victim's statements and the

18 physical evidence we had, the merits of this case, he

19 would have been arrested, regardless of the statement

20 he made.

21         Q.     Okay.  And was that the protocol that this

22 office followed in July of 2005?

23             MS. BAUMGARTNER:  Objection.  Vague.

24             THE WITNESS:  Which protocol?

25             MR. SCOTT:  Q.  That you would arrest

                                                140

1    or en route?

2         A.    If he wasn't there for the actual arrest,

3    I remember him getting there pretty quickly.

4         Q.    And after you told Mr. Cook he was under

5    arrest, was he escorted to jail?

6         A.    At some point afterwards he was booked.

7              I don't know if he was physically taken,

8    or if they did an in-absentia booking.

9              Generally, what happens, when we have a

10   police officer arrested, the POA, as I understand it,

11   will make bail arrangements prior.  So, it's done in

12   a way that's different.

13             In a normal arrest, very shortly

14   thereafter they would be taken up and booked into

15   jail.

16             The time line for Inspector Cook was

17   more prolonged than that.

18        Q.    Do you know when it was?

19        A.    No.

20        Q.    Was Lieutenant Sloan present when you told

21   Mr. Cook he was under arrest?

22        A.    Yes.

23        Q.    Approximately how long were you and

24   Lieutenant Sloan at Room 400 that afternoon when

25   Mr. Cook was present?

                                                   151

1              MS. BAUMGARTNER:  Objection.  Vague.

2              THE WITNESS:  In Room 400, I think we were

3    there for an hour, an hour and a half.

4              MR. SCOTT:  Q.  And during that hour, to

5    hour and a half, was Mr. Cook present most of that

6    time?

7              MS. BAUMGARTNER:  Objection.  Vague.

8              THE WITNESS:  After the arrest, he was

9    present for the entire time in another room.

10             MR. SCOTT:  Q.  About how long had he been

11   there at Room 400 before you told him he was under

12   arrest?

13        A.    I think, a few minutes.  He wasn't there

14   very long.

15        Q.    And during those few minutes, did the

16   issue come up of interviewing Mr. Cook?

17        A.    I wasn't with him.  I don't know what came

18   up during those few minutes before I came.

19        Q.    Did anyone on behalf of Mr. Cook tell you

20   that he was -- wanted to be interviewed?

21             MS. BAUMGARTNER:  Objection.  Vague.

22             THE WITNESS:  I don't remember any

23   specific discussions prior to telling Inspector Cook

24   that he was under arrest about that.  There were some

25   very shortly thereafter.

1            MR. SCOTT:  Q.  So you don't remember?

2        A.    If it wasn't before, it was very shortly

3    after, that Inspector Cook requested to make the

4    statement.

5        Q.    And did Lieutenant Sloan respond to that

6    request?

7        A.    I don't remember if Lieutenant Sloan did

8    or I did.  But one of us advised Inspector Cook to --

9    that he may need to speak with an attorney, or that

10   there would be an opportunity later; I don't remember

11   the exact language.

12       Q.    Did you hear Lieutenant Sloan say to

13   Mr. Cook, [quote], "No matter what you say, it won't

14   change anything"?

15       A.    I don't remember that specific language.

16   That easily could have been said.

17       Q.    Okay.  And if I understand you correctly,

18   if it didn't matter what Mr. Cook said during the

19   interview, he was going to be arrested regardless.

20       A.    Yes, he was already under arrest at that

21   time.

22       Q.    All right.  And if he had been interviewed

23   before the arrest, it wouldn't have made any

24   difference, it wouldn't have mattered what he said,

25   correct?

                                              153

1           MS. BAUMGARTNER:  Objection.  It's been

2    asked and answered, and calls for speculation.

3           MR. SCOTT:  Q.  Go ahead.

4      A.    It would not have mattered.

5      Q.    Okay.

6           Did you think it was important to get a

7    statement from Mr. Cook?

8           MS. BAUMGARTNER:  Objection.  Vague.

9           THE WITNESS:  It is the best investigative

10   practice very shortly after an arrest to attempt to get

11   a statement.

12          MR. SCOTT:  Q.  And isn't it even a better

13   idea to get the statement before the arrest?

14     A.    Not necessarily.

15     Q.    Oh, there might be exceptions; but, in

16   general, isn't it better to get a statement as soon as

17   possible?

