# EXHIBIT "A"

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

CLIFFORD COOK,                              **CERTIFIED COPY**

      Plaintiff,

vs.                              CASE NO. C07 2569

CITY AND COUNTY OF SAN
FRANCISCO, ANTONIO FLORES,
DON SLOAN, MARSHA ASHE, and
DOES 1 - 50, inclusive,
      Defendants.

_____/

## DEPOSITION OF
## CLIFFORD COOK
December 4, 2007

Reported by:     HANNAH KAUFMAN & ASSOCIATES, INC.
SUSAN IMPERIAL    Certified Shorthand Reporters
CSR #11219       472 Pacheco Street
               San Francisco, CA 94116
               (415) 664-4269

# EXHIBIT "12"

*pro of Case*

*USS GIONTINI*

## WARRANT DECLINATION MEMORANDUM

K. Cook 12.4.07
DEPOSITION
EXHIBIT
12

**Reviewing DA:** _____  **Date of Review:** _9-20-05_

**Suspect(s)** _CHRISTOPHER COOK_

**Police Report No.:** _050 835556_

**Agency:** ☐ SFPD:  ☒ DVRU  ☐ General Works

☐ OTHER: _____

**Inspector/Detail** _FLORES / DVCU_

**Possible Charge(s)** _273.5 PC / 243(e)(1) PC / 502(c)(2)_

**Search Warrant Requested** _____

## EXPLANATION OF DECLINATION

**The above listed warrant(s) was/were denied under REASON CODE** _24L_

**Facts and explanation:**

☐     no prior documented or undocumented DV between the parties
☐     defendant has no known criminal history
☐     details of report cannot be verified/victim cannot be located
☐     there is evidence of mutual physical violence
☐     lack of corroborating evidence:
       ☐ no visible injuries
       ☐ no medical treatment
       ☐ no photos
       ☐ no known independent witness(es)
☐     inconsistencies in statement(s) of ☐ victim or ☐ witness(es)
☐     credibility issues with victim
☒     Explanation/Other: _____

_Victim not interested in pursuing this case_
_After repeated contacts the victim decided against_
_going forward._

Forms\Warr-Decline

ADMINISTRATION
RECEIVED
Tue 9/20/05
BUREAU

HANNAH KAUFMAN & ASSOCIATES, INC.

1  under arrest, correct?

2      A.  Yeah.  I was under arrest.  The moment they told

3  me I was being arrested on an allegation, I was under

4  arrest.

5      Q.  And who actually did that?  Was it Lieutenant

6  Sloan or Captain Ashe?

7      A.  Well, Captain Ashe I believe said, "You're under

8  arrest."  Well, Captain Ashe said that, "We're arresting

9  you on an allegation."  She said, "You're going to be

10  placed under arrest for DV."

11          And I said, "You're arresting me on an

12  allegation?"

13      Q.  Did Deputy Chief Tabak ever come in?

14      A.  Never.

15      Q.  And so after Cashman came back in and said that

16  they wouldn't let you give a statement, what happened?

17      A.  We were arranging to make bail.  Mike Lewis -- we

18  started inquiring what bail would be -- the cost of bail.

19      Q.  And inquiring of whom?

20      A.  Inquiring -- well, from Ashe and Sloan.  Because

21  they were the arresting officers.

22          And they had Inspector Flores, who was the lead

23  investigator on the case.  And usually a bail schedule is

24  set for such incidents pertaining towards each charge.

25  And it was easy enough to know what the Ciardellages were,

DEPOSITION OF CLIFFORD COOK

HANNAH KAUFMAN & ASSOCIATES, INC.

1    incident report were brought against you, correct?

2        A.  Correct.

3        Q.  And Flores was the inspector on your case,

4    correct?

5        A.  Correct.

6        Q.  And do you know whether this is actually your

7    police report number?

8        A.  Well, I'd have to take a look and see.

9        (Witness reviews document.)

10       WITNESS:  Yes, it is.

11       MS. BAUMGARTNER:  Q.  And you have no reason to

12   believe that this wasn't you, even though the name is

13   correct?

14       A.  Well, it was in the case file.  I guess it would

15   be.

