EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CLIFFORD COOK,                        )
                                      )
            Plaintiff,                )
                                      )
    vs.                               )
                                      )  No. C 07-02569 CRB
                                      )
CITY AND COUNTY OF SAN                )
FRANCISCO, ANTONIO FLORES, DON        )
SLOAN, MARSHA ASHE, and DOES          )
1-50, inclusive,                      )
                                      )
            Defendants.               )
                                      )
_____)


DEPOSITION OF CAPTAIN MARSHA ASHE

January 16, 2008


REPORTED BY:   A. MAGGI SAUNDERS,

               C.S.R. No. 2755

CLIFFORD COOK VS. CCSF, ET AL.     Multi-Page™     Deposition of CAPT. MARSHA ASHE
USDC, NORTHERN DIST OF CA, No. C-07-02569 CRB     January 16, 2008
Case 3:07-cv-02569-CRB    Document 52-2    Filed 04/18/2008    Page 3 of 13

### Page 1

```
      IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF CALIFORNIA
                      ---oOo---
CLIFFORD COOK,                )
                              )
          Plaintiff,          )
                              )
     vs.                      )  No. C 07-02569 CRB
                              )
CITY AND COUNTY OF SAN        )
FRANCISCO, ANTONIO FLORES, DON)
SLOAN, MARSHA ASHE, and DOES  )
1-50, inclusive,              )
                              )
          Defendants.         )
                              )



           DEPOSITION OF CAPTAIN MARSHA ASHE
                   January 16, 2008






REPORTED BY: A. MAGGI SAUNDERS,
     C.S.R. No. 2755
```

### Page 2

```
                    I N D E X

                                            Page
Examination by MR. SCOTT                      6
Examination Resumed by MR. SCOTT             83


                   E X H I B I T S

FOR PLAINTIFF                               Page
1    San Francisco Police Department         107
     Chronological of Investigation
2    Incident Report                         180
3    Memorandum, to All Members of DVRU      183
     from Lieutenant Don Sloan, January
     11, 2005, RE: Daily Expectations
     and Investigation Expectations
4    Request for Bail Enhancement            185
5    August 3, 2005 letter to Inspector      186
     Cook from Heather Fong, Chief of
     Police, RE: Decision That You
     Remain Suspended, Pending Police
     Commission Hearing
6    Interoffice Memorandum, to              189
     Inspector Tony Flores, from
     Assistant District Attorney Aguilar
```

### Page 3

```
     Tarchi, RE: Discharge 27 - Further
     Investigation Necessary, 7/28/05
7    Warrant Declination Memorandum          190
```

### Page 4

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition, and on Wednesday, the 16th day of January, 2008, commencing at the hour of 10:3 o'clock a.m. thereof, at the SCOTT LAW FIRM, 1375 Sutter Street, Suite 222, San Francisco, California 94109, (415) 561-9600, before me, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, there personally appeared

          CAPTAIN MARSHA ASHE,

called as a witness by the Plaintiff CLIFFORD COOK, who, being by me first duly sworn, was thereupon examined and interrogated as hereinafter set forth.

          ---oOo---

    SCOTT LAW FIRM, 1375 Sutter Street, Suite 222, San Francisco, California 94109, (415) 561-9600, represented by JOHN HOUSTON SCOTT, ESQ., appeared as counsel on behalf of Plaintiff CLIFFORD COOK.

    DENNIS J. HERRERA, CITY ATTORNEY, OFFICE OF THE CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO, 1390 Market Street, Sixth Floor, San Francisco,

Page 5

1 California 94102; (415) 554-3800, represented by
2 MARGARET W. BAUMGARTNER, DEPUTY CITY ATTORNEY,
3 appeared as counsel on behalf of Defendants CITY AND
4 COUNTY OF SAN FRANCISCO.
5
6 ALSO PRESENT WAS THE PLAINTIFF, CLIFFORD COOK.

Page 6

1           ---oOo---
2      CAPTAIN MARSHA ASHE,
3 called as a witness herein, being first duly sworn by
4 the Certified Shorthand Reporter to tell the truth,
5 the whole truth, and nothing but the truth, testified
6 as follows:
7 EXAMINATION BY MR. SCOTT:
8    Q.  Would you state your full name for the
9 record, please.
10   A.  Yes. It's Marsha Ashe, M-a-r-s-h-a,
11 A-s-h-e.
12   Q.  Okay. And are you usually referred to as
13 "Captain Ashe"?
14   A.  Yes.
15   Q.  And during the deposition, if I just say
16 "Captain," or "Captain Ashe," is either one fine?
17   A.  That's fine.
18   Q.  All right. Captain Ashe, my name is John
19 Scott, and I represent Clifford Cook in a lawsuit
20 that's been brought in Federal Court.
21       We're here to take your deposition
22 today. Thank you for being here.
23   A.  (Nodding head.)
24   Q.  Have you ever had your deposition taken
25 before?

