# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

| | |
|---|---|
| CLIFFORD COOK, | ) |
| Plaintiff, | ) |
| vs. | ) No. C 07-02569 CRB |
| CITY AND COUNTY OF SAN FRANCISCO, ANTONIO FLORES, DON SLOAN, MARSHA ASHE, and DOES 1-50, inclusive, | ) |
| Defendants. | ) |

DEPOSITION OF INSPECTOR ANTONIO FLORES

April 3, 2008

REPORTED BY:  A. MAGGI SAUNDERS,

C.S.R. No. 2755



A. Maggi Saunders & Associates
Certified Shorthand Reporters

57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

CLIFFORD COOK vs. CCSF, ET AL.  Multi-Page  Depo of INSPECTOR ANTONIO FLORES
USDC, NORTHERN DIST OF CA, No. C07-02569 CRB                    April 3, 2008
Case 3:07-cv-02569-CRB   Document 52-3   Filed 04/18/2008   Page 3 of 18

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                     ---oOo---
 4  CLIFFORD COOK,              )
 5         Plaintiff,            )
 6     vs.                       )
                                 ) No. C 07-02569 CRB
 7                               )
    CITY AND COUNTY OF SAN       )
 8  FRANCISCO, ANTONIO FLORES, DON )
    SLOAN, MARSHA ASHE, and DOES )
 9  1-50, inclusive,             )
                                 )
10         Defendants.           )
11                               )
12
13
14
15
16    DEPOSITION OF INSPECTOR ANTONIO FLORES
17              April 3, 2008
18
19
20
21
22
23
24  REPORTED BY: A. MAGGI SAUNDERS,
25         C.S.R. No. 2755
                                              Page 1
```

### INDEX

```
                          Page
 4  Examination by MR. SCOTT            5
```

### EXHIBITS

```
 8  FOR PLAINTIFF                    Page
 9  1    Inspector Flores' Chronological of    47
10       Investigation
11  2    Interoffice Memorandum, to            64
12       Inspector Tony Flores, from
13       Assistant District Attorney
14       Aguilar-Tarchi, RE: Discharge 27 -
15       Further Investigation Necessary in
16       Case No. 050-355-556, 7/28/05
17  3    Police Report from Walnut Creek       75
18       Police Department
19  4    Warrant Declination Memorandum        90
20  5    Incident Report, July 19, 2005       103
21  6    Incident Report, Supplemental        106
                                              Page 2
```

```
 1          BE IT REMEMBERED that, pursuant to Notice
 2  of Taking Deposition, and on Thursday, the 3rd day of
 3  April, 2008, commencing at the hour of 12:18 o'clock
 4  p.m. thereof, at the SCOTT LAW FIRM, 1375 Sutter
 5  Street, Suite 222, San Francisco, California 94109,
 6  (415) 561-9600, before me, A. MAGGI SAUNDERS, a
 7  Certified Shorthand Reporter in and for the State of
 8  California, there personally appeared
 9
10          INSPECTOR ANTONIO FLORES,
11
12  called as a witness by the Plaintiff CLIFFORD COOK,
13  who, being by me first duly sworn, was thereupon
14  examined and interrogated as hereinafter set forth.
15
16                  ---oOo---
17
18       SCOTT LAW FIRM, 1375 Sutter Street, Suite
19  222, San Francisco, California 94109, (415) 561-9600,
20  represented by JOHN HOUSTON SCOTT, ESQ., appeared as
21  counsel on behalf of Plaintiff CLIFFORD COOK.
22
23       DENNIS J. HERRERA, CITY ATTORNEY, OFFICE OF
24  THE CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO,
25  1390 Market Street, Sixth Floor, San Francisco,
                                              Page 3
```

```
 1  California 94102, (415) 554-3800, represented by
 2  MARGARET W. BAUMGARTNER, DEPUTY CITY ATTORNEY,
 3  appeared as counsel on behalf of Defendants CITY AND
 4  COUNTY OF SAN FRANCISCO, ET AL.
 5
 6  ALSO PRESENT WAS CLIFFORD COOK, THE PLAINTIFF.
                                              Page 4
```

Depo of INSPECTOR ANTONIO FLORES — Multi-Page — CLIFFORD COOK vs. CCSF, ET AL.
April 3, 2008 USDC, NORTHERN DIST OF CA, No. C07-02569 CRB
Case 3:07-cv-02569-CRB   Document 52-3   Filed 04/18/2008   Page 4 of 18

**Page 13**

1         MS. BAUMGARTNER: Objection. Calls for a
2 legal conclusion.
3         MR. SCOTT: Q. Just an opinion. Your
4 opinion as a Police Officer.
5    A. Yes.
6    Q. And during the approximately seven years
7 that you have been assigned to that Domestic Violence
8 Unit, approximately how many cases do you handle a
9 year?
10   A. Close to maybe over about a 130, 140.
11   Q. A year.
12   A. A year.
13   Q. So, it would be a little over ten a month?
14   A. Give or take, yes.
15   Q. And how long do most of these
16 investigations last? What would be the average, or the
17 range?
18   A. Well, that depends.
19   Q. Okay. Depends on what?
20   A. It depends on if it's a non-arrest case,
21 it could take several months;
22         If it's an arrest case, where it has to be
23 reviewed by so many hours, to take it to the District
24 Attorney's Office to be reviewed and decided what they
25 are going to do.

**Page 14**

1         So, sometimes the cases could go very
2 fast, or these cases could take a little longer.
3   Q. All right.
4         And if I understand you correctly, there
5 is essentially two categories of cases when you get
6 them:
7         Either an arrest has been made, or an
8 arrest has not been made, when you get the case.
9   A. Yes.
10   Q. Okay. And approximately over the last
11 seven years what percentage of the cases assigned to
12 you have been cases where the arrest has already been
13 made by the time you get the file?
14   A. Um, I would say a large majority, maybe
15 about 75 percent of the cases in the year are usually
16 arrest.
17   Q. And in those approximate 75 percent of the
18 cases where the arrest has been made by the time you
19 get the case, are there sometimes time constraints, in
20 terms of how soon you have to complete your
21 investigation?
22   A. Yes.
23   Q. And why is that?
24   A. There is a day in the week that we don't
25 have the luxury of the 72 hours, that we have to

**Page 15**

1 actually have the thing ready, the case in itself
2 presented to the -- possibly to the DA almost that same
3 day.
4   Q. All right.
5         And what happens if you don't present
6 the case to the DA that same day, or within the 72
7 hours?
8   A. You are responsible for that case. You
9 are responsible of what could happen to it.
10        So, the San Francisco Jails could
11 probably kick that person out of jail.
12   Q. And why is that?
13   A. Because no formal charges have been
14 brought to -- for them, so it's the -- it's a
15 liability, I believe, for the Jail.
16   Q. All right. So, somebody would be held
17 unlawfully?
18   A. Possibly.
19        And if something happened to that
20 individual, where they were there a little longer and
21 no charges were filed and something happens to them
22 while in custody while no charges were -- were
23 placed, or if the case was not dismissed, from what
24 I've been told, that they could be liable for that.
25   Q. Okay. And those cases that you get where

**Page 16**

1 the arrest has already been made, are most of those
2 cases arrests that were made either close in time to
3 the incident, or usually by officers at the scene who
4 responded to a call?
5   A. When you mean time, like how much time are
6 we talking about?
