DENNIS J. HERRERA, State Bar #139669
City Attorney
ELIZABETH SALVESON, State Bar #83788
Chief Labor Team
MARGARET W. BAUMGARTNER, State Bar #151762
ADELMISE WARNER, State Bar #215385
Deputy City Attorneys
Fox Plaza
1390 Market Street, Floor No. 5
San Francisco, California 94102-5408
Telephone:    (415) 554-3859
Facsimile:    (415) 554-4248

Attorneys For Defendants
CITY AND COUNTY OF SAN FRANCISCO ET AL.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CLIFFORD COOK,<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, ANTONIO FLORES, DON SLOAN, MARSHA ASHE, and DOES 1-50, inclusive,<br><br>Defendants. | Case No. C 07 2569 CRB<br><br>**SECOND SUPPLEMENTAL DECLARATION OF MARGARET W. BAUMGARTNER IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  May 9, 2008<br>Time: 10:00 a.m.<br>Place: Ctrm. 8, 19th Fl.<br><br>Date action filed:<br>Trial date:  None set |

1          I, Margaret W. Baumgartner, declare:

2    1.   I am a Deputy City Attorney with the San Francisco City Attorney's Office.  I am the attorney

3         assigned to this matter.  I have personal knowledge of the facts contained herein, except for

4         those facts stated on information and belief, and as to those facts I believe them to be true.  If

5         called upon to testify, I could and would testify competently hereto.

6    2.   Attached hereto as Exhibit A are pertinent pages from the deposition of Captain Marsha Ashe.

7    3.   Attached hereto as Exhibit B are pertinent pages of the deposition of Captain Kevin Cashman

8    4.   Attached hereto as Exhibit C are pertinent pages of the deposition of Lieutenant Donald Sloan

9    5.   Attached hereto as Exhibit D are pertinent pages of the deposition of Inspector Antonio Flores

10   6.   Attached here as Exhibit E are pertinent pages of the deposition of Assistant District Attorney

11        Elizabeth Aguilar Tarchi.

12         I declare under the penalty of perjury under the laws of the State of California that the

13   foregoing is true and correct.

14         Dated:  April 25, 2008

15

16                                   /s/ Margaret W. Baumgartner
                                     Margaret W. Baumgartner
17                                   Deputy City Attorney

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CLIFFORD COOK,                          )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )
                                        )   No. C 07-02569 CRB
                                        )
CITY AND COUNTY OF SAN                  )
FRANCISCO, ANTONIO FLORES, DON          )
SLOAN, MARSHA ASHE, and DOES            )
1-50, inclusive,                        )
                                        )
                Defendants.             )
                                        )
_____)


DEPOSITION OF CAPTAIN MARSHA ASHE

January 16, 2008


REPORTED BY:  A. MAGGI SAUNDERS,

C.S.R. No. 2755



A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

1        BE IT REMEMBERED that, pursuant to Notice

2   of Taking Deposition, and on Wednesday, the 16th day

3   of January, 2008, commencing at the hour of 10:13

4   o'clock a.m. thereof, at the SCOTT LAW FIRM, 1375

5   Sutter Street, Suite 222, San Francisco, California

6   94109, (415) 561-9600, before me, A. MAGGI SAUNDERS,

7   a Certified Shorthand Reporter in and for the State

8   of California, there personally appeared

9

10        CAPTAIN MARSHA ASHE,

11

12  called as a witness by the Plaintiff CLIFFORD COOK,

13  who, being by me first duly sworn, was thereupon

14  examined and interrogated as hereinafter set forth.

15

16        ---oOo---

17

18        SCOTT LAW FIRM, 1375 Sutter Street, Suite

19  222, San Francisco, California 94109, (415) 561-9600,

20  represented by JOHN HOUSTON SCOTT, ESQ., appeared as

21  counsel on behalf of Plaintiff CLIFFORD COOK.

22

23        DENNIS J. HERRERA, CITY ATTORNEY, OFFICE OF

24  THE CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO,

25  1390 Market Street, Sixth Floor, San Francisco,

4

1  California 94102, (415) 554-3800, represented by

2  MARGARET W. BAUMGARTNER, DEPUTY CITY ATTORNEY,

3  appeared as counsel on behalf of Defendants CITY AND

4  COUNTY OF SAN FRANCISCO.

5

6  ALSO PRESENT WAS THE PLAINTIFF, CLIFFORD COOK.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1          Q.    Okay.  And were you aware that about

2    10:00 o'clock that morning Inspector Flores met with

3    Assistant District Attorney Aguilar-Tarchi?

4          A.    No.

5                MS. BAUMGARTNER:  Objection.  Vague as to

6    time.

7                MR. SCOTT:  Q.  At any time.  Have you

8    ever become aware of that?

9          A.    I knew that they were meeting with her.  I

10   wasn't sure what time or when, or if they had met prior

11   with her.

12         Q.    And what did you understand to be the

13   purpose of that meeting?

14         A.    Going to review the facts of the case for

15   a possible warrant.

16         Q.    And who told you that?

17         A.    It was -- We discussed it.  It was what we

18   had discussed.

19         Q.    Okay.  So was the decision to arrest going

20   to be based on whether she would issue a warrant?

21         A.    No.

22         Q.    So you were going to make the arrest,

23   whether or not a warrant would issue?

24         A.    Yes.

25         Q.    Okay.  And whether or not the District

1      A.    Because that's something worth knowing.

2      Q.    Why?

3      A.    Because I would want to ask her, "Why:

4  What problems do you see with this case?  And what, if

5  any of those concerns, can we address before we make

6  the arrest?"