18     A.    In a domestic violence case that's based

19   on physical evidence, whether or not you get a

20   statement beforehand doesn't affect the outcome of the

21   arrest.  The arrest is still made.

22          Statements are used for a variety of

23   reasons, including locking people into stories that can

24   later be refuted.

25          There is a variety of reasons to get the

154

1  in Inspector Flores' chronological report.

2      Q.    What about Lieutenant Sloan, should he

3  have had a chronological report?

4      A.    No.

5      Q.    Why not?

6      A.    His -- He was not the investigator on this

7  case.  He was -- His information appears to have been

8  included in the chron.

9      Q.    Since you've been in the DV Unit, how many

10  people have you arrested for domestic violence?

11      A.    Well, there have been, I want to say --

12  You are talking Police Officers.

13      Q.    No.  Anybody, where you are the arresting

14  officer.

15      A.    Only one.

16      Q.    Mr. Cook.

17      A.    Yes.

18      Q.    So, in 400 arrests a month, since 2000,

19  what?

20      A.    '4.

21      Q.    You've been there since 2004.

22      A.    Mm-hmm.

23      Q.    So, thousands of arrests, and the only one

24  you made was Mr. Cook.

25      A.    Yes.

1   that one reason that you arrested him had to do with an

2   issue of disarming him.

3        A.    No.

4        Q.    Okay, then, I misunderstood you.

5              MS. BAUMGARTNER:  Do you have much longer

6   to go?

7              MR. SCOTT:  Maybe a half-hour.

8              MS. BAUMGARTNER:  Okay, then, can we take

9   a break?

10             MR. SCOTT:  Sure.

11         (Brief recess taken.)

12             MR. SCOTT:  Without objection, back on the

13  record.

14       Q.    Captain Ashe, does a suspect have a right

15  to provide police investigators with exculpatory

16  information?

17             MS. BAUMGARTNER:  Objection.  Vague.

18             THE WITNESS:  We have an obligation to

19  disclose exculpatory information.

20             I don't know what a suspect's rights

21  are, in terms of disclosing that.  I mean, that there

22  is -- that's a legal question, I can't answer.

23             MR. SCOTT:  Q.  Okay.  So, for example, if

24  Mr. Cook had exculpatory information to provide you,

25  you don't know if he had a right to give it to you.

                                                        168

1          A.     Again, that's a legal question that I
2     can't answer.
3          Q.     Okay.
4          A.     I -- There was --
5                 In this case, where the decision to make
6     an arrest was based on victim statements and injury,
7     there is nothing, given the totality of circumstances
8     at that point, that would have convinced us
9     otherwise.
10         Q.     And what if he had --
11         A.     The right to, I don't know.
12         Q.     And what if he could provide you with
13    information that, not only was she the aggressor on the
14    occasion-in-question, but on previous occasions, she
15    had been an aggressor:  Would that be exculpatory
16    information?
17                MS. BAUMGARTNER:  Objection.  Compound.
18    Vague.  Calls for a legal conclusion, and calls for
19    speculation.
20                MR. SCOTT:  Q.  Go ahead.
21         A.     Yes, that could be considered exculpatory
22    information.
23         Q.     And if he had provided you with
24    information that -- to indicate that any injury she
25    had, if she received at another place at another time,

169

1   not during the incident-in-question, would that have

2   been exculpatory information?

3            MS. BAUMGARTNER:   Same objections.

4            THE WITNESS:   Yes, that could have been

5   exculpatory information.

6            MR. SCOTT:   Q.   And do you believe that he

7   had a right to provide you with that information before

8   he was arrested?

9            MS. BAUMGARTNER:   Objection.   It's been

10  asked and answered.   Calls for a legal conclusion.

11           THE WITNESS:   No, I don't believe he had a

12  right to provide that before he was arrested.

13           MR. SCOTT:   Q.   Okay.   And if he had

14  provided you with such information before his arrest,

15  you would have made the arrest anyway, correct?

16           MS. BAUMGARTNER:   Objection.   Calls for

17  speculation.

18           THE WITNESS:   We look at information

19  provided by the named suspect with suspicion, and use

20  it more often than not to lock them into a story that

21  can be disproved.

22           MR. SCOTT:   Q.   Oh.   And do you ever view

23  victim statements with suspicion?