16       Q.  Okay.  And what is your understanding about the

17   District Attorney's Office view of the case once they file

18   this warrant declination memo or create this warrant

19   declination memo?

20       A.  That the case is closed.

21       Q.  So after that, they're no longer doing any work

22   on the case?

23       A.  That's right.

24       Q.  As far as you know, there was no other warrant

25   declination memo in this case prior to September 20th,

DEPOSITION OF CLIFFORD COOK

1   2005, correct?

2       A.  No.

3       Q.  Do you know what the District Attorney's Office

4   was doing on the case between July 27th and September

5   20th?

6       A.  Well, the DA -- which is very unusual -- the case

7   went from the DV unit to the DA's -- District Attorney's

8   investigative unit for them to investigate the case.

9   Which has never happened before; where the DA is doing an

10  investigation on a DV case.  But anyway --

11      Q.  How do you know that happened?

12      A.  Because there's a chron in there.  Erin Gallagher

13  had the case.  And it says in Flores's own chron that

14  Flores concluded the case and passed all the information

15  over to Erin Gallagher from DAI.  The DAI did another two

16  to three weeks of investigation, and then the warrant --

17  then the case was presented to Giuntini, and the case --

18  that's when the warrant declination was issued.  So I

19  don't know why DAI would have to review a case on a DV

20  case that was a misdemeanor at the most.

21      Q.  Were you aware that Lisa Cook was concerned about

22  the police department investigating this matter?

23      A.  I don't know.

24      Q.  Did you read her statement in the chron?

25      A.  Her statements aren't in there too much.  I mean,

# EXHIBIT "B"

EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CLIFFORD COOK,                          )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )
                                        )   No. C 07-02569 CRB
                                        )
CITY AND COUNTY OF SAN                  )
FRANCISCO, ANTONIO FLORES, DON          )
SLOAN, MARSHA ASHE, and DOES            )
1-50, inclusive,                        )
                                        )
                Defendants.             )
                                        )
_____ )

DEPOSITION OF CAPTAIN MARSHA ASHE

January 16, 2008

REPORTED BY:  A. MAGGI SAUNDERS,

C.S.R. No. 2755

A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

DEPOSITION OF CAPTAIN MARSHA ASHE

1           A.      No, I haven't read anything about that.

2           Q.      Okay.  Now, you used the term "injuries":

3                   And that could include anything from, I

4    guess, a scratch, to, I guess, a broken bone, or even

5    murder, I suppose, right?

6           A.      Murder would be the ultimate injury --

7           Q.      Okay.  So --

8           A.      -- but -- physical injury, yes.

9           Q.      Okay.  So, it could be anything from a

10   scratch, to a severe beating, to broken bones, to

11   death?

12          A.      Yes.

13          Q.      Okay.  And in the last year, how many DV

14   felony cases have you pursued, where the only injury

15   was a scratch?

16          A.      I wouldn't be able to -- I have no idea.

17                  We have over 400 cases that come in a

18   month.

19          Q.      Okay.

20          A.      And out of those, I don't know which

21   involved -- or what type of injuries.

22          Q.      You keep statistics on how those

23   400-cases-a-month are resolved, or disposed of?

24          A.      Yes.

25          Q.      Okay.  On average, out of 400 cases a

                                                         50

1    month, how many result in felony arrests?

2         A.    Those 400 cases are felony cases.  We

3    don't track misdemeanor cases in the Unit; and the 400

4    is an average.

5         Q.    Of Domestic Violence?

6         A.    Yes.

7         Q.    Felony cases?

8         A.    Yes.

9         Q.    Okay.  A month.

10        A.    Yes.

11        Q.    All right.

12              And you don't know, of those -- of that

13   400, you don't know how that relates to the number of

14   complaints.

15        A.    400 complaints have been filed with us.

16   Those are the 400 cases.

17        Q.    I'm talking about the people who come to

18   you and make a complaint, but you don't file, you don't

19   arrest.  Or, do you arrest every time somebody comes to

20   you and says, "You know, my spouse injured me; I have a

21   scratch":  Every one of those cases, you make an

22   arrest?

23        A.    At the time of the incident, if there is

24   injury, or complaint of pain, officers are mandated to

25   make an arrest in the field, yes.