Page 7

1    A.  Yes.
2    Q.  On how many occasions?
3    A.  Probably four.
4    Q.  Okay. Were those all work-related?
5    A.  Yes.
6    Q.  And when was the last time you were
7 deposed?
8    A.  Probably 2001.
9    Q.  Those four prior depositions, in any of
10 those cases, were you either a plaintiff or a
11 defendant?
12   A.  No.
13   Q.  So, in all of those cases, you understood
14 you were being deposed as a witness.
15   A.  Yes.
16   Q.  And without the details, can you just tell
17 me generally what those cases involved, whether it was
18 a lawsuit against a police officer, or a lawsuit by a
19 police officer, or a little of both?
20   A.  I remember one specifically:
21       There was a case brought forth by a
22 police officer;
23       Another was against a police officer on
24 a Permit Hearing;
25       And the other two or three, I don't have

Page 8

1 any quick recollection of.
2    Q.  Do you recall, those other two or three,
3 do you recall generally what you were a witness to?
4    A.  One was a party, a wedding celebration,
5 and I -- I'm not recalling specifically the others.
6    Q.  Okay. Approximately how long ago were the
7 others?
8    A.  Oh, they were seven, eight years ago, and
9 beyond.
10   Q.  Okay. Did you understand they involved
11 lawsuits by citizens alleging police misconduct, or
12 were they lawsuits by employees alleging
13 discrimination, or something that was work-related?
14   A.  None of them were about discrimination.
15       They were about misconduct or
16 mishandling of cases; Permit Hearings.
17   Q.  All right. When you say --
18   A.  Civil more than criminal.
19   Q.  Okay. When you say Permit Hearings, what
20 type of "permits" are you talking about?
21   A.  Generally, as a Captain, it's Alcohol, ABC
22 Permits, that type of thing. Misuse; nonexistent ones.
23   Q.  And, now, in the case where you were
24 deposed that was brought by an officer, that was a
25 lawsuit filed in State or Federal Court, I take it?

**Page 65**

1 custody?
2    MS. BAUMGARTNER: Objection. Vague.
3    MR. SCOTT: Q. Go ahead.
4    A. No, not in the sense of --
5    You know, again, an Arresting Officer
6 takes somebody into custody, and I suppose that that
7 would be me, in the sense that I did tell Inspector
8 Cook he was under arrest.
9    Q. Okay. This afternoon in July, when you
10 told him he was under arrest, this would be July 2005,
11 or. . .
12    A. 2005.
13    Q. 2005.
14    Had you had any contact with Mr. Cook
15 prior to that time?
16    A. No.
17    Q. Did -- Had you ever seen him prior to that
18 time?
19    A. Yes.
20    Q. And where had you seen him?
21    A. He worked in the Robbery Detail, which is
22 Room 400. I worked in Room 400. We would nod to each
23 other in the hallway.
24    Q. Did you know him by reputation prior to
25 July 2005?

**Page 66**

1    A. No. Well, I take that back:
2    I knew -- I never put a face with the
3 name, but I did hear Clifford Cook talked about in
4 the Robbery Detail with affection. So, I knew that
5 he was well-liked. That was the reputation that I
6 had about him.
7    Q. Can you give me an example of things that
8 you heard said that led you to believe he was
9 "well-liked"?
10    A. I don't remember anything specifically.
11    Q. So, based on what you had heard from other
12 officers, he had a good reputation?
13    A. He was well-liked.
14    Q. Okay. Did you -- But, by reputation, had
15 you heard anything negative about him?
16    A. No.
17    Q. Did you know anything about his work
18 history?
19    A. No.
20    Q. Did you have access to his personnel file?
21    A. No.
22    Q. Why not?
23    A. We don't have access to personnel files.
24 There has to be a reason to access a personnel file. I
25 certainly never had one.

**Page 67**

1    Q. You were investigating him for a Felony
2 Domestic Violence allegation, correct?
3    A. Yes.
4    Q. And as part of that investigation, did you
5 have access to his personnel file?
6    A. No, I did not.
7    Q. Could you have sought to get permission
8 somehow to look at a personnel file?
9    MS. BAUMGARTNER: Objection. Calls for
10 speculation.
11    MR. SCOTT: Well, if she doesn't know, she
12 can say she doesn't know.
13    THE WITNESS: I don't know --
14    MR. SCOTT: Q. Okay.
15    A. -- it had no relevancy.
16    There was an Administrative Hearing that
17 was proceeding as well.
18    Q. Now, you used -- You mentioned before that
19 one of the things you look at in Domestic Violence
20 cases is history of violence, correct?
21    A. Yes.
22    Q. Now, if Officer Cook had an indication of
23 a history of violence in his personnel file, would that
24 have been relevant?
25    A. Yes --