7   Q. Where, you know, a call comes in, a 911
8 call comes in. The Police go to the scene. There is a
9 battered woman there. She is bleeding. She's injured.
10 Whatever is going on.
11   A. Mm-hmm.
12   Q. And she says, "My husband, he hit me, he
13 beat me up."
14        And he's there, and he's arrested there,
15 boom, on the spot.
16        Would that be kind of common of the kind
17 of cases that you -- the 75 percent you get, where
18 you have got to get your investigation done and get
19 it to the DA within your 72 hours?
20   A. Yes.
21   Q. All right. And let's talk about the other
22 25 percent, plus or minus.
23   A. Mm-hmm.
24   Q. What is a typical fact pattern of those
25 cases?

CLIFFORD COOK VS. CCSF, ET AL.    Multi-Page™ Depo of INSPECTOR ANTONIO FLORES
USDC, NORTHERN DIST. OF CA, No. C07-02569 CRB    April 3, 2008
Case 3:07-cv-02569-CRB    Document 52-3    Filed 04/18/2008    Page 5 of 18

### Page 17

1    A.    Well, that it makes the determination,
2 sometimes the suspect is gone.
3    Q.    Okay.
4    A.    Or the victim has walked in days later,
5 and made reports regarding incidences of violence,
6 and -- or maybe they went to the hospital.
7        And so there are factors, several
8 factors as to why the case is assigned.
9    Q.    Okay. So the -- this other 25 percent,
10 plus or minus, where an arrest has not been made, but
11 you've gotten a case, it could be for a number of
12 reasons:
13        One reason could be, the complaint was
14 made right away, and the police went to the scene, but
15 the husband, or whoever did the attack, wasn't there,
16 couldn't be found, he skipped.
17        And you have time, because while -- up
18 until the time he gets found and -- or assuming you
19 are going to arrest him -- you have time to take it
20 to the DA, because the 72 hours hasn't started,
21 because the arrest hasn't been made.
22        MS. BAUMGARTNER: Objection: Compound.
23        MR. SCOTT: Q. Go ahead. Is that one
24 scenario?
25    A.    Yes and no.

### Page 18

1    Q.    Okay.
2    A.    Because, sometimes, if the person is gone,
3 it may be that there is a likelihood, after looking at
4 the case in a whole, you can say, "We need to find this
5 person, and we need to go get them right now."
6    Q.    Okay.
7    A.    And so, you may just go out, without
8 presenting the case to the DA; and that person is
9 arrested, based on the information that the officers
10 have.
11    Q.    No, I understand that.
12        But what if you can't find the person?
13    A.    Then, we start going through the process
14 of: If we cannot locate the person, and after the
15 several steps that we try, then, that case was -- will
16 be assigned to a -- or given to the DA, whoever is the
17 head of the Domestic Violence Unit down in the DA's
18 office --
19    Q.    Mm-hmm.
20    A.    -- and then that case is presented to them
21 and you say either, "Can I apply for a warrant or, no";
22 or they'll give you more things to do on the case, and
23 a determination will be made, and you'll try to get a
24 warrant, and then you go through that process.
25    Q.    And why do you try to get a warrant?

### Page 19

1    A.    Well, in case the individual might have
2 left town. They might have gone; they might have gone
3 someplace else. There are several factors of why.
4    Q.    Now, in the other 25 percent, one scenario
5 could be that the victim who is complaining waited days
6 or weeks after the alleged incident to complain about
7 it.
8    A.    Yes.
9    Q.    Okay. And that's one scenario.
10    A.    Yes.
11    Q.    And Clifford Cook's case would fall within
12 that category.
13    A.    Yes.
14    Q.    And in those cases, what do you usually do
15 to investigate them, before you make an arrest?
16    A.    I like to talk to the victim.
17    Q.    Why is that?
18    A.    Because I want to get the information, the
19 facts of the case, of what's actually going on.
20    Q.    And what else do you want to do?
21    A.    I want to determine if actually the crime
22 has occurred.
23    Q.    Do you want to talk to the suspect?
24    A.    Yes, I do.
25    Q.    Why?

### Page 20

1    A.    Sometimes I want to hear their side of the
2 story.
3    Q.    Okay. And sometimes do you find out the
4 suspect wasn't even in town when the alleged attack
5 occurred?
6    A.    Are we -- Are we talking about other
7 cases, or are we talking about this specific --
8    Q.    Yeah, other cases.
9    A.    Now, that, I can't recall, if the person
10 wasn't in town or not.
11    Q.    Okay. But you have looked at cases where
12 you determined that the allegations were just false.
13    A.    Yes.
14    Q.    Okay. And you learned, I guess -- I don't
15 know if you are married -- but I guess, in the business
16 you are in, you come across a lot of happily-married
17 couples, who are capable of making false allegations
18 against each other.
19        MS. BAUMGARTNER: Objection: Calls for
20 speculation.
21        MR. SCOTT: Q. Would that be fair to say?
22    A.    Yes.
23    Q.    Wives falsely accusing husbands of doing
24 illegal things, and husbands falsely accusing wives of
25 doing illegal things.

1   A. Yes.
2   Q. Okay. Everything from assault, battery,
3 child molestation, bank robbery, murder, you name it,
4 right?
5   A. Yes.
6   Q. Sometimes it's true, and sometimes it
7 isn't; isn't that right?
8   A. Correct.
9   Q. Okay. And you learned from your
10 experience in this business that sometimes spouses, out
11 of hate, jealousy, rage, anger, or any number of
12 related motives, may make false or exaggerate
13 allegations of what another spouse has done to them or
14 someone else.
15      MS. BAUMGARTNER: Objection: Calls for
16 speculation about why anybody would make false
17 allegations.
18      MR. SCOTT: Q. Go ahead.
19   A. Yes.
20   Q. Okay. Including -- Are you aware of the
21 phenomenon, "sexual assault incident to divorce"?
22   A. No, I haven't heard of that.
23   Q. That hasn't come up?
24      Have you had cases where you learned
25 that somebody alleging domestic violence falsely

Page 21

1 alleged that someone was sexually abusing a child?
2   A. Yes.
3   Q. Okay. So, you've heard that one, too,
4 right?
5   A. I've had a case like that.
6   Q. Okay. And so, you approach these cases
7 with a certain amount of skepticism?
8   A. In what sense?
9   Q. Do you -- You don't automatically believe
10 what everybody tells you, do you?
11   A. I believe in what -- what's told to me,
12 and the other parts of the evidence that's there also.
13   Q. Okay. But you've learned that sometimes
14 people tell you things that just aren't true, right?
15   A. Yes.
16   Q. Okay. And so, you don't assume --
17      I mean, I'll tell you, as a lawyer, I
18 don't assume what my client is telling me is the
19 truth.
20      Do you assume what every person who
21 complains to you is telling you the truth?
22   A. No.
23   Q. All right.
24      And in order to make an arrest, do you
25 usually want to have more than just what somebody is

Page 22

1 telling you?
2      MS. BAUMGARTNER: Objection: Incomplete
3 hypothetical.
4      MR. SCOTT: Q. Go ahead.
5   A. Yes.
6   Q. And that might be physical injuries, for
7 example?
8   A. That's correct.
9   Q. Corroborating witness?
10   A. Yes.
11   Q. A history of violence?
12   A. Yes.
13   Q. What am I leaving out?
14   A. If we're talking about investigating a
15 case where the suspect isn't in custody, I'd like to
16 hear basically the history of the location itself:
17      Like, if there had been prior calls of
18 service to that location; if there has been other
19 documentation, like from the medical community that's
20 out there; besides the witnesses that possibly would
21 come forward, or not come forward: Take a look at
22 that.