7      Q.    Okay.  And if you had been told on the

8  morning of July 27th, 2005, that the District

9  Attorney's Office was not going to prosecute, would you

10  have gone ahead with the arrest anyway in the

11  afternoon?

12      MS. BAUMGARTNER:  Objection.  Incomplete

13  hypothetical.  Calls for speculation.

14      MR. SCOTT:  Q.  Go ahead.

15      A.    Yes, I would have.

16      Q.    Why?

17      A.    Because this case was predicated on

18  physical evidence, escalating violence, as reported by

19  the victim, and lethality factors, that suggested this

20  could easily be a domestic violence homicide.

21      And I felt that we had a legal and ethical

22  responsibility to make an arrest in this case.

23      Q.    And is that why you wanted enhanced bail?

24      A.    Yes.

25      Q.    Did you think enhancing the bail from

126

491902de0f54d55f

1    Q.    Did Captain Cashman tell you he did not

2  want to make the arrest?

3    A.    No.

4    Q.    Was that an option?

5         MS. BAUMGARTNER:  Objection.  Calls for

6  speculation.

7         MR. SCOTT:  Q.  Go ahead.

8    A.    He -- You know, working with Captain

9  Cashman could be quite vocal about certain things.

10        His role in this was administrative, and

11 if he had any opinion as to the arrest, I had never

12 heard it; he never voiced it.

13   Q.    Okay.

14   A.    And no one -- You know, to clarify

15 something:  Nobody wanted to make this arrest.  This is

16 never -- This is never a good thing.

17   Q.    Why was -- To your knowledge, who made the

18 decision to arrest before a warrant was obtained?

19   A.    I ultimately made that decision, in

20 discussion with Deputy Chief Tabak and Captain Keohane.

21   Q.    Well, was it their decision or your

22 decision?

23   A.    It was my decision, supported by them.

24   Q.    What does that mean, "supported by them"?

25   A.    Well, I certainly am not going to make an

177

1    although. . .

2        Q.    So, between --

3        A.    -- separating out the administrative

4    issues, versus the criminal issues, the highest-ranking

5    person there of an investigative nature was Deputy

6    Chief Tabak.

7        Q.    So he was the final decision-maker.

8        A.    In the investigative sense, yes, but he

9    wasn't -- I didn't go to him and ask permission.

10        I went to him to discuss the factors of

11    this case, to see if there were concerns that we

12    hadn't addressed and, in a sense, to involve him in

13    the decision to make the arrest.

14        Q.    So, you essentially told him you planned

15    on making the arrest without a warrant --

16        A.    I supported the arrest, yes.

17        Q.    Well, did you tell him you were going to

18    make an arrest without a warrant, and just as a

19    courtesy, told him, or were you asking for his

20    permission?

21        A.    I was asking for his advice.

22        Q.    And what was his advice?

23        A.    He reviewed the lethality factors, and he

24    supported the idea of making the arrest outside of a

25    warrant.

DEPOSITION OF CAPTAIN MARSHA ASHE

1        Q.    And whose idea was it?

2        A.    Mine.

3        Q.    Okay.  And if it had been his decision to

4 arrest, would he have been the arresting officer?

5        A.    He certainly could have been, although

6 that would have been unlikely.

7        Q.    Well, if it had been his decision, should

8 he have been identified as the arresting officer?

9        MS. BAUMGARTNER:  Objection.  Calls for

10 speculation.  Vague.

11        THE WITNESS:  Again, "arresting officer"

12 is a term that has no clear definition to me.

13        MR. SCOTT:  Okay.  I'm going to mark as

14 Exhibit No. 2 an Incident Report, two pages.  It was

15 Exhibit 4 to Mr. Cook's deposition, and it will be

16 Exhibit 2 to this deposition.

17      (Incident Report marked Plaintiff's

18        Exhibit 2 for identification.)

19        MR. SCOTT:  Q.  Do you recognize this

20 document?

21        A.    (Reviewing the document.)  Yes.

22        Q.    And what is it?

23        A.    It's a San Francisco Police Report.

24        Q.    Have you seen it before today?

25        A.    I don't recall seeing it.  In my review of

180

**DEPOSITION OF CAPTAIN MARSHA ASHE**

STATE OF CALIFORNIA    )    ss.
                        )

## CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 21st day of January, 2008.

*A. Maggi Saunders CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CLIFFORD COOK,                          )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )
                                        )
                                        )   No. C 07 02569 CRB
CITY AND COUNTY OF SAN                  )
FRANCISCO, ANTONIO FLORES, DON          )
SLOAN, MARSHA ASHE, and DOES            )
1-50, inclusive,                        )
                                        )
                Defendants.             )
                                        )
                                        )
_____)


DEPOSITION OF DEPUTY CHIEF KEVIN CASHMAN

March 21, 2008


REPORTED BY:  A. MAGGI SAUNDERS,

              C.S.R. No. 2755

**DISK
ENCLOSED**



**A. Maggi Saunders & Associates**
Certified Shorthand Reporters

57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

1          BE IT REMEMBERED that, pursuant to Notice

2     of Taking Deposition, and continued by Stipulation,

3     and on Friday, the 21st day of March, 2008,

4     commencing at the hour of 12:15 o'clock p.m. thereof,

5     at the SCOTT LAW FIRM, 1375 Sutter Street, Suite 222,

6     San Francisco, California 94109, (415) 561-9600,

7     before me, A. MAGGI SAUNDERS, a Certified Shorthand

8     Reporter in and for the State of California, there

9     personally appeared

10

11          DEPUTY CHIEF KEVIN CASHMAN,

12

13     called as a witness by the Plaintiff CLIFFORD COOK,

14     who, being by me first duly sworn, was thereupon

15     examined and interrogated as hereinafter set forth.