24       A.   Yes.

25       Q.   Why?

                                                    170

DEPOSITION OF CAPTAIN MARSHA ASHE

```
 1         A.    Because, victims in a variety of crimes,
 2   can inflate detail; can, you know, out-and-out lie, in
 3   cases that you had mentioned earlier, but certainly
 4   inflate a story, or exaggerate --
 5         Q.    Exaggerate?
 6         A.    Yes.
 7         Q.    Embellish?
 8         A.    Yes.
 9         Q.    And what about when victims are drunk at
10   the time of the alleged assault, is that considered a
11   factor in evaluating the allegations?
12              MS. BAUMGARTNER:  Objection.  Vague.
13   Lacks foundation.  Calls for speculation.
14              THE WITNESS:  Substance abuse in domestic
15   violences are recognized as one of the factors to be
16   considered in lethality cases; and when there is
17   substance involved, as was alleged in this
18   relationship --
19              MR. SCOTT:  Q.  Alcohol, wasn't it?
20         A.    I believe just alcohol.  I'm not sure --
21              I mean, we almost anticipate there to be
22   alcohol involved in many domestic violence cases, on
23   both sides.
24         Q.    All right.  And has it been your
25   experience that, on occasion, victims who are
```

```
 1   intoxicated or drunk at the time of an incident are not
 2   always reliable historians?
 3        A.   Yes.
 4        Q.   And do you know if the victim in this
 5   case, Lisa Cook, was intoxicated at the time of the
 6   alleged assault?
 7             MS. BAUMGARTNER:  Objection.  Lacks
 8   foundation.  She wasn't there.
 9             MR. SCOTT:  Q.  I asked her, do you have
10   any information?
11        A.   I believe she said she had been out, and
12   had some drinks, but I don't know how close that was to
13   this event, or of that evening.
14        Q.   Now, the conversation that you had with
15   Liz Aguilar-Tarchi, you said it was either the
16   afternoon of the 27th, or the morning of the 28th,
17   correct?
18        A.   Yes.
19        Q.   And should there be a record somewhere of
20   when that phone conversation occurred?
21        A.   I didn't keep a record.  I don't keep
22   those record -- those types of records.
23        Q.   Would there be phone records?
24        A.   Would there be?
25        Q.   Yes.
```

172

1    best recollection, within the morning of the 29th.

2         Q.    When you talked to Miss Tarchi?

3         A.    Yeah, I remember it more of a morning

4    conversation, but that is strictly from recollection.

5         Q.    And it would have been the morning after

6    the arrest.

7         A.    Yes.

8         Q.    So you believe it was the morning of the

9    28th.

10        A.    It was late the afternoon or the morning

11   of the 29th.  The arrest was, I believe, on the 28th,

12   or was it --

13        Q.    The 27th.

14        A.    The 27th.

15        Q.    According to Exhibit 1, it was the 27th.

16        A.    (Looking at the documents)

17              So, then, I'm sorry, 28th, then, the

18   morning of the 28th.

19        Q.    And I think you said you were surprised to

20   learn that she thought the case was weak?

21        A.    No, I wasn't surprised to learn that she

22   thought the case was weak.

23              The case, if we had to proceed strictly on

24   the physical evidence, was weak.  I -- We all -- I

25   certainly recognized that.

                                                      174

```
1            Q.     Did Captain Cashman tell you he did not
2    want to make the arrest?
3            A.     No.
4            Q.     Was that an option?
5                   MS. BAUMGARTNER:  Objection.  Calls for
6    speculation.
7                   MR. SCOTT:  Q.  Go ahead.
8            A.     He -- You know, working with Captain
9    Cashman could be quite vocal about certain things.
10                  His role in this was administrative, and
11   if he had any opinion as to the arrest, I had never
12   heard it; he never voiced it.
13           Q.     Okay.
14           A.     And no one -- You know, to clarify
15   something:  Nobody wanted to make this arrest.  This is
16   never -- This is never a good thing.
17           Q.     Why was -- To your knowledge, who made the
18   decision to arrest before a warrant was obtained?
19           A.     I ultimately made that decision, in
20   discussion with Deputy Chief Tabak and Captain Keohane.
21           Q.     Well, was it their decision or your
22   decision?
23           A.     It was my decision, supported by them.
24           Q.     What does that mean, "supported by them"?
25           A.     Well, I certainly am not going to make an
```