**DEPOSITION OF CAPTAIN MARSHA ASHE**

1          That is one of those discretions that have

2   been taken away from us in -- as law enforcement in

3   Domestic Violence cases --

4          Q.    Okay.

5          A.    -- in fact, it's the only case I can think

6   of in which an arrest is mandated.

7          Q.    So, if I went home tonight, got into an

8   argument with my wife, and decided I wanted to get her

9   arrested:  I just call up the police, the police come,

10  and say, "She hit me," and they'd have to arrest her.

11          MS. BAUMGARTNER:  Objection.  Vague and

12  incomplete hypothetical.

13          MR. SCOTT:  Q.  That's it.  Those are the

14  only facts:

15          Police come.  I tell the police, "She

16  hit me".

17          A.    You would be asked if you were hurt.

18          Q.    I said, "Yeah, I'm hurt.  It hurts."

19          A.    Technically, we would be mandated to make

20  an arrest.

21          Q.    No discretion.

22          A.    Almost none.

23          Q.    That's good to know.

24          Are you trying to make the public aware

25  of this?

                                                        52

1        A.    I don't do any public campaigns in that

2  regard.

3        Q.    All right.  And is this a policy -- Is

4  this your policy?

5        A.    No, this is not my policy --

6              MS. BAUMGARTNER:  Objection:  Vague.  By

7  "you," do you mean SFPD, or her personal policy?

8              MR. SCOTT:  Her.  Her personal policy.

9        Q.    Is it the Department's policy?

10        A.    It is the Department's policy.

11        Q.    How long has it been the Department's

12  policy that there is no discretion to make an arrest,

13  it's mandatory:  If a spouse says, "I got hit, and it

14  hurts"?

15        A.    There -- I said that there is very little

16  discretion, and we are technically mandated to make an

17  arrest.  It is Department policy, and I believe that it

18  is State law to make an arrest.

19        Q.    Okay.  All right.  How long has it been

20  Department policy?

21        A.    I don't know.

22        Q.    Okay.  Is it written somewhere?

23        A.    Yes.

24        Q.    And where would it be written?

25        A.    It's in our General Orders.

53

1      Q.    All right.  And officers are trained that,

2   if there is a call, and they go to a home, and a spouse

3   says, "My spouse hit me, and it hurts," the arrest is

4   mandated?

5      A.    The arrest technically is mandated.

6            Those are -- It's difficult to talk

7   about those situations in a vacuum.  They generally

8   are not -- they are not that manufactured.

9      Q.    How do you know?

10     A.    What?

11     Q.    How do you know whether they are

12  manufactured?

13     A.    There is --

14           MS. BAUMGARTNER:  Objection:

15  Argumentative.  Manufactured?  What manufactured?

16           MR. SCOTT:  She used the term.  She said,

17  "they are not manufactured".  I asked her, "How does

18  she know?"

19           MS. BAUMGARTNER:  The scenario is not

20  manufactured.

21           I think she is saying that -- you asked

22  her a hypothetical question that eliminated all other

23  facts, and that there is never such a situation that

24  she addresses.

25           MR. SCOTT:  Oh, I'm sure there is an

                                                        54

1   infinite number of situations, and we could be here for

2   years discussing all the possible variables, and we --

3   I don't have time for that.

4        Q.    I just gave you one simple hypothetical.

5             So, the officers don't have discretion, if

6   a spouse says, "My spouse hit me, and it hurts":

7             That's an automatic felony arrest; is

8   that right?

9             MS. BAUMGARTNER:  Objection:  Incomplete

10  hypothetical; vague.

11            MR. SCOTT:  Q.  Is that correct?

12       A.    Technically, officers have almost no

13  discretion at the scene of a domestic violence, when

14  there has been injury --

15       Q.    Okay.

16       A.    -- unless there is compelling evidence to

17  the contrary --

18       Q.    Okay.

19       A.    -- and it has to be overwhelmingly --

20       Q.    Okay.  Now, you said "at the scene".  What

21  does that mean, "at the scene"?

22       A.    Most arrests in domestic violence occur at

23  the time, or very close to the time of the incident.