**Page 68**

1    Q. Okay.
2    A. -- if it related to domestic violence,
3 yes, that would have been relevant.
4    Q. Okay. And did you attempt to determine,
5 as part of your investigation before you arrested him,
6 whether he had a history of domestic violence?
7    A. Yes.
8    Q. And what did you find out?
9    A. There were four prior allegations in
10 outside jurisdictions, three or four. The number, I
11 don't recall specifically.
12    Q. And was that something you had specific
13 information about?
14    A. That was information provided by the
15 victim and corroborated by calls for police services in
16 other jurisdictions.
17    Q. Okay. And what did you get to corroborate
18 the allegations?
19    A. There were CAD, or whatever the -- there
20 were histories that documented those calls for
21 services.
22    Q. Okay. And you said three or four?
23    A. Three or four.
24    Q. And what do you know about those three or
25 four?

**Page 69**

1  A. Just that there were three or four
2  allegations: One of which involved an incident of
3  drinking; one of following, or -- up in Napa.
4     You know, the particulars, if I knew, I
5  have certainly forgotten.
6  Q. Did any of them involve violence or
7  injuries?
8  A. I don't believe there were any allegations
9  of injury.
10 Q. Oh. So, there was a history of some, I
11 guess, reports to police, but no prior history of
12 injuries or violence, correct?
13 A. As I recall.
14 Q. All right. And the victim, what was her
15 name?
16 A. Lisa.
17 Q. And when did you first meet her?
18 A. I never met her.
19 Q. Did you ever talk to her?
20 A. No.
21 Q. And the information you had about her
22 allegations, from whom did you obtain that information?
23 A. We got that information from Lieutenant
24 Sloan.
25 Q. And when did you get --

**Page 70**

1     In relation to the arrest on the
2  afternoon of July 27th, when did you get that
3  information from Lieutenant Sloan?
4  A. I think the arrest was on the 28th. I
5  think that I --
6  Q. Oh, okay.
7  A. -- 27th -- again, I --
8  Q. Could be. Well, let's --
9  A. Again, my sense of chronology is bad.
10 Q. Well, whatever day it was -- and we'll get
11 to that in a minute -- in relation to the day of the
12 arrest, when did you get the information from
13 Lieutenant Sloan?
14 A. It was either that morning, or the night
15 before.
16 Q. What did he tell you?
17 A. That there was a history of domestic
18 violence allegations that had been escalating.
19 Q. Anything else?
20 A. That there had been injury to an animal.
21 Q. What kind of animal?
22 A. I think he said a cat.
23 Q. Okay.
24 A. There had been stalking; multiple phone
25 calls; death threats.

**Page 71**

1  Q. Okay. Anything else?
2  A. Lisa had been told that she would not be
3  able to ever get away from Clifford; that he would find
4  her, kill her, dispose of her bones.
5  Q. Anything else?
6  A. And that early on in the marriage there
7  had been some allegation of sexual assault.
8  Q. And how long had they been married?
9  A. I don't know.
10 Q. So, when you say "early on in the
11 marriage," that could have been two months, or ten
12 years?
13 A. My sense was that they have been married
14 for several years prior to this; but, again, that was
15 just a sense, and I don't know what I based that on.
16 Q. Did you get any other information from
17 Lieutenant Sloan regarding the allegations prior to the
18 arrest?
19 A. That she had had a spiral fracture of a
20 hand or arm --
21 Q. I'm sorry?
22 A. -- a spiral fracture of a hand or arm in
23 the most recent incident, which happened on the 19th, I
24 believe.
25 Q. And what is a "spiral fracture"?

**Page 72**

1  A. A spiral fracture is a type of fracture
2  that's caused by a twisting motion.
3  Q. So, by "fracture," you understand there
4  was a broken bone?
5  A. Spiral fracture is -- And I have to give
6  the caveat, I'm not a medical expert here -- but I
7  don't know if it's classified as a broken bone. It is
8  more, I think that it's a hairline fracture.
9     Again, I don't know what that rises to,
10 in terms of degree of fracture.
11 Q. Were there x-rays?
12 A. Yes.
13 Q. Okay. And did you look at the x-rays?
14 A. No.
15 Q. Okay. And did some medical expert tell
16 you that there was a hairline fracture or spiral
17 fracture that was caused by an incident that happened
18 on July 19th?
19 A. I did not speak to a medical expert.
20    I understood Lieutenant Sloan had either
21 talked to a doctor, a medical professional of some
22 sort.
23 Q. And what did he tell you he found out?
24 A. That there was a spiral fracture. Again,
25 I don't remember if it was hand or arm, or . . .