23      Let's see. That's all I can think of at
24 this time.
25   Q. All right. Now, in cases where there has

Page 23

1 been a delay in somebody making a complaint to you,
2 like in this case, the Cook Case, is there a protocol
3 or a -- procedures you usually follow, as part of your
4 investigation, when you get one of these complaints?
5   A. Regarding -- Are we focusing strictly on
6 Mr. Cook's case?
7   Q. Or cases like his, where a spouse has come
8 in a week or so after the alleged assault --
9   A. Mm-hmm.
10   Q. -- and made a complaint --
11   A. Mm-hmm.
12   Q. -- and you've got the case; an arrest
13 hasn't been made.
14      In those situations -- I assume his isn't
15 the only case where some victim waited about a week
16 plus or minus, and made a complaint, right?
17   A. Yes.
18   Q. It's not that unusual, right?
19   A. No, it's not unusual.
20   Q. Okay. Is there a protocol you follow in
21 those cases?
22   A. Well, if a -- the person was to come off
23 the street and just walk into our office and I had the
24 case and -- or maybe to give you a hypothetical like
25 this is that we'd sit down and we'd start talking about

Page 24

CLIFFORD COOK vs. CCSF, ET AL. — Multi-Page — Depo of INSPECTOR ANTONIO FLORES
USDC, NORTHERN DIST OF CA, No. C07-02569 CRB
April 3, 2008
Case 3:07-cv-02569-CRB   Document 52-3   Filed 04/18/2008   Page 7 of 18

**Page 25**

1 the case and get an interview with them.
2 　　　And as the case is going, then I'm going
3 to tell them, "Well, I would like you to do this,
4 this, and this for me."
5 　　　In other words: Medical release; do you
6 have any additional witnesses; get phone numbers.
7 Have they called you before? Please save those
8 messages. Do not change your phone number.
9 　　　You know, then we start talking about,
10 because this person is still out there -- and I kind
11 of make it very clear with them: With or without
12 their cooperation --
13 　Q.　Mm-hmm.
14 　A.　-- it's up to the DA's office to go
15 forward with this case.
16 　Q.　Well, why do you do that?
17 　A.　Well, there are some victims out there
18 that feel that -- that they still have this
19 relationship, and it has to do with love.
20 　　　And within this loving relationship that
21 they have, they don't want to be the bad person.
22 　　　And sometimes they feel that, if they
23 ever go back to the relationship, they can say, "You
24 know, it wasn't me that was pressing charges against
25 you. It was the State or the Police, or whoever."

**Page 26**

1 　Q.　Okay.
2 　A.　And -- But, again, if they decide to go in
3 another direction, which we know, that the victim will
4 go back to the batterer, because -- again, because of
5 the relationship: Long-term; maybe they have financial
6 stuff together; maybe they have children together;
7 maybe they are -- you know, because of a controlling
8 thing that the suspect may have over the victim, or the
9 victim has over the suspect, it could be all these
10 different things.
11 　　　So, at that point, that is why we kind of
12 tell those victims that. And we know that, down the
13 road, that this is a possibility.
14 　Q.　Okay. And based on your investigation of
15 the Cliff Cook case, did you get information that
16 somehow he was controlling his wife Lisa?
17 　A.　There was -- There was --
18 　　　There was some signs that were there.
19 　Q.　Was she financially dependent on him?
20 　A.　I believe so.
21 　Q.　And why do you believe that?
22 　A.　Because there were times when, when I
23 would ask her, for instance, she would say that she
24 didn't have any money; or that Mr. Cook wanted her to
25 sign over a Pink Slip to a Mercedes Benz that she was

**Page 27**

1 driving.
2 　Q.　Do you know if she had a job?
3 　A.　Not that I knew of.
4 　　　And I remember, I think I even believe I
5 asked her if she had a job, if she was working at
6 that time.
7 　Q.　Okay. And where was she living?
8 　A.　With her daughter.
9 　Q.　Okay. Did you understand that --
10 　　　Well, at some point, did you understand
11 that Mr. Cook had reported to you that she was
12 calling him?
13 　A.　Did Mr. Cook tell me --
14 　Q.　Yeah --
15 　A.　-- that he was --
16 　Q.　-- she was calling him.
17 　A.　She was calling him? No, I don't remember
18 having that conversation.
19 　Q.　Okay. And you don't recall him trying to
20 report that to you?
21 　A.　To me?
22 　Q.　Yes.
23 　A.　No.
24 　Q.　All right. Now, do you know how this case
25 was assigned to you?

**Page 28**

1 　A.　I was the on-call Inspector for that week.
2 　Q.　Okay.
3 　A.　And would you like me to explain that
4 part?
5 　Q.　Please.
6 　A.　Okay. As the on-call Inspector, you are
7 basically taking care of the City, and helping out,
8 making support to Patrol when there are incidences.
9 　　　I happened to be the person that was
10 on-call at that time, and there is certain criterias
11 for an on-call for our unit to do.
12 　Q.　Mm-hmm?
13 　A.　In this case, I was ordered by Lieutenant
14 Sloan.
15 　Q.　In your seven years with the Domestic
16 Violence Unit, how many cases of alleged domestic
17 violence have you investigated involving police
18 officers?
19 　A.　[Thinking]. I believe it's going to be
20 more than -- more than five.
21 　Q.　Okay.
22 　A.　More than between ten and five.
23 　Q.　All right. And how many of those -- don't
24 give me names -- but in how many of those cases was
25 there an arrest?

A. [Thinking] Sorry about this.
 And I know one that comes from the top of my head right off the bat.
Q. Other than Mr. Cook?
A. Yes.
Q. That would be Kelly Paul?
A. Yes.
Q. Okay. Other than Mr. Cook and Kelly Paul, can you think of any?
A. Oh, in law enforcement, yes.
Q. Okay. San Francisco Police Officer?
A. No.
Q. Okay. A different agency?
A. Yes.
Q. All right. What agency?
A. The State Department.
Q. All right.
 But in terms of the San Francisco Police Officers, of the five to ten cases of domestic violence you've investigated in your career with domestic violence, you recall two of those, there being arrests, Clifford Cook and Kelly Paul.
A. That I can think of right now.
Q. That you can remember.
A. Yes.

Page 29

Q. All right. So in the cases there was no arrest; is that right?
A. Not that I can recall.
Q. And in those other cases, were they worked-up and taken to the DA for a warrant?
A. Yes.
Q. Okay. And in those other cases, the DA decided not to prosecute, I take it?
A. Yes.
Q. Okay. And in Kelly Paul's case, was that case taken to the DA for a warrant review before the arrest?
A. Yes.
Q. Okay. So, Clifford Cook would be the only case where an arrest was made before the DA did a warrant review?
A. I believe so -- Um --
Q. Of San Francisco Police.
A. For myself?
Q. Yes.
A. For myself, yes.
Q. And what was different about his case?
A. What was different about Mr. Cook's case is that there were -- there were a lot of indicators, a lot of indicators of things escalating.

Page 30

Q. Okay. And it's documented in your Chron?
A. Yes.
Q. And what was escalated?
A. Well, there was a -- There was a -- the alleged incident that happened at his home;
 And then, from -- in days after that, there was the call regarding Mr. Cook being suicidal;
 Then there was prior documentation of prior incidences involving Mr. Cook and his wife.