16

17               ---oOo---

18

19          SCOTT LAW FIRM, 1375 Sutter Street, Suite

20     222, San Francisco, California 94109, (415) 561-9600,

21     represented by JOHN HOUSTON SCOTT, ESQ., appeared as

22     counsel on behalf of Plaintiff CLIFFORD COOK.

23

24          DENNIS J. HERRERA, CITY ATTORNEY, OFFICE OF

25     THE CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO,

3



**A. Maggi Saunders & Associates**
**Certified Shorthand Reporters**
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

1 | 1390 Market Street, Sixth Floor, San Francisco,
2 | California 94102, (415) 554-3800, represented by
3 | MARGARET W. BAUMGARTNER, DEPUTY CITY ATTORNEY,
4 | appeared as counsel on behalf of Defendants CITY AND
5 | COUNTY OF SAN FRANCISCO, ET AL..
6
7
8 | ALSO PRESENT WAS CLIFFORD COOK, THE PLAINTIFF.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4

DEPOSITION OF DEPUTY CHIEF KEVIN CASHMAN

1   with probable cause --

2          Q.     Right.

3          A.     -- at any time.  So, anybody with probable

4   cause legally could make the arrest.

5          Q.     Right.  I understand that.

6          A.     That's my answer.

7          Q.     Okay.  So, there was no reason to discuss

8   whether to arrest -- whether it was -- whether

9   Captain -- I'm sorry -- Inspector Cook should be

10  arrested or not at this meeting, correct?

11         A.     Well, I just -- You know, I kind of

12  answered that a few times now:

13                Only that I know a decision was made

14  prior to the arrest.  Whether it was at that meeting,

15  I couldn't definitely say it was at that meeting, or

16  during this ebb-and-flow of people going in and out

17  of Room 400 --

18         Q.     Okay.

19         A.     -- so it -- at some time a decision was

20  made to make the arrest.

21         Q.     Let me ask it in another way.

22         A.     Sure.

23         Q.     At that meeting at 9:30 in the morning,

24  did you hear Captain Ashe say, "I'm going to arrest --

25  I've made a decision to arrest Inspector Cook?

DEPOSITION OF DEPUTY CHIEF KEVIN CASHMAN

STATE OF CALIFORNIA )
                    )    ss.
                    )

<u>CERTIFICATE OF REPORTER</u>

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 2nd day of April, 2008.

*A. Maggi Saunders CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

# EXHIBIT "C"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CLIFFORD COOK,                    )
                                  )
                Plaintiff,        )
                                  )
        vs.                       )
                                  )    No. C-07-02569 CRB
                                  )
CITY AND COUNTY OF SAN            )
FRANCISCO, ANTONIO FLORES, DON    )
SLOAN, MARSHA ASHE, and DOES      )
1-50, inclusive,                  )
                                  )
                Defendants.       )
                                  )
_____   )

DEPOSITION OF LIEUTENANT DON SLOAN

March 17, 2008

REPORTED BY:  A. MAGGI SAUNDERS,

C.S.R. No. 2755



**A. Maggi Saunders & Associates**
**Certified Shorthand Reporters**
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

1          BE IT REMEMBERED that, pursuant to Notice

2    of Taking Deposition, and on Monday, the 17th day of

3    March, 2008, commencing at the hour of 1:00 o'clock

4    p.m. thereof, at the SCOTT LAW FIRM, 1375 Sutter

5    Street, Suite 222, San Francisco, California 94109,

6    (415) 561-9600, before me, A. MAGGI SAUNDERS, a

7    Certified Shorthand Reporter in and for the State of

8    California, there personally appeared

9

10               LIEUTENANT DON SLOAN,

11

12   called as a witness by the Plaintiff CLIFFORD COOK,

13   who, being by me first duly sworn, was thereupon

14   examined and interrogated as hereinafter set forth.

15

16                    ---oOo---

17

18          SCOTT LAW FIRM, 1375 Sutter Street, Suite

19   222, San Francisco, California 94109, (415) 561-9600,

20   represented by JOHN HOUSTON SCOTT, ESQ., appeared as

21   counsel on behalf of Plaintiffs CLIFFORD COOK.

22

23          DENNIS J. HERRERA, CITY ATTORNEY, OFFICE OF

24   THE CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO,

25   1390 Market Street, Sixth Floor, San Francisco,

3

A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue. Mill Valley. California 94941

License No. 2755

(415) 383-6281

1  California 94102, (415) 554-3800, represented by

2  MARGARET W. BAUMGARTNER, DEPUTY CITY ATTORNEY,

3  appeared as counsel on behalf of Defendants CITY AND

4  COUNTY OF SAN FRANCISCO, ET AL..

5

6          LEGAL VIDEOS, LLC, 4340 Redwood Highway,

7  Suite 150, San Rafael, California 94903, (415)

8  459-7672, represented by GABE ABENDROTH, TRIAL

9  TECHNICIAN/VIDEOGRAPHER, appeared to Videotape the

10 proceedings on behalf of THE PLAINTIFF.