                                                    177

```
 1    arrest of a police officer, if my Deputy Chief has

 2    significant issues with it.  I think that that -- I

 3    mean, I . . .

 4          Q.    Well, were you asking them for permission

 5    to make the arrest without a warrant?

 6          A.    We -- "Permission" is the wrong word.

 7                I wanted independent people to look at a

 8    review of the factors that contributed to making this

 9    arrest outside of a warrant.

10          Q.    So you wanted them to essentially bless

11    this decision before you --

12          A.    I wanted them to understand it, and to

13    agree with it, and just fresh eyes on it.

14          Q.    And did you understand that they were

15    acting on behalf of the Chief?

16          A.    Yes.

17          Q.    And did you understand that, ultimately,

18    you were the final decision-maker on this?

19          A.    I don't believe I was the final

20    decision-maker on it.  I think I had a very strong

21    voice with it, but . . .

22          Q.    Who was the final decision-maker?

23          A.    I suppose, ultimately -- Oh, man. . .

24                In the sense that they were acting on

25    behalf of the Chief, the Chief would have been,
```

1    although. . .

2           Q.    So, between --

3           A.    -- separating out the administrative

4    issues, versus the criminal issues, the highest-ranking

5    person there of an investigative nature was Deputy

6    Chief Tabak.

7           Q.    So he was the final decision-maker.

8           A.    In the investigative sense, yes, but he

9    wasn't -- I didn't go to him and ask permission.

10          I went to him to discuss the factors of

11   this case, to see if there were concerns that we

12   hadn't addressed and, in a sense, to involve him in

13   the decision to make the arrest.

14          Q.    So, you essentially told him you planned

15   on making the arrest without a warrant --

16          A.    I supported the arrest, yes.

17          Q.    Well, did you tell him you were going to

18   make an arrest without a warrant, and just as a

19   courtesy, told him, or were you asking for his

20   permission?

21          A.    I was asking for his advice.

22          Q.    And what was his advice?

23          A.    He reviewed the lethality factors, and he

24   supported the idea of making the arrest outside of a

25   warrant.

1        A.    It says that it was, if I'm reading this

2    correctly.

3        Q.    And did you anticipate that he would be

4    suspended for some period as a result of the arrest?

5             MS. BAUMGARTNER:  Objection.  Vague and

6    lacks foundation.

7             MR. SCOTT:  Q.  Go ahead.

8        A.    I knew that he would be suspended for some

9    amount of time, based on -- based, in part, on this

10   arrest.

11       Q.    And did you understand that one of the

12   Deputy Chiefs at that meeting on the morning of the

13   27th would be involved in the disciplinary process

14   following the arrest, if one was made?

15            MS. BAUMGARTNER:  Objection.  Vague.

16   Calls for speculation.

17            MR. SCOTT:  Q.  Go ahead.

18       A.    Did I understand that one of the --

19       Q.    Deputy Chiefs, either Tabak or Keohane,

20   would be involved in the disciplinary process, if an

21   arrest was made?

22       A.    I knew that Captain -- then Captain

23   Keohane would be involved in the disciplinary process;

24   that's why he was there.

25       Q.    All right.  And whose idea -- Who -- Who

                                                       187

1                (Interoffice Memorandum, to Inspector

2           Tony Flores, from Assistant District

3           Attorney Aguilar Tarchi, RE:  Discharge

4           27 - Further Investigation Necessary,

5           7/28/05 marked Plaintiff's Exhibit 6 for

6           identification.)

7           MR. SCOTT:  Q.  Now, this document we've

8    marked as Exhibit No. 6, is this the document we

9    referred to earlier, that you understood was being

10   provided to Inspector Flores by Ms. Aguilar-Tarchi?

11        A.    Yes.

12        Q.    Okay.  And are these some of the things

13   that she discussed with you when you spoke to her on or

14   about the morning of July 28th?

15        A.    We didn't talk about many specifics, other

16   than she felt, you know, again, that she wanted more

17   documentation of prior events, medical records, witness

18   statements . . .

19        Q.    So, at some point were you aware that she

20   had a list of 11 things that she wanted?

21        A.    No, I didn't know the number.

22        Q.    All right.  And it says, at the top of the

23   page, it refers to "Discharge 27"; do you see that?

24        A.    Yes.

25        Q.    What does that mean to you?

                                                    189

```
                              )
STATE OF CALIFORNIA )      ss.
                              )
```

### CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 21st day of January, 2008.

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281