24       Q.    Why is that?

25       A.    Because of the mandated arrest policy.

55

1       Officers are called to the scene of a

2  domestic violence; there is evidence that supports the

3  victim's statement when the arrest is made.

4       That is the majority of cases that we

5  handle.

6       Q.    What if a spouse waits a week to complain,

7  is it still mandated?

8       A.    It becomes more difficult to have the

9  supporting evidence for the arrest; but the arrest

10 itself is not mandated:  You have an opportunity to

11 review a case in a way that is different from being

12 there at the scene.

13      Q.    How is it different?

14      A.    Well, for one thing, there has been a

15 week's lag time.  There is not the ongoing situation.

16 It's calmed down.  You may have lost evidence; you may

17 have developed more evidence.

18      There is -- It's a more complex situation.

19      Q.    A person could claim an injury that

20 occurred two or three days after the so-called assault,

21 right?

22      A.    Absolutely.

23      Q.    And a person may have -- things may have

24 happened in a week that would give a person a motive to

25 make a false allegation.

56

1  know -- I don't believe that's the phrase she used, so

2  I believe that's a vague question.

3       MR. SCOTT:  Can you read back about two

4  questions and answers ago?  Was there an answer where

5  the witness used the term "decline to prosecute".

6       (The record was read by

7       the Reporter as requested.)

8       MS. BAUMGARTNER:  I apologize.  I did not

9  hear the word "decline".

10      MR. SCOTT:  Fair enough.  It happens to me

11 all the time.

12      Q.   When you used the term, "decline to

13 prosecute," what did you mean by that?

14      A.   I meant the same thing I meant with

15 "discharging a case".  The standard for an arrest is

16 different, and certainly much lower, than the standard

17 of proof in a criminal court case.

18      And it's the District Attorney's Office,

19 after the arrest is made, who has the responsibility

20 to review cases for the likelihood of a conviction.

21      Q.   Are you aware of any cases where a

22 District Attorney reviewed a case before an arrest was

23 made?

24      A.   In an arrest warrant case, that obviously

25 happens.  That information is presented to the District

99

1  Attorney.

2           We oftentimes review cases with the

3  District Attorney before an arrest is made, for a

4  variety of reasons:  Not for approval, but just to

5  see what additional charges may exist; what we may be

6  missing; and if we have an opportunity prior to an

7  arrest for investigative steps, we bring the District

8  Attorney in, as a matter of course, on many, many

9  cases.

10          Q.    So it's not unusual to have the District

11  Attorney's Office review a Domestic Violence case

12  before an arrest is made.

13          A.    Actually, it is unusual.

14          Q.    Okay.

15          A.    It's not unusual to discuss a case with

16  the District Attorney before the arrest, but most of

17  our cases come to us already with an arrest made.

18          Q.    Okay.  But in the cases where an arrest

19  hasn't been made, is it unusual to discuss the case

20  with the District Attorney before an arrest is made?

21          A.    No.

22          Q.    All right.

23          A.    Once the case is being investigated.

24          Q.    And would it be unusual to arrest someone

25  after the District Attorney has told you that she is

100

DEPOSITION OF CAPTAIN MARSHA ASHE

1   not going to prosecute the case?

2       A.    It would be unusual, yes.

3       Q.    How many times has that occurred since

4   you've been assigned to the Domestic Violence Unit?

5       A.    I have never been told by a District

6   Attorney that they weren't going to prosecute a case

7   prior to an arrest.

8       Q.    Okay.  You mean, directly.

9       A.    Or indirectly.

10      Q.    Oh.  And if you were aware of that, would

11  you make an arrest?

12      A.    Possibly --

13          MS. BAUMGARTNER:  Objection.  Calls for

14  speculation.

15          MR. SCOTT:  Q.  Go ahead.

16      A.    Possibly.

17      Q.    Why?

18      A.    The District Attorney doesn't approve our

19  arrests.  The level of --

20          The requirement to make an arrest is

21  very different from the requirements necessary to

22  proceed with a criminal case.

23          And based on the totality of circumstances

24  in a case, it would be unusual, and it would -- it

25  would absolutely be unusual.

101

1    Q.    Just "Statistics".

2    A.    Yes.

3    Q.    And do you submit these reports up your

4  chain-of-commands?