Deposition of CAPT. MARSHA ASHE — Multi-Page — CLIFFORD COOK vs. CCSF, ET AL.
January 16, 2008 — USDC - NORTHERN DIST OF CA, No. C-07-02569 CRB
Case 3:07-cv-02569-CRB    Document 52-2    Filed 04/18/2008    Page 7 of 13

1  MS. BAUMGARTNER: Well, let's stop there.
2  I don't want to --
3  MR. SCOTT: Q. That answers my question.
4  So allegation -- That where there were
5  prior allegations came up, did it come up that these
6  allegations were investigated?
7  A. Yes.
8  Q. And did it come up that they did not
9  result in discipline?
10  A. No. And I don't remember that discussion.
11  I don't know what the disposition of the end prior
12  investigations were.
13  Q. Would that have made a difference, what
14  the disposition was of those allegations?
15  A. For the criminal investigation, no. Not
16  to me, no.
17  Q. Okay. So, if it didn't matter, why were
18  they being discussed?
19  A. Because this case was being discussed
20  as -- both as an administra- -- it was triggering
21  Administrative concerns and Administrative
22  Investigations, and there was the issue of Inspector
23  Cook being suicidal.
24  Q. And that was discussed.
25  A. Yes.

Page 117

1  Q. Was that the primary issue that was being
2  discussed?
3  A. No. The primary issue was not his
4  suicidal -- or the allegation that he was suicidal.
5  Q. The primary issue was whether to arrest or
6  not?
7  A. Yes.
8  Q. Was a decision made at that meeting?
9  A. Yes.
10  Q. Who made the decision?
11  A. It was made in-concert with the Deputy
12  Chief and myself and Lieutenant Sloan.
13  Q. So Lieutenant Sloan, you and Deputy Chief
14  Tabak made the decision to arrest at that meeting.
15  A. Yes.
16  Q. Was that meeting over by 10:00 o'clock?
17  A. I don't remember how long it lasted, or
18  that it started at 9:30, the time line there, I don't
19  know. I don't remember.
20  Q. Okay. And why did you wait until later in
21  the afternoon to arrest him?
22  A. He was gone and out of the building when
23  we asked where he was.
24  Q. Who told you that?
25  A. His Lieutenant.

Page 118

1  Q. Okay. And were you aware that about
2  10:00 o'clock that morning Inspector Flores met with
3  Assistant District Attorney Aguilar-Tarchi?
4  A. No.
5  MS. BAUMGARTNER: Objection. Vague as to
6  time.
7  MR. SCOTT: Q. At any time. Have you
8  ever become aware of that?
9  A. I knew that they were meeting with her. I
10  wasn't sure what time or when, or if they had met prior
11  with her.
12  Q. And what did you understand to be the
13  purpose of that meeting?
14  A. Going to review the facts of the case for
15  a possible warrant.
16  Q. And who told you that?
17  A. It was -- We discussed it. It was what we
18  had discussed.
19  Q. Okay. So was the decision to arrest going
20  to be based on whether she would issue a warrant?
21  A. No.
22  Q. So you were going to make the arrest,
23  whether or not a warrant would issue?
24  A. Yes.
25  Q. Okay. And whether or not the District

Page 119

1  Attorney would prosecute was not significant?
2  A. It wasn't discussed.
3  Q. Oh. And so, you understood that the
4  decision to arrest was made; and then the District
5  Attorney would review the case for a warrant; and then,
6  once that review was done, you would then find out if
7  the DA was going to prosecute?
8  MS. BAUMGARTNER: Objection. Compound.
9  Vague.
10  MR. SCOTT: Q. Go ahead.
11  A. No. That's not what happened.
12  Q. Okay. To your knowledge, is it documented
13  anywhere that the decision was made at that meeting at
14  9:30 to arrest Mr. Cook?
15  A. Documented, in terms of memo form, I
16  certainly did not.
17  Lieutenant Sloan did not.
18  I don't know if Captain Keohane or
19  Captain -- Well, Captain Cashman wouldn't have.
20  It may be that Captain Keohane advised the
21  Chief in-writing, I don't know; I did not document it
22  in-writing.
23  Q. Was Inspector Flores at that meeting at
24  9:30?
25  A. I don't remember if he was or wasn't.

Page 120

**Page 121**

1 Q. How would he be able to report on the
2 meeting, if he wasn't there?
3 A. He -- Well, it says here that he was
4 there; because now I remember a discussion where he
5 said he requested support for the investigation, he
6 needed additional people.
7    We also discussed at the meeting whether
8 SID should take the case. That was discussed.
9 Q. What's "SID"?
10 A. SID is Special Investigations Division.
11 Q. So Captain Cashman should be able to
12 testify that he was present at that meeting when a
13 decision was made to arrest Mr. Cook?
14 A. I would think so.
15 Q. And Lieutenant Sloan should be able to
16 testify to that?
17 A. I should think so.
18 Q. And Inspector Flores should be able to
19 testify to that.
20 A. I should think so.
21 Q. Okay. Because they were present when a
22 decision was made at that 9:30 meeting to arrest
23 Mr. Cook.
24 A. It's my recollection, that when we
25 finished the meeting, we had decided to have a Probable