Q. And that meant it was escalating?
A. From -- Yes.
Q. From the things that happened years earlier?
A. Yes.
Q. Okay. And one of those things was where she was arrested for 647F, and it was recorded that she had bitten him?
A. There was that incident, yes.
Q. Okay. And that was part of the reason he was arrested, because she got drunk and bit him?
   MS. BAUMGARTNER: Objection: Calls for speculation. He's already testified he didn't make that decision.
   MR. SCOTT: Q. Well, was it your understanding that he was the only officer arrested for

Page 31

domestic violence before a warrant review was done by the District Attorney's Office because it was escalating? Did somebody tell you that?
   MS. BAUMGARTNER: That question is vague. He's testified about the people that he has participated in.
   MR. SCOTT: Okay.
   MS. BAUMGARTNER: He has not testified generally about the San Francisco Police Department's DVR Unit as a whole.
   MR. SCOTT: Let me withdraw the question.
Q. Did you believe these escalating factors that you've referred to was a reason to arrest Mr. Cook before the DA did a warrant review?
   MS. BAUMGARTNER: Objection: Vague. What do you mean, "was a reason"? He didn't --
   MR. SCOTT: He's the one who volunteered that information. I asked him why this case was different than the others.
   MS. BAUMGARTNER: Are you asking him to continue the answer to that question.
   MR. SCOTT: Yeah. Yeah, if he can.
   THE WITNESS: I'm sorry, could you repeat that?
   MR. SCOTT: Q. Yeah. I'm trying to find

Page 32

### Page 33

1 out if you believe that Mr. Cook should have been
2 arrested before the DA did a warrant review because of
3 these escalating factors you've mentioned?
4     MS. BAUMGARTNER: So you are asking his
5 opinion --
6     MR. SCOTT: Yeah --
7     MS. BAUMGARTNER: -- about whether he
8 should have been arrested?
9     MR. SCOTT: -- I sure am.
10    MS. BAUMGARTNER: Objection: Vague.
11    MR. SCOTT: Q. Go ahead.
12 A. Yes.
13 Q. Okay. Why?
14 A. Because as I stated before: Because it
15 was getting a little worse.
16 Q. Okay. Were they separated?
17 A. Were they separated?
18 Q. Yeah, at the time of the arrest of
19 Mr. Cook.
20 A. At the time of the arrest, no, not that I
21 know of, no.
22 Q. They were still living together; that was
23 your understanding?
24 A. Oh. I thought that you meant --
25    I'm sorry, I thought you meant --

### Page 34

1 Q. Were they living together?
2 A. I mean, dissolved, that the marriage was
3 dissolved.
4 Q. No. Were they living together?
5 A. Not that I knew of, no.
6 Q. And his weapons had been taken from him,
7 correct?
8 A. That's what I was told.
9 Q. Okay. And you understood, or it was
10 reported to you, he was suicidal?
11 A. That's what I was told.
12 Q. And did -- was one of the escalating
13 factors, or reasons to arrest him is because she
14 reported that he was suicidal?
15 A. Is -- I'm sorry?
16 Q. Is that one of the reasons you think he
17 should have been arrested, because of the report that
18 he was suicidal?
19 A. If you are asking my opinion --
20 Q. Mm-hmm, I am.
21 A. -- I think it was the totality of
22 everything.
23 Q. All right. Was -- Did you refer him for
24 Fitness For Duty, or some kind of psychiatric
25 evaluation?

### Page 35

1 A. No.
2 Q. Did you 5150 him?
3 A. No.
4 Q. Why not?
5 A. (Thinking) Um. . .
6 Q. You didn't think he was suicidal?
7 A. I'm telling you the information that I
8 received.
9 Q. Okay. Did you interview Inspector Cook to
10 try to evaluate whether he was suicidal?
11 A. No.
12 Q. Why not?
13 A. Because I was still doing the preliminary
14 investigation on this case.
15 Q. Is interviewing the suspect part of a
16 preliminary investigation?
17 A. Yes, it is.
18 Q. So you never completed your preliminary
19 investigation?
20 A. I never got a chance to talk to Mr. Cook.
21 Q. Okay. Did you know that he wanted to be
22 interviewed?
23 A. Not until afterwards --
24 Q. After what?
25 A. -- after he was arrested.

### Page 36

1 Q. How did you find out?
2 A. I was told.
3 Q. By whom?
4 A. By the Captain and Lieutenant Sloan.
5 Q. What did they tell you?
6 A. They said they had placed him under
7 arrest, and that -- without incident, and that he was
8 upset, he was nervous, and that nobody was listening to
9 his side of the story.
10 Q. That's what they said?
11 A. That's -- that's what I can recall.
12 Q. And who was the "nobody" who would listen
13 to his side of the story?
14 A. Oh, that, I don't know.
15 Q. Did you want to hear his side of the
16 story?
17 A. Yes.
18 Q. Why?
19 A. Because I wanted to hear; I wanted to
20 know.
21 Q. Okay. And did you want to know that
22 before you had the DA review the case, or after?
23 A. Say that again, please?
24 Q. Yeah. Did you want to interview him
25 before you had the DA review the case, or after?

**Page 37**

1  A. Before.
2  Q. Why?
3  A. So she can look at the case in a whole.
4  Q. All right.
5      Was it your intention to interview
6  Inspector Cook before he was arrested?
7  A. Yes.
8  Q. Okay. And that would be normal protocol
9  for situations like this, correct?
10 A. Yes.
11 Q. Okay. And also, you knew that, once he
12 was arrested, the chances of him agreeing to be
13 interviewed were going to be smaller, correct?
14 A. Yes.
15 Q. Because you figured, once he got arrested,
16 he would lawyer-up, and his lawyer would tell him not
17 to talk, right?
18 A. As he did.
19 Q. Right.
20     But you figured, before he was arrested,
21 you would have a much better opportunity to interview
22 him, right?
23 A. Yes.
24 Q. And were you upset that he was arrested
25 before you had a chance to interview him?

**Page 38**

1  A. Yes.
2  Q. Why?
3  A. Because at the time, when I was having a
4  meeting with the Assistant District Attorney, my
5  intentions was working this case as a warrant workup.
6      This case, in other words, was going to
7  be reviewed by the DA's Office for some guidance, so
8  they understood what was going on.
9  Q. And were you in the process of -- or at
10 least was that process started at the time you learned
11 about the arrest?
12 A. Yes.
13 Q. And you were in the process of informing
14 the District Attorney's Office about information you
15 had as part of the process towards working it up for a
16 warrant?
17 A. Yes.
18 Q. And that would have been normal policy or
19 protocol in this type of a case?
20 A. I don't know if it's a policy, but. . .
21 Q. Normal protocol?
22 A. Yes.
23 Q. Okay.
24     And when you -- that morning, of
25 July 27th, when you first met with

**Page 39**

1  Ms. Aguilar-Tarchi --
2  A. Yes.
3  Q. -- were you with Inspector Ciardella?
4  A. Ciardella.
5  Q. And why was he there?
6  A. Well, because before -- before we got
7  there, I said I needed support. There was just too
8  many tentacles on this case alone, or a lot of -- it
9  wasn't just dealing with San Francisco.
10     And it's always good to have more eyes
11 than just one eye --
12 Q. Mm-hmm.
13 A. -- when you are looking at this case, and
14 I wanted support.
15     And Inspector Ciardella was my support,
16 and he had -- he had been at the DVR Office longer
17 than I had.