11

12 ALSO PRESENT WAS CLIFFORD COOK, THE PLAINTIFF.

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    worked up, was part of the process finding out when the

2    District Attorney was prepared to go to warrant?

3          A.    I don't understand your question.

4          Q.    Well, this workup for a warrant, is this a

5    process that's engaged in between your inspectors and

6    the District Attorney, where at some point a decision

7    was made to go to warrant?

8          A.    Yes.

9          Q.    Okay.  Who makes that decision?

10         A.    The District Attorney.

11         Q.    Okay.  And was it normal policy and

12   practice to wait until the District Attorney was ready

13   to go to warrant before making an arrest?

14         A.    Not always.

15         Q.    Okay.  What would be the exceptions?

16         A.    Immediacy of the case.  The report had

17   come in.  The whereabouts of the subject -- or suspect

18   is known; and I guess timeliness, a case would be -- or

19   the subject would be arrested on a no-warrant basis.

20         Q.    What do you mean by that?

21         A.    Meaning -- I'll use myself for an example:

22                Say, I abused my wife.  And 24 hours

23   later I'm seen walking down the street, and it's a

24   case where the -- the elements of domestic violence

25   are there, a black eye, call it what you will.  An

42

1    Inspector made the arrest.  I felt that the

2    higher-ranking officers involved, or with the unit,

3    should make the arrest, the physical arrest.

4         Q.    And did you take Inspector Cook into

5    custody?

6         A.    Yes.

7         Q.    Do you recall where that occurred?

8         A.    He was sitting in the lobby of the hall,

9    and I recall asking him to come upstairs with me.

10             And then, once we were upstairs, or en

11   route, I don't recall which, I informed Inspector

12   Cook what was transpiring, that he was under arrest.

13        Q.    Did you tell him he was under arrest when

14   you first saw him in the hall?

15        A.    No, I did not.

16        Q.    Okay.  Well, was he under arrest?

17        A.    Yes.

18             MS. BAUMGARTNER:  Objection:  Calls for a

19   legal conclusion.

20             MR. SCOTT:  Q.  Well, I'm just asking for

21   your opinion.

22        A.    In my mind, he was under arrest.

23        Q.    Okay.  Even though you didn't tell him he

24   was under arrest?

25        A.    Correct.

95

```
 1          Q.    Do you recall at any time when Inspector

 2   Cook was in the room that you were asked if you would

 3   interview him before you arrested him?

 4          A.    I don't recall that.

 5          Q.    Okay.  Did you tell people in the room

 6   that, it wouldn't matter what he said, he was going to

 7   be arrested anyway?

 8          A.    I don't recall saying -- making a

 9   statement like that.

10          Q.    Okay.  Is it your testimony you didn't, or

11   you just don't recall?

12          A.    I don't recall making a statement like

13   that.

14          Q.    Okay.  Was there some reason you would not

15   have taken an interview from Inspector Cook before

16   arresting him?

17          A.    Yes.  I felt he should have appropriate

18   legal representation.

19          Q.    Even if he didn't want it?

20          A.    Yes.

21          Q.    All right.  And didn't you assume that

22   most lawyers would tell him not to talk?

23          A.    I did assume that.

24          Q.    Okay.  So you didn't really want to know

25   what he had to say.
```

                                                    101

DEPOSITION OF LIEUTENANT DON SLOAN

```
                    )
STATE OF CALIFORNIA )    ss.
                    )
```

CERTIFICATE OF REPORTER

   I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

   That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

   That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

   That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

   IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 18th day of March, 2008.

*A. Maggi Saunders CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

# EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CLIFFORD COOK,                        )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )
                                      )
                                      )      No. C 07-02569 CRB
                                      )
CITY AND COUNTY OF SAN                )
FRANCISCO, ANTONIO FLORES, DON        )
SLOAN, MARSHA ASHE, and DOES          )
1-50, inclusive,                      )
                                      )
            Defendants.               )
                                      )
_____      )


DEPOSITION OF INSPECTOR ANTONIO FLORES

April 3, 2008


REPORTED BY:  A. MAGGI SAUNDERS,

            C.S.R. No. 2755



**A. Maggi Saunders & Associates**
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

1       BE IT REMEMBERED that, pursuant to Notice

2   of Taking Deposition, and on Thursday, the 3rd day of

3   April, 2008, commencing at the hour of 12:18 o'clock

4   p.m. thereof, at the SCOTT LAW FIRM, 1375 Sutter

5   Street, Suite 222, San Francisco, California 94109,

6   (415) 561-9600, before me, A. MAGGI SAUNDERS, a

7   Certified Shorthand Reporter in and for the State of

8   California, there personally appeared

9

10              INSPECTOR ANTONIO FLORES,

11

12  called as a witness by the Plaintiff CLIFFORD COOK,

13  who, being by me first duly sworn, was thereupon

14  examined and interrogated as hereinafter set forth.

15

16                  ---oOo---

17

18      SCOTT LAW FIRM, 1375 Sutter Street, Suite

19  222, San Francisco, California 94109, (415) 561-9600,

20  represented by JOHN HOUSTON SCOTT, ESQ., appeared as

21  counsel on behalf of Plaintiff CLIFFORD COOK.

22

23      DENNIS J. HERRERA, CITY ATTORNEY, OFFICE OF

24  THE CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO,

25  1390 Market Street, Sixth Floor, San Francisco,

3



**A. Maggi Saunders & Associates**
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

1  California 94102, (415) 554-3800, represented by

2  MARGARET W. BAUMGARTNER, DEPUTY CITY ATTORNEY,

3  appeared as counsel on behalf of Defendants CITY AND

4  COUNTY OF SAN FRANCISCO, ET AL.

5

6  ALSO PRESENT WAS CLIFFORD COOK, THE PLAINTIFF.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

DEPOSITION OF INSPECTOR ANTONIO FLORES

1        So, sometimes the cases could go very

2   fast, or these cases could take a little longer.