5    A.    Yes.

6    Q.    And who do you submit these reports to?

7    A.    They go to my Deputy Chief.

8    Q.    And who is that?

9    A.    It was Morris Tabak, T-a-b-a-k.

10    Q.    And who is it now?

11    A.    Deputy Chief David Shinn, S-h-i-n-n.

12    Q.    And if I understand you correctly, these

13  monthly reports that you referred to as "Statistics"

14  would include information such as the number of

15  Domestic Violence cases you present a month to the

16  District Attorney's Office?

17    A.    (Nodding head.)

18    Q.    And the number of those which are

19  prosecuted and the number which are not?

20    A.    Yes.

21    Q.    And you believe, on average, it's at least

22  50 percent of those cases are not prosecuted.

23    A.    Yes.

24    Q.    Okay.  And how many of those that are not

25  prosecuted are -- involve an arrest?

105

DEPOSITION OF CAPTAIN MARSHA ASHE

1          A.    All of them.

2          Q.    Okay.  All of them?

3          A.    Yes.

4          Q.    And those arrests are at the scene?

5          A.    Most of those.

6                Most of the cases we get in are because

7     an arrest has been made at the scene.  So, it would

8     follow that most of the cases we present, then, to

9     the District Attorney, just as a matter of course,

10    are cases in which an arrest has been made.

11               But a hundred percent of our rebooking

12    packages are based on an arrest that was made prior,

13    either at the scene, or the Inspectors made the

14    Probable Cause arrest.  That's the nature of

15    rebooking, is that there is an arrest that is made.

16               So, either at the scene, by the responding

17    officers; or afterwards, based on Probable Cause by the

18    Inspector.

19         Q.    Okay.  And do DAs ever review cases before

20    an arrest is made, if not made at the scene?

21         A.    Yes.

22         Q.    Okay.  And what happens in the situations

23    if the DA reviews the case before an arrest is made,

24    and the DA informs your office that she is not going to

25    prosecute?

                                                      106

1    investigative criteria.  If an officer is involved, the

2    case will be investigated.

3            Q.    Well, aren't all allegations of Domestic

4    Violence investigated?

5            A.    No.  A burden, in a sense, is placed on a

6    victim in a non-arrest case to come forward.

7                 This case was investigated, without the

8    victim coming forward.  We were more proactive with it.

9            Q.    Why?

10           A.    Because of the Officer-involved

11   allegation.

12           Q.    Okay.  So, if my client had not been a

13   Police Officer, you would have treated this

14   differently.

15           A.    Yes.

16           Q.    Okay.

17                 What if my client had been a woman --

18                 MS. BAUMGARTNER:  Objection.  Calls for

19   speculation.

20                 MR. SCOTT:  Q.  -- would you have treated

21   it differently, and everything else was the same:  He

22   was married to another woman?

23                 MS. BAUMGARTNER:  Objection.  Calls for

24   speculation.

25                 MR. SCOTT:  Q.  Go ahead.

                                                      112

1    Q.    Was that the primary issue that was being

2  discussed?

3    A.    No.  The primary issue was not his

4  suicidal -- or the allegation that he was suicidal.

5    Q.    The primary issue was whether to arrest or

6  not?

7    A.    Yes.

8    Q.    Was a decision made at that meeting?

9    A.    Yes.

10    Q.    Who made the decision?

11    A.    It was made in-concert with the Deputy

12  Chief and myself and Lieutenant Sloan.

13    Q.    So Lieutenant Sloan, you and Deputy Chief

14  Tabak made the decision to arrest at that meeting.

15    A.    Yes.

16    Q.    Was that meeting over by 10:00 o'clock?

17    A.    I don't remember how long it lasted, or

18  that it started at 9:30, the time line there, I don't

19  know.  I don't remember.

20    Q.    Okay.  And why did you wait until later in

21  the afternoon to arrest him?

22    A.    He was gone and out of the building when

23  we asked where he was.

24    Q.    Who told you that?

25    A.    His Lieutenant.

118

1          Q.     Okay.  And were you aware that about

2     10:00 o'clock that morning Inspector Flores met with

3     Assistant District Attorney Aguilar-Tarchi?

4          A.     No.

5               MS. BAUMGARTNER:  Objection.  Vague as to

6     time.