**Page 122**

1 Cause arrest, either there, or very shortly thereafter.
2 I remember it taking place at the meeting.
3 Q. Okay. And your recollection is that this
4 was a verbally-agreed-to at the meeting, in the
5 presence of Captain Cashman, Lieutenant Sloan, and
6 Inspector Flores.
7 A. I don't know if Captain Cashman was there
8 for the entire meeting, nor do I know if Inspector
9 Flores was there for the entire meeting.
10    I do know that Deputy Chief Tabak and I
11 and Captain, now Deputy Chief Keohane discussed making
12 an arrest at that meeting.
13    So I don't know if the others had left and
14 then we discussed it, but I do know that the three of
15 us discussed the arrest.
16 Q. And were you aware -- Well, it says here
17 that:
18    "Inspector Flores was told to update the
19    DA's Office on the incident."
20    Do you see that?
21 A. Yes.
22 Q. And did that happen?
23 A. I imagine it did. It seems like he met
24 with them at 10:00.
25 Q. Okay. And what did you understand to be

**Page 123**

1 the purpose of Inspector Flores updating the DA's
2 Office?
3    MS. BAUMGARTNER: Objection. It's been
4 asked and answered.
5    THE WITNESS: I remember a discussion
6 regarding a warrant, but I don't -- I don't know what
7 he meant exactly by saying, you know, "told to update
8 the DA's Office on the incident".
9    MR. SCOTT: Q. And did you understand
10 that at approximately 10:00 o'clock that morning,
11 Inspector Cirradelli and Inspector Flores met with
12 Assistant District Attorney Aguilar-Tarchi?
13 A. I didn't know that they were meeting with
14 her that morning.
15 Q. Okay. You knew they were meeting with
16 someone in the DA's Office, you didn't know if it was
17 her?
18 A. I didn't know when they were meeting. I
19 knew they would be meeting with her --
20 Q. All right.
21 A. -- I didn't know when.
22 Q. And it says here in this Chrono:
23    "While conducting meeting, Lieutenant
24    Sloan came in and informed us that the
25    suspect would be taken into custody."

**Page 124**

1    Do you see that?
2 A. Yes.
3 Q. Do you have any reason to believe that did
4 not happen?
5 A. No.
6 Q. Okay. Do you believe Inspector Flores
7 already knew about that when he went to the meeting?
8 A. I don't, you know, again, remember if
9 Inspector Flores was still in the room when we had
10 discussed making the arrest.
11 Q. All right. And when did you find out that
12 Miss Aguilar-Tarchi had decided not to prosecute the
13 case on the morning of July 27th?
14    MS. BAUMGARTNER: Objection. Calls for
15 speculation. Lacks foundation.
16    MR. SCOTT: Q. Go ahead.
17 A. I didn't know on the morning of July 27th,
18 that she was not going to prosecute the case.
19 Q. Did you find out later that she had told
20 Inspector Flores and Inspector Cirradelli on the
21 morning of the 27th, that she was not going to charge
22 the case?
23 A. No.
24 Q. You never found that out?
25 A. No.

1  Q. To your knowledge, did Ms. Aguilar-Tarchi
2  tell Inspector Flores on the morning of July 27th,
3  that, based on what he presented, she would not charge
4  the case?
5  A. No.
6  Q. You don't know.
7  A. No, I do know: No, I didn't know.
8  Q. No. My question is, do you know if that
9  happened?
10 A. No. I --
11 Q. Okay.
12 A. -- do know that that happened.
13 Q. Okay. And if it had happened, and if
14 Lieutenant Sloan was informed of that, should he have
15 reported that to you?
16     MS. BAUMGARTNER: Objection. Calls for
17 speculation.
18     MR. SCOTT: Q. Go ahead.
19 A. Had he known that she was not going to
20 prosecute the case; is that your question?
21 Q. Yes. Should that have been reported to
22 you?
23     MS. BAUMGARTNER: Same objection.
24     THE WITNESS: Yes.
25     MR. SCOTT: Q. Why?

Page 125

1  A. Because that's something worth knowing.
2  Q. Why?
3  A. Because I would want to ask her, "Why:
4  What problems do you see with this case? And what, if
5  any of those concerns, can we address before we make
6  the arrest?"
7  Q. Okay. And if you had been told on the
8  morning of July 27th, 2005, that the District
9  Attorney's Office was not going to prosecute, would you
10 have gone ahead with the arrest anyway in the
11 afternoon?
12     MS. BAUMGARTNER: Objection. Incomplete
13 hypothetical. Calls for speculation.
14     MR. SCOTT: Q. Go ahead.
15 A. Yes, I would have.
16 Q. Why?
17 A. Because this case was predicated on
18 physical evidence, escalating violence, as reported by
19 the victim, and lethality factors, that suggested this
20 could easily be a domestic violence homicide.
21     And I felt that we had a legal and ethical
22 responsibility to make an arrest in this case.
23 Q. And is that why you wanted enhanced bail?
24 A. Yes.
25 Q. Did you think enhancing the bail from