18 Q. Okay. And was he assigned to help you on
19 the case?
20 A. Yes.
21 Q. And when was that decision made to assign
22 him, do you know?
23 A. I believe it was on the 27th.
24 Q. Okay. And was that at the meeting that
25 you had with, I guess, [Captain] Cashman and Captain

**Page 40**

1  Ashe and Captain Sloan and others that morning before
2  you went to the DA's Office?
3  A. You mean, Lieutenant Sloan?
4  Q. Yes, Lieutenant Sloan.
5  A. He was there. And I believe Deputy Chief
6  Tabak was there.
7  Q. Right.
8  A. Yes.
9  Q. You were at that meeting?
10 A. Yes.
11 Q. And what did you understand to be the
12 purpose of that meeting?
13 A. It was to brief everybody about what had
14 been going on, or what I had learned up to that point.
15 Q. Okay. To your knowledge, were any
16 decisions made at that meeting in terms of whether to
17 arrest Inspector Cook at that time?
18 A. Not that I can recall.
19 Q. Okay. And when you left the meeting, as
20 far as you knew, you were going to investigate the case
21 further, with the assistance of Inspector Ciardella.
22 A. Yes.
23 Q. And at that point you anticipated that you
24 would work up the case for a warrant.
25 A. It was actually at the meeting that I was

## Page 41

1 instructed to go meet with the DA's Office, to bring
2 them aboard about what was going on.
3   Q. Okay. And for the purpose of working it
4 up for a warrant?
5   A. That was my purpose.
6   Q. All right. And you understood that's what
7 you were going to be doing.
8   A. Yes.
9   Q. All right. And you told that to Inspector
10 Ciardella?
11   A. Yes.
12   Q. And you told that to Ms. Aguilar-Tarchi?
13   A. As we were getting into the facts of the
14 case, that is when, I would say, we were interrupted.
15   Q. Okay. And how long had that meeting gone
16 on with Ms. Aguilar-Tarchi before the meeting was
17 interrupted?
18   A. I can't recall.
19   Q. Okay. Closer to five minutes or a
20 half-an-hour or an hour?
21   A. Not a half-hour.
22   Q. Okay. Maybe more than five minutes?
23   A. I can't tell you.
24   Q. Did you have your case file with you?
25   A. I believe so, yes.

## Page 42

1   Q. And were you sharing information about the
2 case with her?
3   A. Yes.
4   Q. And was she indicating to you what
5 additional information she wanted?
6   A. She was in the process, yes.
7   Q. Okay. And at that point it was, at least
8 before you were interrupted, you understood that you
9 would be doing further investigation on the case to
10 work it up to a warrant.
11   A. Yes.
12   Q. Which would be the way that you work up
13 most of the cases, this 25 percent, where there hasn't
14 been an arrest already, this would be how most of those
15 cases are handled.
16   A. Sometimes. Sometimes they take the case,
17 and there is nothing else needed on that case, and they
18 will sign-off on a memo, an ID memo, and -- for the
19 charges.
20   Q. And that could have happened in this case?
21   A. That could have happened, yes, in this
22 case.
23   Q. But it didn't, right?
24   A. It didn't.
25   Q. All right. And were you surprised that

## Page 43

1 your meeting with Ms. Aguilar-Tarchi was interrupted?
2   A. Yes.
3   Q. And why were you surprised?
4   A. Because at the time I thought we were
5 there to discuss the case for a warrant workup.
6   Q. All right. And who interrupted the
7 meeting?
8   A. Lieutenant Sloan.
9   Q. And what did he say?
10   A. That they were going to arrest Cliff Cook.
11   Q. And you were surprised to hear that?
12   A. Yes.
13   Q. Why?
14   A. Because it was at that moment that I
15 remember looking at Inspector Ciardella and myself, and
16 I went looking at Liz, and then I kind of looked back
17 to Lieutenant Sloan.
18       And it was, I said, "Well, we're just
19 presenting the case."
20       And he says, "Well, we're going to
21 arrest him, anyway, the Captain and I."
22   Q. Did he say anything else?
23   A. And to get a bail enhancement.
24   Q. That's when he told you to get a bail
25 enhancement?

## Page 44

1   A. I believe it was there, and one more time.
2   Q. And did he tell you why he wanted you to
3 get a bail enhancement?
4   A. Because of the seriousness of the case.
5   Q. Those were his words?
6   A. No. That's -- I believe that's why he
7 wanted it.
8   Q. But did he tell you why, or you are just
9 assuming --
10   A. He ordered me to get a bail enhancement.
11   Q. Okay. And did you ask him why?
12   A. I can't recall if I did or not.
13   Q. Okay. Did you think a bail enhancement
14 was warranted in the case?
15   A. No.
16   Q. Why not?
17   A. Well, I believed, I thought, if they were
18 going to arrest him, there would be several charges
19 there, which would have made the bail high, if they
20 were going to arrest.
21   Q. Did you think he was a flight risk?
22   A. No.
23   Q. Did you think, by enhancing the bail, it
24 was going to be more difficult for him to bail out?
25   A. Yes.

**Page 45**

1  Q.  Okay.  You didn't think he would be able
2  to make the bail?
3  A.  Honestly, I don't know.
4  Q.  And did you believe, or was it your
5  impression, from your conversation with Lieutenant
6  Sloan, that he wanted to make the bail high, so
7  Mr. Cook wouldn't be able to bail out?
8  A.  I believe so.
9  Q.  Okay.  And did you understand, a Police
10 Officer being in custody in a jail, can be
11 life-threatening?
12 A.  I know that.
13 Q.  You know that.
14 A.  Yes.
15 Q.  Okay.  And did you discuss that with
16 Lieutenant Sloan that, if Inspector Cook wasn't able to
17 bail out, it could be life-threatening?
18 A.  Well, seeing that, you know, in past
19 practices of the Jail, that he would be isolated from
20 anybody else in general population.  That's what I do
21 know, so; but I never had that conversation with
22 Lieutenant Sloan.
23 Q.  Did -- Well, how long did the meeting with
24 Ms. Aguilar-Tarchi last after it was interrupted by
25 Lieutenant Sloan?

**Page 46**

1  A.  Probably less than five minutes.
2  Q.  And what do you recall about those
3  minutes, those less-than-five minutes, what was
4  discussed?
5  A.  I think she had the same look as we had.
6  Q.  Which was?
7  A.  You know, shock;
8      And she handed back the documents that I
9  had given her, and it was to the effect of, "Come
10 back when it's done for the rebooking."
11 Q.  And what did that -- What did you
12 understand that to mean, "when it's done"?
13 A.  Well, now that he had -- Mr. Cook had been
14 arrested.
15 Q.  The 72 hours are running?
16 A.  We are now in a predicament, that now we
17 have to gather all our documents;
18      We have a police report to write;
19      We have a bail enhancement to do;
20      We have to get enough information
21 documented on the Chronological Investigation Report;
22      So, it means we're going fast.
23 Q.  And it compromised your ability to do an
24 investigation in 72 hours, didn't it?
25 A.  Yes.

**Page 47**

1  Q.  And it also compromised your
2  investigation, because it was going to be more
3  difficult to interview Inspector Cook, right?
4  A.  Yes.
5  Q.  So, as an Investigator, arresting him was
6  a bad idea, wasn't it, from just the investigation
7  point of view, of compromising your investigation?