3        Q.    All right.

4        And if I understand you correctly, there

5   is essentially two categories of cases when you get

6   them:

7        Either an arrest has been made, or an

8   arrest has not been made, when you get the case.

9        A.    Yes.

10       Q.    Okay.  And approximately over the last

11  seven years what percentage of the cases assigned to

12  you have been cases where the arrest has already been

13  made by the time you get the file?

14       A.    Um, I would say a large majority, maybe

15  about 75 percent of the cases in the year are usually

16  arrest.

17       Q.    And in those approximate 75 percent of the

18  cases where the arrest has been made by the time you

19  get the case, are there sometimes time constraints, in

20  terms of how soon you have to complete your

21  investigation?

22       A.    Yes.

23       Q.    And why is that?

24       A.    There is a day in the week that we don't

25  have the luxury of the 72 hours, that we have to

14

DEPOSITION OF INSPECTOR ANTONIO FLORES

1      A.    Well, that it makes the determination,

2  sometimes the suspect is gone.

3      Q.    Okay.

4      A.    Or the victim has walked in days later,

5  and made reports regarding incidences of violence,

6  and -- or maybe they went to the hospital.

7            And so there are factors, several

8  factors as to why the case is assigned.

9      Q.    Okay.  So the -- this other 25 percent,

10 plus or minus, where an arrest has not been made, but

11 you've gotten a case, it could be for a number of

12 reasons:

13           One reason could be, the complaint was

14 made right away, and the police went to the scene, but

15 the husband, or whoever did the attack, wasn't there,

16 couldn't be found, he skipped.

17           And you have time, because while -- up

18 until the time he gets found and -- or assuming you

19 are going to arrest him -- you have time to take it

20 to the DA, because the 72 hours hasn't started,

21 because the arrest hasn't been made.

22           MS. BAUMGARTNER:  Objection:  Compound.

23           MR. SCOTT:  Q.  Go ahead.  Is that one

24 scenario?

25     A.    Yes and no.

                                                    17

1        Q.    Okay.

2        A.    Because, sometimes, if the person is gone,

3    it may be that there is a likelihood, after looking at

4    the case in a whole, you can say, "We need to find this

5    person, and we need to go get them right now."

6        Q.    Okay.

7        A.    And so, you may just go out, without

8    presenting the case to the DA; and that person is

9    arrested, based on the information that the officers

10   have.

11       Q.    No, I understand that.

12             But what if you can't find the person?

13       A.    Then, we start going through the process

14   of:  If we cannot locate the person, and after the

15   several steps that we try, then, that case was -- will

16   be assigned to a -- or given to the DA, whoever is the

17   head of the Domestic Violence Unit down in the DA's

18   office --

19       Q.    Mm-hmm.

20       A.    -- and then that case is presented to them

21   and you say either, "Can I apply for a warrant or, no";

22   or they'll give you more things to do on the case, and

23   a determination will be made, and you'll try to get a

24   warrant, and then you go through that process.

25       Q.    And why do you try to get a warrant?

18

**DEPOSITION OF INSPECTOR ANTONIO FLORES**

1       A.    Well, in case the individual might have

2   left town.  They might have gone; they might have gone

3   someplace else.  There are several factors of why.

4       Q.    Now, in the other 25 percent, one scenario

5   could be that the victim who is complaining waited days

6   or weeks after the alleged incident to complain about

7   it.

8       A.    Yes.

9       Q.    Okay.  And that's one scenario.

10      A.    Yes.

11      Q.    And Clifford Cook's case would fall within

12  that category.

13      A.    Yes.

14      Q.    And in those cases, what do you usually do

15  to investigate them, before you make an arrest?

16      A.    I like to talk to the victim.

17      Q.    Why is that?

18      A.    Because I want to get the information, the

19  facts of the case, of what's actually going on.

20      Q.    And what else do you want to do?

21      A.    I want to determine if actually the crime

22  has occurred.

23      Q.    Do you want to talk to the suspect?

24      A.    Yes, I do.

25      Q.    Why?

19

**DEPOSITION OF INSPECTOR ANTONIO FLORES**

1    been a delay in somebody making a complaint to you,

2    like in this case, the Cook Case, is there a protocol

3    or a -- procedures you usually follow, as part of your

4    investigation, when you get one of these complaints?

5         A.    Regarding -- Are we focusing strictly on

6    Mr. Cook's case?

7         Q.    Or cases like his, where a spouse has come

8    in a week or so after the alleged assault --

9         A.    Mm-hmm.

10        Q.    -- and made a complaint --

11        A.    Mm-hmm.

12        Q.    -- and you've got the case; an arrest

13   hasn't been made.

14              In those situations -- I assume his isn't

15   the only case where some victim waited about a week

16   plus or minus, and made a complaint, right?

17        A.    Yes.

18        Q.    It's not that unusual, right?

19        A.    No, it's not unusual.

20        Q.    Okay.  Is there a protocol you follow in

21   those cases?

22        A.    Well, if a -- the person was to come off

23   the street and just walk into our office and I had the

24   case and -- or maybe to give you a hypothetical like

25   this is that we'd sit down and we'd start talking about

                                                    24

**DEPOSITION OF INSPECTOR ANTONIO FLORES**

1   the case and get an interview with them.