7               MR. SCOTT:  Q.  At any time.  Have you

8     ever become aware of that?

9          A.     I knew that they were meeting with her.  I

10    wasn't sure what time or when, or if they had met prior

11    with her.

12         Q.     And what did you understand to be the

13    purpose of that meeting?

14         A.     Going to review the facts of the case for

15    a possible warrant.

16         Q.     And who told you that?

17         A.     It was -- We discussed it.  It was what we

18    had discussed.

19         Q.     Okay.  So was the decision to arrest going

20    to be based on whether she would issue a warrant?

21         A.     No.

22         Q.     So you were going to make the arrest,

23    whether or not a warrant would issue?

24         A.     Yes.

25         Q.     Okay.  And whether or not the District

                                                    119

1  the purpose of Inspector Flores updating the DA's

2  Office?

3          MS. BAUMGARTNER:   Objection.   It's been

4  asked and answered.

5          THE WITNESS:   I remember a discussion

6  regarding a warrant, but I don't -- I don't know what

7  he meant exactly by saying, you know, "told to update

8  the DA's Office on the incident".

9          MR. SCOTT:   Q.   And did you understand

10  that at approximately 10:00 o'clock that morning,

11  Inspector Cirradelli and Inspector Flores met with

12  Assistant District Attorney Aguilar-Tarchi?

13          A.   I didn't know that they were meeting with

14  her that morning.

15          Q.   Okay.   You knew they were meeting with

16  someone in the DA's Office, you didn't know if it was

17  her?

18          A.   I didn't know when they were meeting.   I

19  knew they would be meeting with her --

20          Q.   All right.

21          A.   -- I didn't know when.

22          Q.   And it says here in this Chrono:

23               "While conducting meeting, Lieutenant

24               Sloan came in and informed us that the

25               suspect would be taken into custody."

                                                    123

1              Do you see that?

2       A.     Yes.

3       Q.     Do you have any reason to believe that did

4  not happen?

5       A.     No.

6       Q.     Okay.  Do you believe Inspector Flores

7  already knew about that when he went to the meeting?

8       A.     I don't, you know, again, remember if

9  Inspector Flores was still in the room when we had

10  discussed making the arrest.

11      Q.     All right.  And when did you find out that

12  Miss Aguilar-Tarchi had decided not to prosecute the

13  case on the morning of July 27th?

14              MS. BAUMGARTNER:  Objection.  Calls for

15  speculation.  Lacks foundation.

16              MR. SCOTT:  Q.  Go ahead.

17      A.     I didn't know on the morning of July 27th,

18  that she was not going to prosecute the case.

19      Q.     Did you find out later that she had told

20  Inspector Flores and Inspector Cirradelli on the

21  morning of the 27th, that she was not going to charge

22  the case?

23      A.     No.

24      Q.     You never found that out?

25      A.     No.

DEPOSITION OF CAPTAIN MARSHA ASHE

1        A.    Because that's something worth knowing.

2        Q.    Why?

3        A.    Because I would want to ask her, "Why:

4   What problems do you see with this case?  And what, if

5   any of those concerns, can we address before we make

6   the arrest?"

7        Q.    Okay.  And if you had been told on the

8   morning of July 27th, 2005, that the District

9   Attorney's Office was not going to prosecute, would you

10  have gone ahead with the arrest anyway in the

11  afternoon?

12        MS. BAUMGARTNER:  Objection.  Incomplete

13  hypothetical.  Calls for speculation.

14        MR. SCOTT:  Q.  Go ahead.

15        A.    Yes, I would have.

16        Q.    Why?

17        A.    Because this case was predicated on

18  physical evidence, escalating violence, as reported by

19  the victim, and lethality factors, that suggested this

20  could easily be a domestic violence homicide.

21        And I felt that we had a legal and ethical

22  responsibility to make an arrest in this case.

23        Q.    And is that why you wanted enhanced bail?

24        A.    Yes.

25        Q.    Did you think enhancing the bail from

                                                    126

1   in Inspector Flores' chronological report.