Page 126

1  50,000 to 100,000 was going to stop a homicide from
2  happening?
3  A. I think, in domestic violence cases, we
4  can put up barriers and roadblocks.
5     I think, in most of the domestic
6  violence homicide cases, you always ask yourself:
7  What if this had been put up? What if this barrier
8  had been put up?
9  Q. Mm-hmm.
10 A. It was simply another barrier.
11 Q. So you thought enhancing the bail from
12 50,000 to 100,000 might prevent a homicide.
13 A. I thought --
14     MS. BAUMGARTNER: Objection. I'm sorry.
15 Incomplete hypothetical. Calls for speculation.
16     MR. SCOTT: Q. Go ahead.
17 A. I thought it provided an additional layer
18 to a victim who claimed to be terrified of a suspect,
19 additional layer of protection.
20 Q. A victim you'd never talked to, correct?
21 A. Yes.
22 Q. All right. Since you've been in the DV
23 Unit, how many times has your office tried to enhance a
24 bail of an arrestee --
25 A. I don't --

Page 127

1  Q. -- for domestic violence?
2  A. I don't know.
3  Q. Are you aware of any other cases?
4  A. Yes.
5  Q. How many?
6  A. I don't know.
7  Q. Approximately how many do you recall?
8  A. I don't have any sense of that.
9     When I review case files, they talk
10 about whether or not bail-enhancement was sought or
11 received.
12     Oftentimes -- Not oftentimes -- but that
13 can also be requested on the street by the arresting
14 officers at the time of an arrest; and I don't have
15 any sense of how often that happens, other than it's
16 not common, nor is it rare to have that.
17 Q. How many times have you reviewed a DV case
18 where there was enhanced bail?
19     MS. BAUMGARTNER: Objection. It's been
20 asked and answered.
21     THE WITNESS: I don't really have a sense
22 of that. I read it, and it doesn't -- I mean, it's not
23 so rare that it sticks out. It's . . .
24     MR. SCOTT: Q. Whose idea was it to
25 enhance the bail in this case?

Page 128

**Page 153**

1   MR. SCOTT: Q. So you don't remember?
2   A. If it wasn't before, it was very shortly
3 after, that Inspector Cook requested to make the
4 statement.
5   Q. And did Lieutenant Sloan respond to that
6 request?
7   A. I don't remember if Lieutenant Sloan did
8 or I did. But one of us advised Inspector Cook to --
9 that he may need to speak with an attorney, or that
10 there would be an opportunity later; I don't remember
11 the exact language.
12   Q. Did you hear Lieutenant Sloan say to
13 Mr. Cook, [quote], "No matter what you say, it won't
14 change anything"?
15   A. I don't remember that specific language.
16 That easily could have been said.
17   Q. Okay. And if I understand you correctly,
18 if it didn't matter what Mr. Cook said during the
19 interview, he was going to be arrested regardless.
20   A. Yes, he was already under arrest at that
21 time.
22   Q. All right. And if he had been interviewed
23 before the arrest, it wouldn't have made any
24 difference, it wouldn't have mattered what he said,
25 correct?

**Page 154**

1       MS. BAUMGARTNER: Objection. It's been
2 asked and answered, and calls for speculation.
3       MR. SCOTT: Q. Go ahead.
4   A. It would not have mattered.
5   Q. Okay.
6       Did you think it was important to get a
7 statement from Mr. Cook?
8       MS. BAUMGARTNER: Objection. Vague.
9       THE WITNESS: It is the best investigative
10 practice very shortly after an arrest to attempt to get
11 a statement.
12       MR. SCOTT: Q. And isn't it even a better
13 idea to get the statement before the arrest?
14   A. Not necessarily.
15   Q. Oh, there might be exceptions; but, in
16 general, isn't it better to get a statement as soon as
17 possible?
18   A. In a domestic violence case that's based
19 on physical evidence, whether or not you get a
20 statement beforehand doesn't affect the outcome of the
21 arrest. The arrest is still made.
22       Statements are used for a variety of
23 reasons, including locking people into stories that can
24 later be refuted.
25       There is a variety of reasons to get the

**Page 155**

1 statement, but to get it as quickly as possible.
2 That didn't happen in Inspector Cook's case.
3   Q. And what are the reasons to try to get a
4 statement from a suspect?
5   A. It generally is to lock them into a story
6 that can be refuted in Court later.
7   Q. And has it been your experience, you have
8 a better chance of getting a statement from someone
9 before they are arrested, as opposed to after?
10   A. I'm not sure I understand your question.
11   Q. Well, you've been a cop since 1982. Has
12 it been your experience that people are usually more
13 willing to give a statement before they are arrested,
14 as compared to after?
15       MS. BAUMGARTNER: Objection. Vague.
16       THE WITNESS: Suspects are generally not
17 willing to give you a statement at all.
18       MR. SCOTT: Q. Mm-hmm.
19   A. If in certain cases, like child abuse, you
20 have a -- a better chance of getting statement from
21 somebody before the arrest, but those are dynamics that
22 are probably particular to a sexual abuse.
23       In domestic violence cases, we almost
24 always get the statement after the arrest, when the
25 case is based on physical evidence, victim