8  A.  Yes.
9  Q.  When did you next present the case to
10 Ms. Aguilar-Tarchi?
11 A.  Well, I was given, I think -- I'd have to
12 look over my Chronological Report.
13 Q.  Okay.  We'll make it an Exhibit.
14 A.  I think, less than a day or two.
15 Q.  Okay.  This is a long time ago, I don't
16 expect you to have perfect recall.  And we do have your
17 Chrono here.  I'm going to make it Exhibit 1.
18      (Inspector Flores' Chronological of
19      Investigation marked Plaintiff's Exhibit
20      1 for identification.)
21      MR. SCOTT: Q.  Okay.  And please refer to
22 this to refresh your recollection, in terms of any
23 questions I ask of you.
24 A.  Sure.  What I've been handed is a 1 to
25 33-page Chronological Investigation, which I recognize.

**Page 48**

1  It has my name, my Star No. , Inspector Flores, Star
2  No. 683.  This is the document that I generated.
3  Q.  Okay.  Was any of this document in
4  existence on the morning of July 27th, when you met
5  with Ms. Aguilar-Tarchi?
6  A.  The 33 documents?
7  Q.  Any of these pages.
8  A.  Possibly, about a quarter of it.
9  Q.  All right.
10     And do you recall this being part of a
11 package of documents that you showed to her that
12 morning?
13 A.  Um, there could be possibly this, and
14 other documents.
15 Q.  All right.  And I think I was asking you
16 if --
17 A.  When I went back to Liz Tarchi --
18 Q.  Yeah.
19 A.  -- with the case.
20 Q.  Right.  When was the last time you went
21 back to her with it, after the morning of the 27th?
22 A.  (Looking at the report).
23     It was the 28th.
24 Q.  Okay.  And why did you go back to her the
25 next day?

### Page 49

1  A. I had to.
2  Q. And why did you have to go back the next
3  day?
4  A. Because the clock was ticking.
5  Q. And how many hours did you have?
6  A. This case had to be submitted by the end
7  of the day.
8  Q. Okay. And if the DA wasn't going to
9  prosecute by the end of the 28th, then, Mr. Cook was
10 going to have to be released from custody?
11 A. Yes.
12 Q. Of course, I guess he was already out of
13 custody then, wasn't he?
14 A. Yes.
15 Q. He bailed?
16 A. I believe so, yes.
17 Q. But even though he bailed out, you still
18 had to have it reviewed, and a decision had to be made
19 to prosecute by the end of the 28th?
20 A. Yes.
21 Q. And did you get any additional information
22 that you presented to Ms. Aguilar-Tarchi on the 28th,
23 that you did not have on the 27th, when you met with
24 her that morning?
25 A. (Thinking).

### Page 50

1  Q. Or was it essentially the same package of
2  information that you had brought to her on the 27th?
3        MS. BAUMGARTNER: Essentially, or exactly
4  the same?
5        MR. SCOTT: Q. Well, let's start with
6  exactly.
7  A. No.
8  Q. It wasn't exactly the same?
9  A. No.
10 Q. Okay. And what was new?
11 A. Basically, it would have been the taking
12 him into custody, the arrest report. Just other
13 things.
14 Q. Any additional evidence to support the
15 Chron?
16 A. As far as . . .
17 Q. Anything: Witnesses, physical evidence,
18 confessions?
19 A. I think there were more interviews
20 regarding the other parties that we were at the time
21 doing the investigation.
22       We were receiving a call back from the
23 doctor that had seen Ms. Cook, and had -- basically
24 had called the police earlier.
25 Q. And that was information you got after

### Page 51

1  Mr. Cook was arrested on the 27th, and before you
2  presented the case to Ms. Aguilar-Tarchi on the 28th?
3  A. (Looking at the report) Yes, that was
4  afterwards.
5  Q. Okay. And where is that in your Chrono?
6  A. It's on the tenth page, 7/27 of '05, at
7  1453 hours.
8  Q. All right.
9  A. And my meeting with Liz was -- I mean,
10 Ms. Aguilar-Tarchi was on 7/25/05, at 10:00 o'clock.
11 Q. Okay. And did he provide you any other
12 information than what is in this Chrono?
13 A. I had him talk to Inspector Martinez, 'cuz
14 he was part of -- also an individual that was assigned
15 as support in this investigation.
16 Q. Okay. And was it your understanding at
17 the time that he called that he was examining
18 Mrs. Cook?
19 A. Yes.
20 Q. Okay. And had you suggested that she go
21 to see a doctor after you talked to her on the 26th?
22 A. No.
23 Q. And do you know why she wrote -- and this
24 was regarding an incident that occurred on -- allegedly
25 occurred on July 19th, correct?

### Page 52

1  A. 19th, 20th.
2  Q. Okay, 19th, to 20th?
3  A. Yes.
4  Q. And do you know why she was seeing a
5  doctor a week later regarding that?
6  A. I cannot tell you why.
7  Q. Okay. And do you know if on the 27th,
8  when she saw the doctor, if that related to alleged
9  injuries she received on the 19th or 20th, or if it was
10 something else?
11 A. That, I don't know.
12 Q. Okay. Do you recall any other new
13 information you had that you did not have when
14 Inspector Cook was arrested, but you did have the next
15 day, when you met with Ms. Aguilar-Tarchi?
16 A. Um, just what's documented in the
17 Chronological.
18 Q. Okay. When did you first become aware of
19 the EPO? I guess that's an Emergency Protective Order?
20 A. Yes.
21 Q. When did you first become aware of that?
22 A. I was the person that obtained the EPO.
23 Q. And why did you obtain the EPO?
24 A. It's basically to protect the victim:
25    To have the suspect to stay away, under

**Page 53**

1 certain conditions, for them not to have any contact
2 with that individual.
3     It also provides, if there were children:
4 Child custody, move-out orders, surrender all the
5 firearms.
6     And it gives them an opportunity to go
7 forward, when this order is given, to obtain a
8 Restraining Order. It gives them a short period of
9 time, seven calendar days, five working days.
10    Q.   Now, the EPO, or at least having an EPO in
11 effect, would mean there would be less of a reason to
12 have to arrest somebody, in terms of any concerns you
13 had about future incidents of violence?
14         MS. BAUMGARTNER: Objection: Incomplete
15 hypothetical.
16         MR. SCOTT: Q. Go ahead.
17    A.   No. There is -- There is many times where
18 the EPO is served, and the person is taken into
19 custody.
20    Q.   No, I understand that.
21         I'm just saying, that would be a reason;
22 and if the concern is further or future violence, and
23 if there is an EPO there, then, there might be less
24 concern about that, assuming the person is going to
25 obey the EPO.

**Page 54**

1     A.   If they complied, yes.
2     Q.   All right. Now, let me ask you something:
3          To your knowledge, did the Police
4 Department ever order Inspector Cook to stay away from
5 his wife?
6     A.   There was an alleged Chief's Order.
7     Q.   And if he had disobeyed that Order, he
8 could have been fired, right?
9     A.   From my understanding.
10    Q.   Okay. And that's even better than EPO,
11 isn't it?
12         MS. BAUMGARTNER: Objection. What's the
13 question, whether he believes that it's better? In
14 what way?
15         MR. SCOTT: No, it would have a greater
16 deterrent effect.
17    Q.   It's one thing to -- you know, so you go
18 into Court, and some Judge slaps you on your hand for
19 disobeying an EPO.