2              And as the case is going, then I'm going

3   to tell them, "Well, I would like you to do this,

4   this, and this for me."

5              In other words:  Medical release; do you

6   have any additional witnesses; get phone numbers.

7   Have they called you before?  Please save those

8   messages.  Do not change your phone number.

9              You know, then we start talking about,

10  because this person is still out there -- and I kind

11  of make it very clear with them:  With or without

12  their cooperation --

13       Q.    Mm-hmm.

14       A.    -- it's up to the DA's office to go

15  forward with this case.

16       Q.    Well, why do you do that?

17       A.    Well, there are some victims out there

18  that feel that -- that they still have this

19  relationship, and it has to do with love.

20             And within this loving relationship that

21  they have, they don't want to be the bad person.

22             And sometimes they feel that, if they

23  ever go back to the relationship, they can say, "You

24  know, it wasn't me that was pressing charges against

25  you.  It was the State or the Police, or whoever."

                                                    25

### DEPOSITION OF INSPECTOR ANTONIO FLORES

1    Q.    Okay.

2    A.    And -- But, again, if they decide to go in

3  another direction, which we know, that the victim will

4  go back to the batterer, because -- again, because of

5  the relationship:  Long-term; maybe they have financial

6  stuff together; maybe they have children together;

7  maybe they are -- you know, because of a controlling

8  thing that the suspect may have over the victim, or the

9  victim has over the suspect, it could be all these

10  different things.

11          So, at that point, that is why we kind of

12  tell those victims that.  And we know that, down the

13  road, that this is a possibility.

14    Q.    Okay.  And based on your investigation of

15  the Cliff Cook case, did you get information that

16  somehow he was controlling his wife Lisa?

17    A.    There was -- There was --

18          There was some signs that were there.

19    Q.    Was she financially dependent on him?

20    A.    I believe so.

21    Q.    And why do you believe that?

22    A.    Because there were times when, when I

23  would ask her, for instance, she would say that she

24  didn't have any money; or that Mr. Cook wanted her to

25  sign over a Pink Slip to a Mercedes Benz that she was

26

1  domestic violence before a warrant review was done by

2  the District Attorney's Office because it was

3  escalating?  Did somebody tell you that?

4           MS. BAUMGARTNER:  That question is vague.

5  He's testified about the people that he has

6  participated in.

7           MR. SCOTT:  Okay.

8           MS. BAUMGARTNER:  He has not testified

9  generally about the San Francisco Police Department's

10  DVR Unit as a whole.

11           MR. SCOTT:  Let me withdraw the question.

12       Q.    Did you believe these escalating factors

13  that you've referred to was a reason to arrest Mr. Cook

14  before the DA did a warrant review?

15           MS. BAUMGARTNER:  Objection:  Vague.  What

16  do you mean, "was a reason"?  He didn't --

17           MR. SCOTT:  He's the one who volunteered

18  that information.  I asked him why this case was

19  different than the others.

20           MS. BAUMGARTNER:  Are you asking him to

21  continue the answer to that question.

22           MR. SCOTT:  Yeah.  Yeah, if he can.

23           THE WITNESS:  I'm sorry, could you repeat

24  that?

25           MR. SCOTT:  Q.  Yeah.  I'm trying to find

                                                        32

**DEPOSITION OF INSPECTOR ANTONIO FLORES**

1  out if you believe that Mr. Cook should have been

2  arrested before the DA did a warrant review because of

3  these escalating factors you've mentioned?

4          MS. BAUMGARTNER:  So you are asking his

5  opinion --

6          MR. SCOTT:  Yeah --

7          MS. BAUMGARTNER:  -- about whether he

8  should have been arrested?

9          MR. SCOTT:  -- I sure am.

10          MS. BAUMGARTNER:  Objection:  Vague.

11          MR. SCOTT:  Q.  Go ahead.

12      A.    Yes.

13      Q.    Okay.  Why?

14      A.    Because as I stated before:  Because it

15  was getting a little worse.

16      Q.    Okay.  Were they separated?

17      A.    Were they separated?

18      Q.    Yeah, at the time of the arrest of

19  Mr. Cook.

20      A.    At the time of the arrest, no, not that I

21  know of, no.

22      Q.    They were still living together; that was

23  your understanding?

24      A.    Oh.  I thought that you meant --

25          I'm sorry, I thought you meant --

33

DEPOSITION OF INSPECTOR ANTONIO FLORES

1      Q.    Were they living together?

2      A.    I mean, dissolved, that the marriage was

3   dissolved.

4      Q.    No.  Were they living together?

5      A.    Not that I knew of, no.

6      Q.    And his weapons had been taken from him,

7   correct?

8      A.    That's what I was told.

9      Q.    Okay.  And you understood, or it was

10  reported to you, he was suicidal?

11     A.    That's what I was told.

12     Q.    And did -- was one of the escalating

13  factors, or reasons to arrest him is because she

14  reported that he was suicidal?

15     A.    Is -- I'm sorry?

16     Q.    Is that one of the reasons you think he

17  should have been arrested, because of the report that

18  he was suicidal?

19     A.    If you are asking my opinion --

20     Q.    Mm-hmm, I am.

21     A.    -- I think it was the totality of

22  everything.

23     Q.    All right.  Was -- Did you refer him for

24  Fitness For Duty, or some kind of psychiatric

25  evaluation?