2        Q.    What about Lieutenant Sloan, should he

3   have had a chronological report?

4        A.    No.

5        Q.    Why not?

6        A.    His -- He was not the investigator on this

7   case.  He was -- His information appears to have been

8   included in the chron.

9        Q.    Since you've been in the DV Unit, how many

10  people have you arrested for domestic violence?

11       A.    Well, there have been, I want to say --

12  You are talking Police Officers.

13       Q.    No.  Anybody, where you are the arresting

14  officer.

15       A.    Only one.

16       Q.    Mr. Cook.

17       A.    Yes.

18       Q.    So, in 400 arrests a month, since 2000,

19  what?

20       A.    '4.

21       Q.    You've been there since 2004.

22       A.    Mm-hmm.

23       Q.    So, thousands of arrests, and the only one

24  you made was Mr. Cook.

25       A.    Yes.

                                                      166

DEPOSITION OF CAPTAIN MARSHA ASHE

1    Q.    Oh.  Any reason why you made the arrest,

2  instead of the Inspector handing the case, Mr. Flores?

3    A.    Yes.

4    Q.    And why is that?

5    A.    Because, as the Commanding Officer of the

6  Unit, and in prior assignments, whenever there was a

7  disarming, or an arrest of an officer, I felt it was my

8  responsibility to do that personally.

9          It is very difficult to do, and it is

10 something that nobody looks forward to doing, and as

11 Commanding Officer, I feel that it's clearly my role.

12   Q.    Well, when was Mr. Cook disarmed?

13   A.    He was disarmed administratively, I would

14 believe, earlier in the week.  I didn't have any -- I

15 have no knowledge of that, other than reviewing the

16 chron.

17   Q.    So the issue of his being disarmed wasn't

18 part of your concern over the arrest, correct?

19   A.    In what sense?

20   Q.    Well, that wasn't an issue, in terms of

21 having to disarm him at the time he was arrested.

22   A.    I don't remember that we talked about when

23 he was disarmed.  I'm not sure of your question, I'm

24 sorry.

25   Q.    Well, I thought I understood you to say

                                                    167

1    Q.    Did Captain Cashman tell you he did not

2  want to make the arrest?

3    A.    No.

4    Q.    Was that an option?

5    MS. BAUMGARTNER:  Objection.  Calls for

6  speculation.

7    MR. SCOTT:  Q.  Go ahead.

8    A.    He -- You know, working with Captain

9  Cashman could be quite vocal about certain things.

10    His role in this was administrative, and

11  if he had any opinion as to the arrest, I had never

12  heard it; he never voiced it.

13    Q.    Okay.

14    A.    And no one -- You know, to clarify

15  something:  Nobody wanted to make this arrest.  This is

16  never -- This is never a good thing.

17    Q.    Why was -- To your knowledge, who made the

18  decision to arrest before a warrant was obtained?

19    A.    I ultimately made that decision, in

20  discussion with Deputy Chief Tabak and Captain Keohane.

21    Q.    Well, was it their decision or your

22  decision?

23    A.    It was my decision, supported by them.

24    Q.    What does that mean, "supported by them"?

25    A.    Well, I certainly am not going to make an

177

1   although. . .

2          Q.    So, between --

3          A.    -- separating out the administrative

4   issues, versus the criminal issues, the highest-ranking

5   person there of an investigative nature was Deputy

6   Chief Tabak.

7          Q.    So he was the final decision-maker.

8          A.    In the investigative sense, yes, but he

9   wasn't -- I didn't go to him and ask permission.

10          I went to him to discuss the factors of

11   this case, to see if there were concerns that we

12   hadn't addressed and, in a sense, to involve him in

13   the decision to make the arrest.

14          Q.    So, you essentially told him you planned

15   on making the arrest without a warrant --

16          A.    I supported the arrest, yes.

17          Q.    Well, did you tell him you were going to

18   make an arrest without a warrant, and just as a

19   courtesy, told him, or were you asking for his

20   permission?

21          A.    I was asking for his advice.

22          Q.    And what was his advice?

23          A.    He reviewed the lethality factors, and he

24   supported the idea of making the arrest outside of a

25   warrant.

179