**Page 156**

1 statements.
2       There was also the additional charge of
3 the CLETS -- all caps -- entries for inquiries.
4   Q. Was Mr. Cook the first San Francisco
5 Police Officer ever arrested for CLETS inquiries?
6   A. I have no idea.
7   Q. You wouldn't be surprised to hear that,
8 would you?
9       MS. BAUMGARTNER: Objection. Calls for
10 speculation.
11       THE WITNESS: Would I be surprised to hear
12 that?
13       MR. SCOTT: Q. Yes.
14   A. Yes, I would be surprised to hear that.
15   Q. Okay. Do you know of any other San
16 Francisco Officers who were arrested for CLETS
17 inquiries prior to Mr. Cook?
18   A. I have no knowledge of those.
19   Q. So, you are the first one -- the first
20 officer you are aware of for CLETS inquiries?
21       MS. BAUMGARTNER: Objection. Misstates
22 the facts: Captain Ashe was not arrested.
23       MR. SCOTT: Q. No. You are --
24       Mr. Cook is the first officer you are
25 aware of who was arrested for CLETS inquiries?

Page 161

1  Q. All right. And you were concerned that
2 because you were making the arrest, he might kill
3 himself.
4  A. Yes.
5  Q. And you understood that, based on this
6 arrest, he could be terminated from the department,
7 even if the DA didn't prosecute him.
8      MS. BAUMGARTNER: Objection. Vague; lacks
9 foundation.
10      THE WITNESS: That, in and of itself,
11 would be unlikely, but, possibly.
12      MR. SCOTT: Q. Why do you say it would be
13 unlikely?
14  A. There is some precedent set, both for an
15 arrest and -- an arrest on all matter of crimes that --
16 Just a minute, let me rephrase.
17      An arrest does not necessarily expose an
18 Officer to termination, although it will be considered.
19      We have a history of a number of people
20 that are arrested for a variety of crimes.
21      Most prevalently, I guess, is Drunk
22 Driving, that are terminated sometimes on paper; that
23 terminations held in abeyance, pending, you know,
24 good behavior for three years.
25      But, yes, when a Police Officer is

Page 162

1 arrested, he or she is exposed to the possibility of
2 being terminated.
3      In domestic violence, it becomes even more
4 significant, because of prohibitions, if there is a
5 conviction.
6  Q. Now, back to Exhibit No. 1: Did you
7 understand that the case was going to be presented to
8 Miss Aguilar-Tarchi again on July 28th?
9  A. Yes.
10  Q. And who told you that?
11  A. That's the way we do business. I assumed
12 that, in part.
13      I also had a conversation with Liz, either
14 the afternoon, late in the afternoon of the 27th, or
15 early the morning of the 28th, that she didn't like the
16 case. She had some investigative steps that she wanted
17 taken for the case.
18      So I was aware that it would be
19 presented, or we wanted it presented early on, but I
20 wasn't aware that it was being presented at
21 9:00 o'clock.
22  Q. And did you call Liz Aguilar-Tarchi, or
23 did she call you?
24  A. I don't remember who called whom.
25  Q. But you talked --

Page 163

1  A. She's difficult to get ahold of, so I
2 imagine she called me, either because I called her,
3 or -- but we did talk on the phone.
4  Q. And you believe it was either the
5 afternoon of the 27th, or the morning of the 28th.
6  A. Yes.
7  Q. And what did she tell you?
8  A. She didn't like the case. She thought
9 that there were problems with it.
10      I felt that she wanted to be -- I --
11 her --
12  Q. I just asked what she told you. I'll ask
13 you later what you thought and felt.
14  A. Yeah. I didn't tell her anything. You
15 know, she called to tell me she didn't like the case.
16  Q. Were those her words?
17  A. I don't remember her specific words, but
18 that was certainly the intent of her phone call in our
19 discussion.
20  Q. Did you ask her why she didn't like the
21 case?
22  A. We talked about investigative steps that
23 she would like to see taken.
24  Q. Did she tell you that she had discussed
25 this with Inspector Flores on the morning of the 27th?