20         It's another thing to get fired for
21 disobeying a Chief's Order, wouldn't you agree?
22    A.   Well, that could come back to bite
23 somebody. Because, sometimes a person, they've been
24 ordered to not have any contact, and then could fuel
25 the fire again. So, it's like a double-edged sword.

**Page 55**

1     Q.   What do you mean?
2     A.   Yes, that person could comply and say,
3 "Yes, I will not, because if I do this, I'll be fired."
4     Q.   Right.
5     A.   But, then, on the other hand, they could
6 look at it and say, "Oh, my God. My whole career is
7 coming to a crash. What do I have to lose."
8     Q.   Yeah?
9     A.   And something worse could happen.
10    Q.   So, that's a reason not to do a Chief's
11 Order, because something worse could happen?
12         MS. BAUMGARTNER: Objection: Misstates
13 his testimony.
14         MR. SCOTT: Q. All right. Wouldn't you
15 agree that, if a person is acting rationally, if there
16 is a Chief's Order not to have contact, you are not
17 going to have contact, because there is a risk of
18 losing your job?
19         MS. BAUMGARTNER: Objection: Incomplete
20 hypothetical.
21         MR. SCOTT: Go ahead.
22         MS. BAUMGARTNER: You are making
23 assumptions that -- This question has nothing to do
24 with this case. You are making assumptions that may or
25 may not exist. What does it matter whether he believes

**Page 56**

1 that, if somebody is acting rational, they'll obey a
2 Chief's Order or not? I mean, that's -- that's
3 argument.
4          MR. SCOTT: I'm just asking questions.
5 You want to argue. I'm just asking questions.
6     Q.   Wouldn't you agree with me that --
7          Let's do some foundational issues here:
8          You didn't seek a 5150 for [Lieutenant]
9 Cook, because you didn't think he was suicidal,
10 correct?
11    A.   For Inspector Cook, no.
12    Q.   Okay. And you didn't refer him to a
13 Fitness For Duty Evaluation, or take steps in that
14 direction, correct?
15    A.   No. That's not my -- in the scope of my
16 employment.
17    Q.   All right. Somebody else would have to
18 make that call.
19    A.   That's correct.
20    Q.   Okay. Could you make a recommendation in
21 that regard, that he be evaluated for Fitness For Duty?
22    A.   As long as I've been here, I have not done
23 anything like that.
24    Q.   I'm not asking you whether you had; but
25 you understood you could have made such a

CLIFFORD COOK VS. CCSF, ET AL.     Multi-Page™ Depo of INSPECTOR ANTONIO FLORES
USDC, NORTHERN DIST. OF CA, No. C07-02569 CRB     April 3, 2008
Case 3:07-cv-02569-CRB    Document 92-3    Filed 04/18/2008    Page 15 of 18

**Page 81**

1    A.   I'm sorry, 18...
2    Q.   1818.
3    A.   Oh, okay. Yes.
4    Q.   Do you know what police report that is?
5    A.   I would have to assume.
6    Q.   Okay. You just don't know.
7    A.   I don't know.
8    Q.   But, apparently, you had received a police
9 report that was in your case file as of the evening of
10 July 26th.
11    A.   Yes.
12    Q.   And that would have been in the file when
13 you presented it the next morning to
14 Ms. Aguilar-Tarchi.
15    A.   Possibly, yes.
16    Q.   Okay. Well, it should have been, right?
17    A.   Yeah; I'm hoping, yes.
18    Q.   And you can't testify that it was, but in
19 the normal course of business, it should have been.
20    A.   Yes.
21    Q.   Thank you.
22    And at 1811 hours, there is a reference
23 here to a Chief's Order being granted. What is that
24 "Chief's Order"?
25    A.   It was for the suspect to surrender his

**Page 82**

1 firearms, and basically not to have any more contact
2 with the victim in this case --
3    Q.   Okay.
4    A.   -- and -- until this matter was concluded.
5    Q.   And you understood that, if he violated
6 this Order, it could be grounds for discipline,
7 including termination.
8    A.   Yes.
9    Q.   And according to this Chrono, you told
10 Mrs. Cook about the Order -- that would be Lisa Cook --
11 and she told you she was happy and felt safe.
12    A.   Yes.
13    Q.   Did she tell you -- Did she tell you
14 something inconsistent with that between the evening of
15 the 26th and the morning of the 27th?
16    MS. BAUMGARTNER: Objection: Vague as to
17 what you mean, inconsistent".
18    MR. SCOTT: Q. Well, did she tell you
19 that she was no longer happy, or no longer felt safe
20 the next morning?
21    A.   The day -- the next -- the following day?
22    Q.   Yes.
23    A.   Let me look at the.... (Reviewing the
24 document) So, being the first time that I met the
25 victim --

**Page 83**

1    Q.   Right?
2    A.   -- on July 26th --
3    Q.   Right.
4    A.   -- and during that time? Is that what
5 we're talking about?
6    Q.   Yeah. I'm just trying to find out if --
7    Where it says, she told you at 1811
8 hours, on July 26th, that she was happy and felt safe
9 in response to you telling her about the Chief's
10 Order being granted, and you told her the conditions
11 of the Order, and that he either had or would
12 surrender his firearms, and would not have --
13 surrender his police powers, and not have any contact
14 with her or her family, to your understanding did
15 that change the way she felt between about 6:11 p.m.,
16 the evening of July 26th, and the 27th?
17    A.   Well, then, by then, I -- we had more
18 information regarding with her.
19    Q.   Right. I'm just trying to find out if at
20 the time Inspector Cook was arrested on the next day,
21 did you understand that, somehow, Lisa Cook's being
22 happy and feeling safe had changed? Is there some
23 reason she was no longer happy and feeling safe?
24    A.   I can't answer that.
25    Q.   Well, did she tell you? You can tell me

**Page 84**

1 what she told you.
2    A.   No, I understand that. Asking about
3 feelings, what she expressed, I can't recall her
4 expressing that afterwards.
5    Q.   All right. Well, let's look at page 13
6 out of 33. And at the bottom of the page, this is a
7 reference to a conversation you had with Lisa Cook on
8 the evening of July 28th; is that correct?
9    A.   July 28th? Yes.
10    Q.   Yes. And at the end of your notes, which
11 take up most of that page, it says:
12    "During part of the conversation, the
13    victim felt relaxed and calm."
14    Do you see that?
15    A.   Yes.
16    Q.   Is that something she told you, or that's
17 just your impression?
18    A.   That was my impression.
19    Q.   All right. So, on the 26th, she told you
20 she was happy and felt safe, and on the 28th, your
21 impression was she was relaxed and calm.
22    Do you recall that, somehow, that changed
23 in any way between the 26th and the 28th?
24    A.   Well, Miss Cook's demeanor with me was not
25 pleasant.

**Page 85**

1  Q.  Okay.
2  A.  So, when I referenced, "felt relaxed and
3  calm," it was: We're in a relaxed environment right
4  here, but that doesn't mean that I'm calm.
5  Q.  Okay. You look calm.
6  A.  Well, thank you. Well, I'm worried that
7  she'll be upset at me, if I don't talk loud enough.
8  Q.  I guess what I'm trying to get at is, do
9  you recall something coming up, some information you
10 got from Lisa Cook, either on the evening of the 26th,
11 or the morning of the 27th, that would have been a
12 reason to arrest Inspector Cook, because of some
13 concerns about Lisa Cook's safety?