34

1    Ashe and Captain Sloan and others that morning before

2    you went to the DA's Office?

3           A.     You mean, Lieutenant Sloan?

4           Q.     Yes, Lieutenant Sloan.

5           A.     He was there.  And I believe Deputy Chief

6    Tabak was there.

7           Q.     Right.

8           A.     Yes.

9           Q.     You were at that meeting?

10          A.     Yes.

11          Q.     And what did you understand to be the

12   purpose of that meeting?

13          A.     It was to brief everybody about what had

14   been going on, or what I had learned up to that point.

15          Q.     Okay.  To your knowledge, were any

16   decisions made at that meeting in terms of whether to

17   arrest Inspector Cook at that time?

18          A.     Not that I can recall.

19          Q.     Okay.  And when you left the meeting, as

20   far as you knew, you were going to investigate the case

21   further, with the assistance of Inspector Ciardella.

22          A.     Yes.

23          Q.     And at that point you anticipated that you

24   would work up the case for a warrant.

25          A.     It was actually at the meeting that I was

                                                        40

DEPOSITION OF INSPECTOR ANTONIO FLORES

1      A.      I believe it was there, and one more time.

2      Q.      And did he tell you why he wanted you to

3  get a bail enhancement?

4      A.      Because of the seriousness of the case.

5      Q.      Those were his words?

6      A.      No.  That's -- I believe that's why he

7  wanted it.

8      Q.      But did he tell you why, or you are just

9  assuming --

10     A.      He ordered me to get a bail enhancement.

11     Q.      Okay.  And did you ask him why?

12     A.      I can't recall if I did or not.

13     Q.      Okay.  Did you think a bail enhancement

14  was warranted in the case?

15     A.      No.

16     Q.      Why not?

17     A.      Well, I believed, I thought, if they were

18  going to arrest him, there would be several charges

19  there, which would have made the bail high, if they

20  were going to arrest.

21     Q.      Did you think he was a flight risk?

22     A.      No.

23     Q.      Did you think, by enhancing the bail, it

24  was going to be more difficult for him to bail out?

25     A.      Yes.

44

1    Q.    Okay.  You didn't think he would be able

2  to make the bail?

3    A.    Honestly, I don't know.

4    Q.    And did you believe, or was it your

5  impression, from your conversation with Lieutenant

6  Sloan, that he wanted to make the bail high, so

7  Mr. Cook wouldn't be able to bail out?

8    A.    I believe so.

9    Q.    Okay.  And did you understand, a Police

10  Officer being in custody in a jail, can be

11  life-threatening?

12    A.    I know that.

13    Q.    You know that.

14    A.    Yes.

15    Q.    Okay.  And did you discuss that with

16  Lieutenant Sloan that, if Inspector Cook wasn't able to

17  bail out, it could be life-threatening?

18    A.    Well, seeing that, you know, in past

19  practices of the Jail, that he would be isolated from

20  anybody else in general population.  That's what I do

21  know, so; but I never had that conversation with

22  Lieutenant Sloan.

23    Q.    Did -- Well, how long did the meeting with

24  Ms. Aguilar-Tarchi last after it was interrupted by

25  Lieutenant Sloan?

45

DEPOSITION OF INSPECTOR ANTONIO FLORES

1    A.    Probably less than five minutes.

2    Q.    And what do you recall about those

3 minutes, those less-than-five minutes, what was

4 discussed?

5    A.    I think she had the same look as we had.

6    Q.    Which was?

7    A.    You know, shock;

8         And she handed back the documents that I

9 had given her, and it was to the effect of, "Come

10 back when it's done for the rebooking."

11    Q.    And what did that -- What did you

12 understand that to mean, "when it's done"?

13    A.    Well, now that he had -- Mr. Cook had been

14 arrested.

15    Q.    The 72 hours are running?

16    A.    We are now in a predicament, that now we

17 have to gather all our documents;

18         We have a police report to write;

19         We have a bail enhancement to do;

20         We have to get enough information

21 documented on the Chronological Investigation Report;

22         So, it means we're going fast.

23    Q.    And it compromised your ability to do an

24 investigation in 72 hours, didn't it?

25    A.    Yes.

**DEPOSITION OF INSPECTOR ANTONIO FLORES**

1        Q.    Did anyone ever suggest to you that this

2    case was treated differently because Inspector Cook was

3    a black man married to a white woman?

4        A.    No.

5        Q.    Did you ever think that?

6        A.    No.

7        Q.    Why do you think this case was treated

8    differently than others?

9              MS. BAUMGARTNER:  Objection.  Calls --

10   Based on facts not in evidence, necessarily, that this

11   case was treated differently, but go ahead.

12             THE WITNESS:  I don't think his case is

13   different from other cases.

14             I mean, if you took minus him being a

15   police officer, there is several incidences where

16   someone has been arrested later on, after the fact

17   the incident has occurred.