Page 164

1  A. She said that she had talked to Inspector
2 Flores, and then was surprised when Lieutenant Sloan
3 came in and said that we would be making an arrest.
4 She did say that, she was surprised.
5  Q. Okay. And what did you say to her in
6 response, if anything?
7  A. I didn't say -- I don't remember saying
8 anything too specific to her. I listened to her.
9      We talked about protocols for
10 officer-involved domestic violence cases.
11      Talked about national standards;
12      Talked about what we -- you know, her
13 concerns, what she wanted done on this case.
14  Q. Okay. And what were her concerns that she
15 expressed to you?
16  A. She had documented her concerns in a
17 later -- I mean, she wrote her concerns out.
18      I don't remember specifically what steps
19 she wanted done, but there was -- she wanted more
20 documentation of prior allegations, and -- I think
21 that was the length of time.
22  Q. And so you understood that she had put
23 together a list of additional documents or information
24 she wanted?
25  A. Mm-hmm.

**Page 173**

1  MS. BAUMGARTNER: Objection. Calls for
2  speculation.
3       THE WITNESS: I don't know.
4       MR. SCOTT: Q. Should there be phone
5  records?
6       MS. BAUMGARTNER: Objection. Calls for
7  speculation.
8       THE WITNESS: I don't know. I don't know
9  what records are tracked through the audit system.
10      MR. SCOTT: Q. And do you know if Miss
11 Tarchi has a record of when that phone conversation
12 occurred?
13      A.  I don't know.
14      Q.  Okay. So you don't know if there is
15 something in her file indicating when that conversation
16 occurred?
17      A.  I don't know.
18      Q.  Okay. And do you recall whether that
19 conversation occurred before or after the arrest?
20      A.  Oh, that was after the arrest.
21      Q.  So you are sure it was after 3:00 o'clock?
22      A.  I am sure it was after the arrest. I
23 don't know what time the arrest was specifically.
24      Q.  Okay. Well --
25      A.  I remember it being in the morning, to my

**Page 174**

1  best recollection, within the morning of the 29th.
2       Q.  When you talked to Miss Tarchi?
3       A.  Yeah, I remember it more of a morning
4  conversation, but that is strictly from recollection.
5       Q.  And it would have been the morning after
6  the arrest.
7       A.  Yes.
8       Q.  So you believe it was the morning of the
9  28th.
10      A.  It was late the afternoon or the morning
11 of the 29th. The arrest was, I believe, on the 28th,
12 or was it --
13      Q.  The 27th.
14      A.  The 27th.
15      Q.  According to Exhibit 1, it was the 27th.
16      A.  (Looking at the documents)
17          So, then, I'm sorry, 28th, then, the
18 morning of the 28th.
19      Q.  And I think you said you were surprised to
20 learn that she thought the case was weak?
21      A.  No, I wasn't surprised to learn that she
22 thought the case was weak.
23          The case, if we had to proceed strictly on
24 the physical evidence, was weak. I -- We all -- I
25 certainly recognized that.

**Page 175**

1  I was surprised that she had such a strong
2  sense of this case as -- and I had wondered what she
3  had been told about it, because her perception of the
4  case was pretty different from my perception.
5          And, again, I wondered what she had been
6  told, and how the case had been presented to her,
7  because she is in a position similar to the position
8  that I am in, which is: You make decisions based on
9  the information presented. And I did not present
10 information to her. So, I was not sure how much
11 information had been filtered.
12      Q.  So you understood Inspector Flores was the
13 primary person providing her with information?
14      A.  Yes.
15      Q.  And he was the primary source of your
16 information.
17      A.  He was the lead investigator in this case.
18          My primary source for information was
19 Lieutenant Sloan. I generally go through my chain.
20      Q.  And you understood Lieutenant Sloan's
21 primary source of information was Inspector Flores.
22      A.  And Lisa Cook.
23      Q.  Oh. So, at the time you felt that perhaps
24 Inspector Flores had a different take on the case than
25 Lieutenant Sloan?

**Page 176**

1       A.  No, I didn't feel that.
2       Q.  Okay. And is it your testimony that prior
3  to your conversation with Liz Aguilar-Tarchi after the
4  arrest, you had no information that she did not want to
5  prosecute the case?
6       MS. BAUMGARTNER: Objection. It's been
7  asked and answered. Vague as to time.
8       MR. SCOTT: Q. Before the arrest.
9       A.  I had no discussion with her, nor with
10 anyone, about her dislike of this case prior to the
11 arrest, that I can recall. And I just -- There is
12 nothing there.
13      Q.  Okay. Is there any reason why Captain
14 Cashman didn't arrest Mr. Cook?
15      MS. BAUMGARTNER: Objection. Calls for
16 speculation.
17      MR. SCOTT: Q. Go ahead.
18      A.  Yes, we talked about that.
19          And because Kevin had a more
20 administrative role, and also to be available as a
21 support factor for Inspector Cook, they had known
22 each other quite a while, and there was affection
23 between them; and it was easier if I, as somewhat of
24 an unknown personality to Inspector Cook, make the
25 arrest.

```
                    )
STATE OF CALIFORNIA )   ss.
                    )
```

## CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 21st day of January, 2008.

*A. Maggi Saunders CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California