14       MS. BAUMGARTNER: Objection: Vague. What
15 is the question? Can you repeat the question?
16       MR. SCOTT: Sure, I'll repeat it.
17 Q.  Were you aware of something that came up
18 on the evening of July 26th, or the morning of
19 July 27th, that -- some new information that would have
20 constituted a reason to arrest Inspector Cook because
21 of Lisa Cook's concern about her safety.
22       MS. BAUMGARTNER: Whoa.
23       Objection: That's compound and complex.
24 I can't understand the question. I think it's
25 assuming facts not in evidence, that he had no reason

**Page 86**

1  to worry about it before. I think that that's what's
2  happening here.
3        And it's just an incomprehensible
4  question.
5        MR. SCOTT: Q. Go ahead.
6        MS. BAUMGARTNER: If you can understand
7  it.
8        THE WITNESS: I don't understand the
9  question.
10       MR. SCOTT: Q. All right. Did she tell
11 you that Inspector Cook had made any threats to her?
12 A.  No.
13 Q.  That would have been important
14 information, right?
15 A.  Yes.
16       MS. BAUMGARTNER: Important to what?
17 Excuse me.
18       THE WITNESS: I'm sorry.
19       MR. SCOTT: Important to him as an
20 Investigator.
21 Q.  And you certainly wanted to know if he had
22 made any threats, correct?
23 A.  Yes.
24 Q.  And she told you that he had not made any
25 threats, correct?

**Page 87**

1  A.  Yes.
2  Q.  All right. And did you share that with
3  Lieutenant Sloan?
4  A.  I believe Lieutenant Sloan -- Let me look
5  before I answer. (Looking in the Chrono)
6        I believe Lieutenant Sloan was right
7  there when we were having this conversation.
8  Q.  Okay. Was he right there when she
9  confirmed that the date of the alleged incident,
10 July 19th, that she was under the influence of alcohol?
11 A.  Yes.
12 Q.  And was Lieutenant Sloan there when she
13 reported that she was taking medication for allergy, a
14 Zyrtec and Biaxrin?
15 A.  Yes.
16 Q.  And was Lieutenant Sloan there when she
17 told you that that medication had side effects with
18 alcohol?
19 A.  Yes.
20 Q.  And you report here that, "She said it
21 affects her badly". What is that referring to? What
22 "affects her badly," the alcohol and the medication?
23 A.  That, I can't recall.
24 Q.  Okay. Would there be any way of you, if
25 we had the original case file in front of you, would

**Page 88**

1  there be any way of determining what was in the file on
2  July 27th, as opposed to what later was put in the
3  file?
4  A.  What do you mean?
5  Q.  Well, I assume right now, if we had the
6  file in front of us, it would be, you know, thick, with
7  a lot of pages in it; and if I were to ask you if the
8  file was here, hypothetically, if I were to ask you of
9  which documents were there on the 27th and which ones
10 weren't, would you be able to answer that question?
11 A.  There is a possibility, yes.
12 Q.  And how do you believe you would do that?
13 A.  Some of it might, like some of the fax
14 reports that were provided to me, they might have a
15 time stamp on them as to when we received them.
16       There could be, just the way the file
17 would be organized.
18 Q.  Okay. About how many hours did you spend
19 working on this case, the Cook Case?
20 A.  More than ten.
21 Q.  Closer to 200?
22 A.  Possibly.
23 Q.  Okay. And of those approximately 200
24 hours, plus or minus, how many hours had you worked on
25 the case prior to the time that Mr. Cook was arrested?

**Page 89**

1  A. Before that time?
2  Q. Yeah.
3  A. Several.
4  Q. Okay. About ten hours, maybe?
5  A. Possibly.
6  Q. So you worked the case about ten hours,
7 plus or minus, before he was arrested; and then,
8 certainly well over a hundred hours, maybe closer to
9 200 hours, after he was arrested.
10  A. Yes.
11  Q. And were you ever able to build a case to
12 support a prosecution?
13      MS. BAUMGARTNER: Objection. Whether he
14 believes he could support a prosecution, or whether the
15 DA supported a prosecution?
16      MR. SCOTT: It only matters what the DA
17 thinks.
18  Q. Were you able to build a case that the DA
19 was willing to prosecute?
20  A. The case was reviewed. . .
21     Are you speaking of the very end?
22  Q. At any time.
23  A. At --
24  Q. Beginning, middle, end: At any time, were
25 you able to persuade anybody in the DA's Office to

**Page 90**

1 prosecute the case?
2  A. Well, I believe the case was reviewed a
3 few times by the DA's Office and, each time, new, "So,
4 well, let's try this."
5  Q. Okay.
6  A. "Let's try that. If Miss Cook isn't
7 feeling comfortable with you, then, maybe possibly
8 having somebody else do the interview."
9  Q. Okay.
10  A. And during that time, I think, there was a
11 final decision that was made.
12  Q. By whom?
13  A. By the District Attorney's Office.
14  Q. And do you know who in the District
15 Attorney's Office?
16  A. Assistant District Attorney Russ Giuntini.
17  Q. And did you ever discuss that decision
18 with him?
19  A. No.
20      MR. SCOTT: I'm going to mark as next in
21 order, I think it's No. 4, a Warrant Declination
22 Memorandum, dated September 20, 2005, and we'll make
23 this No. 4.
24      (Warrant Declination Memorandum marked
25      Plaintiff's Exhibit 4 for

**Page 91**

1 identification.)
2      THE WITNESS: Thank you. And what I was
3 handed was a Warrant [Declaration] Memorandum, Exhibit
4 No. 4.
5      MR. SCOTT: Q. And this appears to say
6 that the -- under the -- for "Explanation of
7 Declination, Reason Code: 24L," do you see that?
8  A. Yes.
9  Q. And does "24L" mean anything to you?
10  A. Yes.
11  Q. What does that mean to you?
12  A. It's a code that the DA's Office uses.
13  Q. And what does it signify?
14  A. That at this time that they are not going
15 to go forward with the case.
16  Q. Does that mean because there is no
17 corroboration?
18  A. It's a lack of -- lack of things.
19  Q. Lack of evidence?
20  A. I just had a meltdown. I can't remember
21 the exact terminology for the 24L.
22  Q. Is there a different code, where you have
23 a victim who is not cooperating?
24  A. That, I can't recall.
25  Q. You don't recall --

**Page 92**

1  A. I mean, I can't -- I'm -- There are --
2  Q. Lots of codes.
3  A. There is a lot of codes for reasons why a
4 case hasn't gone forward, and I am just having a
5 meltdown right now. Sorry.
6  Q. A senior moment; I have them all the time.
7     But there is a code for a situation where
8 a victim will not cooperate, correct?
9  A. Yes.
10  Q. Okay. Is "24L" that code?
11  A. I can't recall.
12  Q. And then there is another code for
13 situations where either there is no corroboration, or
14 insufficient evidence.
15  A. Yes, I believe so.
16  Q. And you have been able to get arrests and
17 prosecutions where victims didn't cooperate, correct?
18  A. Yes.
19  Q. And just because a victim doesn't want to
20 cooperate doesn't mean you can't arrest and prosecute
21 someone for Domestic Violence, correct?
22  A. Yes.
23  Q. In fact, it happens all the time, right?
24  A. Yes.
25  Q. Now, in the scheme of things, in terms of

```
                    )
STATE OF CALIFORNIA )   ss.
                    )
```

CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 5th day of April, 2008.

*A. Maggi Saunders, CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California