18             MR. SCOTT:  Q.  Right.  And plenty where

19   it went to a warrant workup --

20       A.    Yes.

21       Q.    -- right?

22       A.    Yes.

23       Q.    Now, I'm not suggesting he's the only

24   person in the history of the San Francisco Police

25   Department who was arrested before a warrant workup;

DEPOSITION OF INSPECTOR ANTONIO FLORES

STATE OF CALIFORNIA )
                   )    ss.
                   )

## CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 5th day of April, 2008.

*A. Maggi Saunders CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

CLIFFORD COOK,                    )
                                  )
            Plaintiff,            )
                                  )
      vs.                         )
                                  )
                                  )    No. C-07-02569 CRB
CITY AND COUNTY OF SAN            )
FRANCISCO, ANTONIO FLORES, DON    )
SLOAN, MARSHA ASHE, and DOES      )
1-50, inclusive,                  )
                                  )
            Defendants.           )
                                  )
                                  )
_____      )


DEPOSITION OF ELIZABETH AGUILAR-TARCHI

March 21, 2008


REPORTED BY:  A. MAGGI SAUNDERS,

            C.S.R. No. 2755

**DISK
ENCLOSED**



**A. Maggi Saunders & Associates**
**Certified Shorthand Reporters**
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281

1          BE IT REMEMBERED that, pursuant to Notice

2   of Taking Deposition, and on Friday, the 21st day of

3   March, 2008, commencing at the hour of 10:00 o'clock

4   a.m. thereof, at the SCOTT LAW FIRM, 1375 Sutter

5   Street, Suite 222, San Francisco, California 94109,

6   (415) 561-9600, before me, A. MAGGI SAUNDERS, a

7   Certified Shorthand Reporter in and for the State of

8   California, there personally appeared

9

10          ELIZABETH AGUILAR-TARCHI,

11

12   called as a witness by the Plaintiff CLIFFORD COOK,

13   who, being by me first duly sworn, was thereupon

14   examined and interrogated as hereinafter set forth.

15

16               ---oOo---

17

18          SCOTT LAW FIRM, 1375 Sutter Street, Suite

19   222, San Francisco, California 94109, (415) 561-9600,

20   represented by JOHN HOUSTON SCOTT, ESQ., appeared as

21   counsel on behalf of Plaintiff CLIFFORD COOK.

22

23          DENNIS J. HERRERA, CITY ATTORNEY, OFFICE OF

24   THE CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO,

25   1390 Market Street, Sixth Floor, San Francisco,

                                                        3



1  California 94102, (415) 554-3800, represented by

2  MARGARET W. BAUMGARTNER, DEPUTY CITY ATTORNEY,

3  appeared as counsel on behalf of Defendants .

4

5  ALSO PRESENT WAS CLIFFORD COOK, THE PLAINTIFF.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

**A. Maggi Saunders & Associates**
**Certified Shorthand Reporters**
57 Plymouth Avenue. Mill Valley, California 94941

License No. 2755

(415) 383-6281

1        Q.    Okay.  And did they -- Did they tell you

2   that they wanted you to review the case for any

3   particular purpose?

4        A.    No; because, again, it wasn't a rebooking.

5              I don't think we ever got that far

6   because, as I said, the meeting was brief.

7              But, obviously, their purpose must have

8   been to tell me, "We have a situation.  What might be

9   needed by your office?  What might you look at,"

10  based on my experience.

11       Q.    So, based on your experience, was it your

12  understanding they were there to either find out if you

13  thought there was enough to charge the case, or whether

14  it should be worked-up for a warrant?

15       A.    No.  It was neither a warrant workup --

16  that's a very different precise -- because they would

17  come down with a packet --

18       Q.    Okay.

19       A.    -- and I would have a formal memo that I

20  would prepare to say, "Oh, it's a warrant review."

21             It was not that; I definitely I know it

22  wasn't that.

23             And it was not a rebooking, i.e., there

24  was no one under arrest, that would trigger me

25  filling out a particular form, to make a decision

12

DEPOSITION OF ELIZABETH AGUILAR-TARCHI

1    that day.

2           Q.      Okay.

3           A.      It was an informal discussion.

4           Q.      Okay.  And when --

5                   Did they provide you with enough

6    information, that you felt that there was enough to

7    have the case charged?

8           A.      I don't think we got that far.

9                   I remember it being very brief;

10   mentioning that it was a member of the SFPD; and that

11   there had been a domestic violence incident.

12                  And I remembered -- The door was closed,

13   someone knocking, and that someone was Lieutenant,

14   stating "Inspector -- Oh, there has been an arrest, you

15   don't have to have any discussion."

16                  And I just -- I paused.  That was it.

17          Q.      And why did that mean there didn't have to

18   be a discussion?

19          A.      Because, if there has been an arrest, they

20   are going to bring me a case later for review.

21                  I wasn't formally making a decision.  It

22   was an informal, casual, I guess, they are telling

23   him, "We have the case," or "We have -- We're

24   handling the situation."

25          Q.      Okay.  And when is the next time you had

                                                          13

DEPOSITION OF ELIZABETH AGUILAR-TARCHI

STATE OF CALIFORNIA  )
                     )      ss.
                     )

### CERTIFICATE OF REPORTER

I, A. MAGGI SAUNDERS, a Certified Shorthand Reporter in and for the State of California, duly appointed and licensed to administer oaths and so forth, do hereby certify:

That the witness named in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth;

That the deposition was reported by me, a Certified Shorthand Reporter and disinterested person, and thereafter transcribed into typewriting under my direction;

That if the deposition has not been signed by the time of trial, a reasonable opportunity having been given the witness to do so, signature has been waived in accordance with stipulation between counsel.

IN WITNESS WHEREOF, I have hereunto set my hand and subscribed my signature this 31st day of March, 2008.

*A. Maggi Saunders, CSR*

A. MAGGI SAUNDERS, C.S.R. No. 2755,
Certified Shorthand Reporter,
In and For the State of California

A. Maggi Saunders & Associates
Certified Shorthand Reporters
57 Plymouth Avenue, Mill Valley, California 94941

License No. 2755

(415) 383-6281